## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: The Honorable Gary S. Katzmann, Judge**

| | |
|---|---|
| FUJIAN YINFENG IMP & EXP TRADING CO., LTD. | ) |
| Plaintiff, | ) |
| v. | ) Court No. 21-00087 |
| UNITED STATES, | ) |
| Defendant. | ) |

### PLAINTIFF'S RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION

### FOR JUDGMENT UPON THE AGENCY RECORD

Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*

Dated: July 23, 2021

# TABLE OF CONTENTS

I.    RULE 56.2 STATEMENT ................................................................................ 1

      A.   Administrative Determination Subject to Appeal ......................... 1

      B.   Issues Presented ................................................................................ 1

II.   Standard of Review ..................................................................................... 2

III.  ARGUMENT ................................................................................................. 4

      A.   The Department's Surrogate Value Selection for Sawnwood is Not
           Supported by Substantial Evidence ................................................ 6

      B.   The Department's Surrogate Financial Statement Selection is Not
           Supported by Substantial Evidence .............................................. 13

      C.   The Department's Selection of Brazil as the Primary Surrogate Country is
           Not Supported by Substantial Evidence ...................................... 24

           1.   Malaysia Reports Import Values on the Department's Preferred CIF
                Basis ........................................................................................ 26

           2.   Malaysia Sources the Best Available Information to Value Other
                Inputs ...................................................................................... 29

IV.   Conclusion and Prayer for Relief ............................................................ 32

## TABLE OF AUTHORITIES

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 882 F. Supp. 2d 1366 (Ct. Int'l Trade Nov. 30, 2012) ..............................................................................................................12

*Allied Pac. Food (Dalian) Co. v. United States*, 435 F. Supp. 2d 1295 (2006)..............................3

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984).............................................2

*Citic Trading Co. v. United States*, 27 C.I.T. 356 (Ct. Int'l Trade 2003). ...................................2-3

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003).............................................5

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197 (1938) ...................................................2

*Diversified Products Corp. v. United States*, 572 F. Supp. 883 (Ct. Int'l Trade 1983)...................2

*Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262 (CIT 2006)............................................3

*Guandong Chemicals Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365 (CIT 2006) ......3

*Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323 (2006).................................................3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29  (1983).......................4

*NTSF Seafoods Joint Stock Co. v. United States*, 487 F. Supp. 3d 1310 (Ct. Int'l Trade 2020) ...14

*Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) .............12

*Shenzhen Xinboda Indus. Co. v. United States*, 976 F. Supp. 2d 1333 (Ct. Int'l Trade 2014)......14

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)......................................................4

*SNR Roulements v. United States*, 402 F.3d 1358 (Fed Cir. 2005)..................................................2

*Taian Ziyang Food Co. v. United States*, 637 F. Supp. 2d 1093 (Ct. Int'l Trade 2009)...............12

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ................................................................2

**Statutes & Regulations**

19 U.S.C. § 1516a(b)(1)(B) .............................................................................................................2

**Administrative Decisions**

*Certain Activated Carbon From the People's Republic of China; 2010-2011; Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 67,337 (Dep't Comm. Nov. 9, 2012)...25

*Certain Activated Carbon from China* Remand Results, CIT 16-185 (June 17, 2019)................29

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of the Second Administrative Review*, 72 Fed. Reg. 13,242 (March 2007) ..............................................15

*Certain Steel Nails From the People's Republic of China: Final Results of the Fourth Antidumping Duty Administrative Review*, 79 Fed. Reg. 19,316 (April 2014) ...........................15

*Certain Steel Threaded Rod Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 83,800 (November 22, 2016)....................................................................12, 25

*Certain Hardwood Plywood Products from the People's Republic of China; 2017-2018; Preliminary Results of Antidumping Duty Administrative Review*, 85 Fed. Reg. 7,270 (February 7, 2020) ......................................................................................................................25

*Certain Steel Racks and Parts Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value* (July 17, 2019) .................................29

*Chlorinated Isocyanurates Preliminary Results of Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments; 2018-2019*, 85 Fed. Reg. 67,709 (October 26, 2020) ....................................................................................................................................21

*Circular Welded Carbon-Quality Steel Pipe Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 75,042 (October 28, 2016) ..........................................................................34

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 62275 (October 2, 2020) ..................................................................................19, 24

*Folding Metal Tables and Chairs From the People's Republic of China: Final Results of 2007-2008 Deferred Antidumping Duty Administrative Review and Final Results of 2008-2009 Antidumping Duty Administrative Review*, 76 Fed. Reg. 2,883-03 (Jan. 18, 2011) ............15

*Hardwood and Decorative Plywood from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 58,273 (Dep't Comm. Sept. 23, 2013) .....................................................................................................................................22

*Steel Wire Garment Hangers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2010-2011*, 78 Fed. Reg. 28,803 (May 16, 2013)..................................................................................................................26

*Wooden Bedroom Furniture From the People's Republic of China: Final Results and Final Rescission in Part*, 76 Fed. Reg. 49,729 (Aug. 11, 2011), ...........................................27

**Other Authorities**

*Notice of Proposed Rulemaking and Request for Public Comments: Antidumping Duties; Countervailing Duties*, 61 FR 7308 (February 27, 1996)............................................23

## I.   RULE 56.2 STATEMENT

Pursuant to Rule 56.2 (c)(1), Plaintiff Fujian Yinfeng Imp & Exp Trading Co., Ltd., ("Yinfeng" or "Plaintiff") hereby states the administrative decision subject to appeal and the issues of law presented:

### A.  Administrative Determinations Subject to Appeal

The U.S. Department of Commerce (the "Department") published its contested final determination in the Federal Register on January 4, 2021 and the Antidumping Order on February 16, 2021.  *Wood Mouldings and Millwork Products From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order*, 86 FR 9,486 (February 16, 2021*); see also Wood Mouldings and Millwork Products from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 63 (January 4, 2021) *incorporating* Issues & Decision Memorandum ("IDM").

### B.  Issues Presented

1.      Issue One: Whether the Department's surrogate value selection for birch and poplar sawnwood as the best available information was supported by substantial evidence?

2.      Issue Two:  Whether the Department's surrogate value selection for the financial ratios as the best available information was supported by substantial evidence?

3.      Issue Three: Whether the Department's selection of Brazil as the primary surrogate country was supported by substantial evidence?

## II.    Standards of Review

This Court "shall hold unlawful any determination . . . found . . . to be unsupported by substantial evidence on the record or otherwise not in accordance with law.[1]

"[S]ubstantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[2]  Furthermore, "substantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence."[3]  Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [its] view.'"[4]

In cases involving non-market-economy ("NME") countries, although "the standard of review precludes the court from determining whether Department's choice of surrogate value was the best available on an absolute scale, the court may determine the reasonableness of Commerce's selection of surrogate prices."[5]  While the statute "'grants to Commerce broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis.' . . . [t]his discretion . . . is constrained by the underlying objective of [19 U.S.C. § 1677b(c)]; to obtain the most accurate dumping margins possible."[6]  "'This objective is achieved

---

[1] 19 U.S.C. § 1516a(b)(1)(B)(i); *accord SNR Roulements v. United States*, 402 F.3d 1358, 1361 (Fed Cir. 2005).
[2] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (*quoting Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938)).
[3] *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).
[4] *Diversified Products Corp. v. United States*, 572 F. Supp. 883, 888 (1983) (*quoting Universal Camera*, 340 U.S. at 488).
[5] *Citic Trading Co. v. United States*, 27 C.I.T. 356, 366 (Ct. Int'l Trade 2003).
[6] *Citic Trading Co. v. United States*, 27 C.I.T. 356, 365 (Ct. Int'l Trade 2003) n.12 (citations omitted).

only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents.'"[7]

The courts have elaborated on the meaning of "best available" in the NME normal value statute. The *Dorbest* court wrote a seminal opinion summarizing the law:

> The term "best available" is one of comparison, i.e., the statute requires Commerce to select, from the information before it the best data for calculating an accurate dumping margin. The term "best" means "excelling all others." II Oxford English Dictionary 139 (2d 1989); Webster's II new Riverside University Dictionary 168 (1988) ("{e}xceeding all others in excellence, achievement, or quality"). This "best" choice is ascertained by examining and comparing the advantages and disadvantages of using certain data as opposed to other data.

*Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262, 1268 (CIT 2006) ("*Dorbest*"), *citing Guandong Chemicals Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365 (CIT 2006). The *Dorbest* Court thus concluded that "{o}n factual issues, the court's role 'is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'" *Dorbest* at 1269, *citing Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1327 (2006) (add'l citations omitted).

According to *Dorbest*, "Commerce needs to justify its selection of data with a reasoned explanation." *Dorbest* at 1269 (citation omitted). The *Dorbest* Court further cautioned that {i}n doing so, Commerce must 'conduct a fair comparison of the data sets on the record' with regard to its announced method or criteria." *Id*., citing *Allied Pac. Food (Dalian) Co. v. United States*, 435 F. Supp. 2d 1295, 1313-14 (2006). Finally, *Dorbest* warned: "Commerce's findings or conclusions rendered in equations or numeric form are not beyond scrutiny." *Id*.

---

[7] *Id.* (citations omitted).

### III.    ARGUMENT

The Department relied upon Brazil as the primary surrogate country in this investigation. This determination was primarily based on two unfounded findings by the Department 1) that the Brazilian sawnwood HTS were equally specific to the Malaysian sawnwood HTS and 2) that the Brazilian financial statements were more comparable than the Malaysian financial statements. Yinfeng challenges each of these determinations separately as well as the overall country selection related to the Department's findings for these two issues.

As an initial matter, Yinfeng also notes a procedural unfairness in this proceeding.  While the Department ultimately did consider all surrogate value submissions in its Final Determination, the Department refused to consider a significant amount of the record in its Preliminary Determination.  This was contrary to long-standing consistent practice, and deprived Yinfeng of the opportunity of addressing in its case brief the Department's determination based on the complete record.  The errors the Department made in its Final Determination with respect to the Malaysian record may have been resolved if the Department had addressed those aspects of the record in its Preliminary Determination.

In its Preliminary Determination, the Department stated it would only consider the initial surrogate value submissions at this time, ignoring critical later filed, but still timely submitted, surrogate value information.  While the Department's surrogate value letter may suggest that the Department may only consider the initial surrogate value submission in the Preliminary Determination, that is not the Department's established practice.  The Department has a consistent practice of considering the entire surrogate record, including the information in the final surrogate value submissions timely submitted 30 days before the expected Preliminary Determination.  *See*, *e.g.*, *Wooden Cabinets and Vanities and Components Thereof Preliminary*

*Affirmative Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 54,106 (October 9, 2019) and accompanying Prelim. IDM at 3 (discussing that parties submitted final surrogate value submissions) and 13-14 (discussing and relying upon financials and other surrogate values submitted in the final surrogate value submissions); *Refillable Stainless Steel Kegs Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, Postponement of Final Determination, and Extension of Provisional Measures*, 84 Fed. Reg. 25,745 (June 4, 2019) and accompanying Prelim. IDM at 4 (discussing that parties submitted final surrogate value submissions) and 27-28 (discussing and relying upon financials and other surrogate values submitted in the final surrogate value submissions).  Accordingly, it was arbitrary to not consider the final surrogate value submissions without providing notice to the parties of a change in practice.  *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003) (Commerce acts arbitrarily and capriciously when it "consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for the change in practice.).

The parties, but Plaintiff in particular, were disadvantaged by not having the benefit of a Preliminary Determination based upon the full surrogate record before them for briefing. Notably, the initial surrogate value deadline and rebuttal information the Department did consider in the Preliminary Determination was filed only 20 days (initial deadline June 17, 2020) and 7 days (rebuttal deadline June 29, 2020) before the July 6, 2020 final surrogate value deadline information the Department refused to consider.  The surrogate value and surrogate country determinations are complex factual considerations and any potential issues that the Department may have raised concerning the full record or final surrogate value submissions were not considered and thus were not easily redressed in the concluding phase of this investigation as

a result.  Yinfeng was left to only try to predict the Department's consideration of the full surrogate record in its case brief.  Indeed, Yinfeng submits that the critical factual errors made by the Department with respect to the Malaysian record would have been made evident and addressed if the Department had considered the entire record in the preliminary determination according to its consistent practice.  While ultimately in the Final Determination the Department considered the entire record (albeit with errors of fact), Yinfeng submits that it was prejudiced by this procedural anomaly that significantly contributed to the Department's reliance on Brazil and the overstating of Yinfeng's margin.

> **A.    The Department's Surrogate Value Selection for Sawnwood is Not Supported by Substantial Evidence.**

Yinfeng's primary raw materials to produce subject merchandise are radiata pine sawnwood and fir sawnwood, which represented the significant and main cost components in the subject merchandise.  *See* Yinfeng Section D generally and Exhibit D-9 cost reconciliation. (April 21, 2020) CD199 PD303.  Specifically, Yinfeng reported consuming radiata pine sawnwood of a thickness exceeding 6 mm, <u>sawn lengthwise</u>.  Yinfeng provided full input product descriptions and pictures to show that its pine sawnwood was sawn lengthwise.  *See* Yinfeng First supplemental Part II at section D.1, and at Exhibit SQ1-34 and Exhibit SQ1-35 (July 7, 2020) CD425-428 PD511.  Likewise, Yinfeng reported consuming fir sawnwood of a thickness exceeding 6mm, <u>sawn lengthwise</u> and also provided pictures demonstrating this feature of this important raw material input. *See id.*

The Department selected Brazil as the primary surrogate country and relied upon Brazilian import statistics for these inputs.  Specifically, the Department relied upon Brazilian HTS 4407.11.00 and HTS 4407.12.00.  Yinfeng argued the Department should rely upon Malaysian imports under the Malaysian HTS 4407.11.00.10 and HTS 4407.12.00.10 because

they were specific to wood sawn lengthwise, unlike the Brazilian options.  The Department

justified its selection of the Brazilian HTS:

> We note that the six-digit HTS subheadings in Commerce's preliminary
> determination SV spreadsheet were abbreviated because the seventh and
> eighth digits were both zero based on the Brazilian HTS information also provided in the
> petitioner's SV submission. For example, if the Brazilian HTS subheading number
> reflected in Commerce's SV summary chart was 440711, the actual unabbreviated
> HTS subheading number was 44071100. Therefore, as the Brazilian HTS
> subheadings also extend to eight digits, we find them to be just as specific as the
> Malaysian HTS subheadings in this regard. Moreover, the descriptions for the
> Brazilian HTS subheading numbers are just as detailed as the descriptions for the
> Malaysian HTS subheading numbers, at the eight or 10-digit level, whichever
> appropriate.  For example, for both pine sawnwood and fir sawnwood, the eight-
> digit Brazilian HTS subheading numbers for these two major inputs clearly note
> the wood species of each input being also sawn lengthwise, whether or not planned,
> sanded, or end jointed of a thickness greater than six millimeters.  Similarly, the
> Malaysian HTS notes the same inputs at the same specificity at the 10-digit level.

Final IDM at 20.  However, this explanation contains three mistakes of fact.

First, in fact, the Department did rely upon the 6-digit HTS 4407.11 and 4407.12, and

not the eight-digit HTS as the Department wrongly claims.  The final surrogate value

underlying excel calculation sheets clearly shows only the 6-digit HTS.  PD662-663.  There

are no hidden "00".  The Department relied on other HTS that similar had only "00" for the

7th and 8th digit, and those "00" are shown in the excel calculations sheets for these other HTS.

For example, HTS 4808.10.00 & 4821.10.00 are fully shown with all eight digits in the data,

but HTS 4407.11 and 4407.12 are again only shown at the 6-digit level.

Nonetheless, there is actually no distinction between the 6-digit and 8-digit level of an

HTS when the 7th and 8th digit are "00."  This is the second fact that the Department was

utterly incorrect about, stating that "as the Brazilian HTS subheadings also extend to eight

digits, we find them to be just as specific as the Malaysian HTS subheadings in this regard."

Final IDM at 20.  The addition of "00" at the end of the HTS entails that the country has no

more specific delineated HTS (i.e. there are no "10" or "99" ending HTS—no 4407.11.10 or

4407.11.99, for example).  *See* Pet. Prelim. SVs (June 17, 2020) at Exhibit 2 (where petitioner

downloaded all more specific HTS under 4407.11 and 4407.12, and there was only

4407.11.00 and 4407.12.00) PD415.  The Department is also fully aware of this based upon

their vast experience with HTS schedules.  Therefore, the 6-digit and 8-digit Brazil HTS for

4407.12 and 4407.11 are in fact the same.

      Petitioner acknowledged this reality, providing the 6-digit HTS definition as the

definition of the 8-digit HTS.  *See* Pet. Rebuttal Br. at 9; PD641.  The harmonized tariff

schedule ("HTS") is harmonized at the 6-digit level across all countries.  More specific HTS

after this, i.e. 8-digit or 10-digit HTS, are decided by each individual country.  Indeed, for this

reason, there is no specific Brazilian definition for 4407.11, 4407.12, 4407.11.00, or

4407.12.00 on the record.  The Brazilian HTS whether 4407.11 or 4407.11.00, or 4407.12. or

440712.00, has the same harmonized definition as the 6-digit HTS in all countries.

4407.11.00, or 4407.12.00 is not as specific as the Malaysian HTS, which are in fact unique

Malaysian-defined more specific 10-digit HTS, 4407.11.00.<u>10</u> and HTS 4407.12.00.<u>10</u>.  The

Department was incorrect to say the Brazil HTS at the 8-digit level is *as specific* as the

Malaysian 10-digit HTS.  This fact is most obvious when examining the actual definition of

these HTS.

      The third critical error the Department made in the Final Determination was to state

that the Brazil HTS and Malaysian HTS were both specific to "sawn lengthwise."  Final IDM

at 20.  The eight-digit[8] Brazilian HTS does not offer the same specificity as the ten-digit

---

[8] To be clear, the Malaysian HTS is not more specific merely because it is 10-digit and the Brazil HTS is
8-digit.  As explained above, the harmonized tariff schedule is harmonized at the 6-digit level across all
countries.  After that, each country makes its own determination of how many more specific delineated

Malaysian HTS.  The Brazilian HTS is <u>not</u> specific only to wood "sawn lengthwise."  The HTS submitted by petitioner and relied upon by the Department indicate that the wood covered includes **sawn <u>or</u> chipped lengthwise, <u>or</u> sliced <u>or</u> peeled woods**.  Petitioner submitted Brazilian HTS 4407.11.00 and 4407.12.00.  *See* Pet. Prelim. SVs at Exhibit 1&2 PD415.  Petitioner provided the following definition of these HTS as excerpted from the Brazil tariff schedule:

| | |
|---|---|
| 4407 | Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness exceeding 6 mm. |
| 440711 | Pine "Pinus spp." sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness of > 6 mm |
| 440712 | Fir "Abies spp." and spruce "Picea spp." sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness of > 6 mm |

*Id*. at Exhibit 2.  Even in petitioner's case brief, petitioner cited to this same exhibit and page and said the 8-digit HTS covers:

> Pine `Pinus spp.' sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness of > 6 mm

Pet. Rebuttal Brief at 9 (citing to petitioner's SV submission at Exhibit 2, page 20)[9] PD641.  The record unequivocally establishes that the Brazilian HTS covers wood sawn lengthwise, chipped lengthwise, sliced, or peeled.

The Department itself even downloaded the Brazilian import data in the preliminary and final determinations, providing an abbreviated definition of the full definition above provided by petitioner that again makes evident that these HTS cover wood that is sawn or chipped, rather than only sawn lengthwise:

---

HTS to provide and how many digits to use.  Some countries use 8-digit while others use 10-digit or 11-digit HTS as their most specific HTS available.  In Brazil, 8-digit HTS are the most specific while in Malaysia 10-digit HTS are the most specific.  Yinfeng is not arguing that 10-digit HTS are always more specific than 8-digit HTS.  Rather, for these specific HTS the Malaysian 10-digit HTS is definitely more detailed than than the Brazil 8-digit (which as explained above, is only the same specificity as the 6-digit HTS).

[9] While petitioner correctly quoted the applicable HTS definition, petitioner's statement that the Brazilian definition is the same as the Malaysian definition is patently untrue.  Pet. Rebuttal Brief at 8-9.

| 440711 | Pine Wood Sawn/Chipped Lngtw, Thickness Gt 6Mm |
| 440712 | Fir Wood Sawn/Chipped, Thickness Exceeding 6Mm |

*See* Final SV Memo at Excel Attachment tab "SV" PD662-663; *see also* Prelim. SV Memo at Excel Attachment tab "SV" PD553-557.  Accordingly, it is definitive on the record that the HTS relied upon by the Department in Brazil for fir and pine sawnwood covers more than only wood that is sawn lengthwise, i.e., includes also wood that would have been "chipped…sliced or peeled" rather than sawn lengthwise.  Slicing and peeling is further processing that Yinfeng's purchases have not undergone.  Indeed, Yinfeng further processes its own sawnwood.  *See* Yinfeng Section D response at Exhibit D-3 (production flowchart) CD199 PD303.

However, the Malaysian HTS on the record is specific to wood that is **sawn lengthwise only**.  The Malaysian tariff schedule is divided into more specific HTS:

| 44.07 | | Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness exceeding 6 mm. | |
|---|---|---|---|
| | | - Coniferous: | |
| | 4407.11.00 | - - Of pine (*Pinus spp.*): | |
| | 4407.11.00 10 | - - - Sawn lengthwise | m³ |
| | 4407.11.00 20 | - - - Sliced or peeled | m³ |
| | 4407.11.00 90 | - - - Other | m³ |
| | 4407.12.00 | - - Of fir (*Abies spp.*) and spruce (*Picea spp.*): | |
| | 4407.12.00 10 | - - - Sawn lengthwise | m³ |
| | 4407.12.00 20 | - - - Sliced or peeled | m³ |
| | 4407.12.00 90 | - - - Other | m³ |
| | 4407.19.00 | - - Other: | |
| | 4407.19.00 10 | - - - Sawn lengthwise | m³ |
| | 4407.19.00 20 | - - - Sliced or peeled | m³ |
| | 4407.19.00 90 | - - - Other | m³ |

Resp. Final SVs (July 6, 2020) at Exhibit SV2-21 PD490-507.

Malaysia provides HTS 4407.11.00.10, which precisely covers this input, sawnwood "of a thickness exceeding 6 mm. Coniferous: Of pine (Pinus spp.): <u>Sawn lengthwise</u>." *See* Resp. Final SVs at Exhibit SV2-1 PD490-507.  Malaysia further provides HTS 4407.12.00.10, which precisely covers this input, sawnwood "of a thickness exceed 6 mm. Coniferous: Of fir (Abies spp.) and spruce (Picea spp.): <u>Sawn lengthwise</u>." *Id*.  As seen, these Malaysian HTS only include sawn lengthwise and specifically *exclude* sliced or peeled and other (i.e. other than sawn lengthwise, peeled, or sliced- this HTS would include chipped lengthwise, for example) woods that fall into other 10-digit categories.  The Malaysian tariff schedule is definitely and unquestionably more detailed with respect to these key inputs in question.  In contrast, Brazil offers only one HTS that includes sawn lengthwise, chipped lengthwise, sliced, and peeled wood *all together* in one HTS category.  In sum, these different types of wood cuts that are less specific to that consumed by Yinfeng are included in the Brazilian HTS but are excluded in the more specific Malaysian HTS.

Therefore, the Department's statement that the Brazilian HTS covers only sawn lengthwise wood is definitively incorrect and unsupported by substantial evidence.  Likewise, the Department's statement that the Malaysian HTS and Brazilian HTS "note{} the same inputs at the same specificity" is also so obviously flawed it would amount to a clerical error.  Yinfeng even raised this again in a ministerial error comment, but the Department improperly dismissed this error as not clerical in nature.  *See* Yinfeng Ministerial Error Comments (January 5, 2021) PD668; Dep't Ministerial Error Memo (January 11, 2021) PD674.

The Brazilian HTS and Malaysian HTS do not cover the same inputs or the same specificity.  The Malaysian HTS is specific to sawn lengthwise only. The Brazilian HTS includes a larger less specific basket category of other wood cuts.  The Brazilian HTS is less

specific generally, and likewise less specific to Yinfeng's inputs, as Yinfeng consumes wood

that is sawn lengthwise only for these two key raw material inputs to wood moulding.

The Department prefers specificity as a matter of longstanding surrogate value policy,

particularly for the primary raw material.  While the Department considers several factors in

its analysis, specificity is clearly the most critical component.  The Court has upheld this

principle, finding "in sum, 'product specificity' logically must be the primary consideration in

determining 'best available information.' If a set of data is not sufficiently 'product specific,'

it is of no relevance whether or not the data satisfy the other criteria set forth in Policy

Bulletin 04.1."  *See Taian Ziyang Food Co. v. United States*, 783 F. Supp. 2d 1292, 1330 (Ct.

Int'l Trade 2011), *see also Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378,

1386 (Fed. Cir. 2014) (surrogate value selection justified where Commerce treated product-

specificity as "more important factor" than other criteria); *Ad Hoc Shrimp Trade Action

Comm. v. United States*, 618 F.3d 1316, 1320 (Fed. Cir. 2010) (affirming selection of

"product-specific data" as "best available information"); *see also Certain Steel Threaded Rod

Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 83,800

(November 22, 2016) and accompanying IDM at 8 (Relying on Bulgaria as the primary

surrogate country because it has greater specificity for diameter of the steel inputs).

The Court should order the Department to correct its erroneous conclusions and treat

the Malaysian sawnwood HTS as the most specific surrogate values for Yinfeng's inputs at

issue.  And the Court should direct the Department to follow its well-established preference

for specificity and determine that Malaysia sources the best available surrogate value

information for Yinfeng's inputs as a result. For this reason alone, the Department should

select Malaysia as the primary surrogate country, because Brazil does not provide anywhere

near as much specificity on the most important wood inputs consumed by the respondents to

produce subject merchandise.  Malaysia also has further advantages as a surrogate country, as

explained below.

> **B.** **The Department's Surrogate Financial Statement Selection is Not Supported by Substantial Evidence.**

The Department relied upon two Brazilian surrogate financial statements: Adami and

Duratex. Final IDM at 22.  The record contained six Malaysian financial statements from

producers of identical merchandise that were contemporaneous with the POI.  *See* Resp. Final

SVs at Exhibit SV2-3 (summarizing the Malaysian financial statements[10]) PD490-507.  The

Department dismissed four of these statements because they did not overlap with the entire

period of investigation, leaving the Malaysian statements from Minho and Classic Scenic for

consideration.  Final IDM at 22.  The Department then determined the Brazilian financial

statements were the best available information:

> Comparing the financial data for the two Brazilian producers and two Malaysian producers under consideration that meet our surrogate producer selection criteria, we find that the data for the two Brazilian producers best represents the industry under investigation, as they are limited more to wood products and less inclusive of industries unrelated to the merchandise under investigation.

Final IDM at 22.  However, this finding is not supported by the record.  Rather, the opposite is

true, and the Malaysian financial statements are limited to the most comparable products and

also produce identical merchandise while the Brazilian companies are engaged in dissimilar

production, including a different level of integration, and it is uncertain whether they produce

identical merchandise at all.

---

[10] The record contains twenty Malaysian financial statements in total.  Seventeen of these statements were from producers of identical merchandise.  Six of these statements were from producers of identical merchandise and were contemporaneous with the POI.

As an initial matter, the Department's complete dismissal of the other four contemporaneous financial statements from Malaysian producers of identical merchandise was improper.  The period of investigation was July 1, 2019 through December 31, 2019.  Minho and Classic Scenic's financial statements were year ending December 31, 2019.  The record also contained the financial statement from LMT Superbonus year ending October 31, 2019 (overlapping with four months of the six month POI), year ending September 30, 2019 financial statement from Fine Quality Timber (overlapping with three months of the POI), and year ending August 31, 2019 financial statements from both Haluan Mutiara and Chern Hinp Timber (overlapping with two months of the POI).  The Department's primary concern when selecting financial statements is specificity, and these statements are all from producers of identical merchandise.  *See Shenzhen Xinboda Indus. Co. v. United States*, 976 F. Supp. 2d 1333, 1368 (Ct. Int'l Trade 2014) ("Commerce's regulations require that surrogate financial ratios be derived from "non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country." 19 C.F.R. § 351.408(c)(4)…Commerce "favors the financial statements of surrogates that [1] produce the identical merchandise, [2] consume the identical raw material, and [3] have identical or comparable production experience."  And, in determining whether a potential surrogate produces merchandise that is comparable, Commerce typically considers (1) physical characteristics, (2) end uses, and (3) production processes.") (internal citation omitted).  The Department also has a longstanding interest in relying on multiple financial statements.  *NTSF Seafoods Joint Stock Co. v. United States*, 487 F. Supp. 3d 1310, 1318 (Ct. Int'l Trade 2020) (discussing the Department's standard practice to rely upon multiple financial statements when available).

Consistent with these primary preferences, the Department has found a company's financial statement is contemporaneous so long as its reporting period overlaps with a part of the period of review. As the Department explained:

> In complying with the statute and the regulations, the Department calculates the financial ratios based on contemporaneous financial statements of companies producing comparable merchandise from the surrogate country when it deems those financial statements to be also representative of the industry under review and to contain accurate and complete data. When considering contemporaneity, however, **the Department does not select one set of financial statements over another simply because the overlap with the POR is larger**. Rather the Department finds that **as long as the potential surrogate statement covers a portion of the POR, it is deemed contemporaneous** and appropriate for use if it meets the remaining criteria.

*Folding Metal Tables and Chairs From the People's Republic of China: Final Results of 2007-2008 Deferred Antidumping Duty Administrative Review and Final Results of 2008-2009 Antidumping Duty Administrative Review*, 76 Fed. Reg. 2,883-03 (Jan. 18, 2011), and accompanying IDM, at Cmt. 2C (emphasis added); *see also Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of the Second Administrative Review*, 72 Fed. Reg. 13,242 (March 2007) and accompanying IDM at Comment 9A (where the Department found a statement overlapping 12 months of the POR and one overlapping 8 months of the POR were both contemporaneous); *Certain Steel Nails From the People's Republic of China: Final Results of the Fourth Antidumping Duty Administrative Review*, 79 Fed. Reg. 19,316 (April 2014) and accompanying IDM at Comment 2A ("Returning to our analysis of LSI and Bangkok Fastening, with regard to only using 2012 financial statements, we disagree with Petitioner and find that the 2011 Bangkok Fastening financial statements should also be used, as they do overlap the POR by five months and their inclusion provides a broader average.").  Therefore, the Court should order the Department to consider all contemporaneous Malaysian financial

statements from producers of identical merchandise on the record.  The Department's exclusion of contemporaneous relevant statements was arbitrary in light of the practice cited above.

### **The Malaysian Statements**

Whether considering all six Malaysian statements or the two that overlap the entire POI, the Malaysian surrogate financial statements are far more comparable than the two Brazilian financial statements.  Minho lists manufacturing moulded timber and moulded timber products among its primary business. In particular, the company states it "has a capacity of 10 million linear feet of moulding per month. The company's product range includes general and specific mouldings…." Exhibit SV2-3 at company information page 5, PD490-507.  Minho is clearly a significant producer of identical subject merchandise.  The other businesses of the company include manufacturing sawn timber, trading timber and timber products, sawmilling and timber equipment, and manufacturing paper bags from wood.  *Id*. at note 29.  The company not only produces identical merchandise, but its other businesses are also comparable with similar raw materials and equipment with some overlapping manufacturing processes.

Classic Scenic Berhad is primarily engaged in the manufacturing of picture frame mouldings (identical merchandise), and its only other business is highly similar production of other timber products.  This company is the largest wooden picture frame manufacturer in Malaysia. Exhibit SV2-4 at company information page 1, PD490-507.  Critically, its identical subject merchandise sales revenue represented over 88.95% of its revenue, or 49,873,761 out of 56,067,131 RM.  *See* Exhibit SV2-4 at Note 15, PD490-507.  The company is overwhelmingly dedicated to identical merchandise, and its only other division, manufacture of timber products, is highly comparable.

The Department's statement that Minho and Classic Scenic, "have multiple divisions not involved with the subject merchandise" utterly fails to consider the extent of Classic Scene's identical production division and fails to consider the comparability of the other divisions of both of these companies.  Final IDM at 22.  Moreover, this finding is arbitrary considering the evidence that the Brazilian statements do not produce identical merchandise and are involved in a highly dissimilar level of integration, namely forestry.  Before discussing the issues with the two Brazilian producers, Yinfeng also wants to highlight the comparability of the other four Malaysian financial statements that the Department improperly did not consider.

Fine Quality Timber produces many different types of mouldings and finger-joints. It is a member of Malaysia Wood Moulding & Joinery Council and listed moulding among its main products.  Its only other business is in processing timber.  All of its manufacturing processes are identical or highly comparable.  *See* Exhibit SV2-9 (containing the financial statement and company information) PD490-507.  The company lists the machinery used in its production, namely moulders, lamination lines, boring machines, sanding lines, lacquering lines, etc.  *Id*. at company information page 14 (typical production flow). Yinfeng uses the same machines and processes to produce subject merchandise.  *See* Yinfeng Section D response at Exhibit D-3 CD199 PD303. As described, Fine Quality's core business is "manufacturing general and engineered mouldings included design and provider of manufacturing solution". *Id*. at company information page 10.  In addition, its scope of physical products includes softwood and hardwood mouldings. *Id*. at 896.

Haluan Mutiara is primarily engaged in the production of moulded products including handrail, paneling, cornice, staircases, and it also produced the intermediate finger-joint product. And, as a member of the Malaysian Wood Moulding & Joinery Council, it listed its main

17

products as including skirting mouldings. The only other products the company produces are wood timber products. *See* Exhibit SV2-10 PD490-507. Chern Hinp Timber Trading Sdn Bhd, as a member of the Malaysia Wood Moulding & Joinery council, listed its main products as including door frames and skirting moulding. *See* Exhibit SV2-11 PD490-507. Therefore, this company produces identical merchandise. LMT Superbonus Sdn Bhd is also a producer of mouldings and a member of the Malaysia Wood Moulding & Joinery Council. Door frame and skirting moulding were listed as its main products, with its raw materials were listed as pallets and sawn timber. *See* Exhibit SV2-8 PD490-507. The company produces identical merchandise, such as mouldings, and is representative of the financial ratios in the mouldings industry.

**The Brazilian Statements**

In contrast, the record contains only two Brazilian financial statements: Adami and Duratex[11]. These companies are large conglomerates[12]. While the two Brazilian companies produce timber products, there is no record evidence to show they produced any large percentage of mouldings, or in some cases, no evidence that the company produced *any* mouldings (identical merchandise) at all. Even if the Brazilian companies may have produced some comparable merchandise (if any), it is the Department's practice to rely on companies that produced identical merchandise because they would be best reflective of the production and financial experience in

---

[11] The record contains a third Brazilian financial statement from Eucatex, but the Department properly found it could not rely upon the company because the statement had a qualified opinion by the auditor. Prelim. IDM. at 30. The company also does not produce identical merchandise and is engaged in dissimilar production. Plaintiff notes that all of the Malaysian statements had *unqualified* opinions, in other words the auditor found the statement to be reliable and free of any misstatements.

[12] The Department mentions the fact that Minho and Classic Scenic are holding companies and its financials are based on the consolidated financials of its subsidiaries. Final IDM at 22. However, Duratex is likewise a holding company and its financials are based on that of its subsidiaries and Adami's statement also includes subsidiaries' costs. This is a normal occurrence and the Department frequently relies on the consolidated financials under such circumstances.

the identical industry of the respondents. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 62275 (October 2, 2020) and accompanying IDM at Comment 6 (refusing to rely upon companies that produce comparable merchandise when the Department had a statement to rely upon from a company that produced identical merchandise.). Further, the Brazilian companies' other business sectors are not comparable and are highly dissimilar to the industry producing the subject merchandise; yet those dissimilar businesses impact their financial ratios.

Adami S/A has a forestry division, energy division, chemical division, and paper/cardboard box division. The company cultivates large forests. *See* Resp. Rebuttal SVs (June 29, 2020) at Exhibit SVR-1 PD459; *see also* Adami Financial Statement at note 10 (discussing biological assets) PD415. The company produces its own energy as well. The company is at a vastly different level of integration than respondents. The manufacturing costs, raw materials, and equipment and labor involved in growing and harvesting trees is not comparable to the costs of companies, such as respondents, that purchase lumber and make downstream lumber and moulded products. Moreover, only a small portion of the products produced by this company may be truly comparable. Producing chemicals, energy, and cardboard boxes are very different processes of manufacturing with different raw materials and end uses. The company is primarily engaged in dissimilar production and does not represent the best available information for the surrogate financial ratios. *See* 19 U.S.C. 1677b(c)(1)(B) (requiring the Department to select the best available information for the surrogate values for production costs).

There is no direct or clear record to show Adami produced any identical merchandise. Even though Petitioner pointed out that it started to produce blocks, blancs, panels and frames, such items are not necessarily mouldings.  Petitioner also suggested that the company was among the top ten exporters of "subject merchandise" in the respondent selection data in the concurrent Brazilian investigation.  *See* Pet. Prelim. Cmts at 6 PD531.  However, this data comes from the general US Customs HTS data which includes other non-subject merchandise so it is inconclusive at best.

Even if the company produces some subject merchandise, the company's financial statement and webpage make clear that any production of moulded products is very minor.  In the company's webpage printout, after a lengthy introduction of the company's paper and cardboard production, hydroelectric plant, forest replenishment, saw mill and pulp production, there is only one sentence that mentions the company "was recently expanded and modernized for the production of blocks, blancs, frames, among other products destined for the foreign market". *See* Pet Prelim. SVs at Exhibit 8 PD415.  In other words, this company only recently started to produce those products and would naturally have testing periods for those products, and its financial statements or financial ratios would not be representative of the moulding industry in any material way. At the very most, this company produced a very small or inconsequential amount of mouldings (if any), and their financial statements are not representative of the experience of a producer primarily engaged in the mouldings industry.  In sharp contrast, the financial statements from the Malaysian companies are primarily focused on the production of mouldings (identical merchandise).

The second Brazilian company, Duratex, operates three divisions: deca (ceramic, metal, electronic showers), wood, and ceramic tiles.  Already two of these divisions are not remotely

comparable to wood mouldings.  The company produces an extensive line of ceramic tiles and showers sets, including electronic metal shower units.  The raw materials, production process, and end-use are not comparable.  Like Adami, the wood division involves forestry and some downstream wood product production.  Duratex "has over 150 thousand hectares of land and cultivates eucalyptus using advances technology."  Resp. Rebuttal SVs at Exhibit SVR-2 (excerpts from Duratex's webpage) PD459.  The company has 7 forestry units.  For the rest of its forestry division, Duratex describes that they produce medium density particle board, medium density fiber board, and laminated vinyl tile flooring.  *Id*.  The company is primarily engaged in dissimilar production.  The company is not focused on any moulding operations.

Petitioner provided information that the company produces certain footer products under its Durafloor division.  Durafloor, as evidenced by its name, is focused on flooring products.  Such footers are not main products, but rather are only minor/supplemental products for its flooring products—which is only one of its divisions. Further, <u>this large conglomerate includes subsidiaries in other non-economically comparable countries including Belgium, Columbia, Uruguay, and other European and North American subsidiaries</u>. *See* Duratex Financial Statement at Note 12 PD415.  Even in the wood division, it had four facilities in Brazil and three in Colombia.  Its financial ratios would be heavily impacted by its non-economically comparable country operations outside of Brazil.  For this reason alone, the statement is wholly unusable. *See, e.g., Chlorinated Isocyanurates Preliminary Results of Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments; 2018-2019*, 85 Fed. Reg. 67,709 (October 26, 2020) and accompanying Prelim. IDM at 24-25 (Refusing to rely upon a financial statement because of the company's global presence, with subsidiaries operating in multiple non-comparable countries).

The record establishes that the Brazilian companies are primarily engaged in the production of <u>dissimilar</u> products.  None of these statements or company webpages list mouldings as a product that any company produces.  The only items produced by these companies that may be considered identical merchandise were a couple baseboard products by Duratex—one product among hundreds Duratex produces.  *See* Pet. Prelim SV at Exhibit 8 (providing a Duratex webpage print of one product) PD415.  *Compare* Resp. Rebuttal SVs at Exhibit SVR-2 (providing more excerpts from their webpage with dissimilar products) PD459. At best, Brazil offers only one financial statement from a company that *may* produce mouldings. But as explained above, this baseboard product is only one very minor product in one sector and also this company is engaged in production in non-economically comparable countries that is inseparably incorporated in its financial results.  The Brazilian companies are primarily engaged in the production of dissimilar products, which also should disqualify them from treatment as the "best available information".

Moreover, each of the Brazilian companies maintains an extensive forestry division.  The level of integration of these companies is dissimilar to that of Yinfeng but also of the Malaysian surrogates.  Therefore, they are not suitable surrogates for the financial costs of companies, like respondents, that purchase sawnwood and produce mouldings products—and do not have costs of maintaining forests and logging.  *See Hardwood and Decorative Plywood from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 58,273 (Dep't Comm. Sept. 23, 2013) and accompanying *Issues & Decision Memo* at 62 ("The Department's standard criteria for selecting financial statements in calculating surrogate financial ratios includes examining the level of integration of the surrogate company in order to approximate the overhead costs, SG&A, and profit levels of the respondent.  Further, the

Department has an established practice of rejecting financial statements of surrogate producers whose production process is not comparable to the respondent's production process when better information is available.").

In contrast, the record contains six contemporaneous Malaysian financial statements from companies that definitively produce identical merchandise (and particularly listed mouldings among their main products). While a couple of the Malaysian companies are involved in logging, the products the companies produce are identical or highly comparable, making these companies still far more comparable than the Brazilian statements. *See* Pet. Final Rebuttal SVs at Exhibit 1 (providing that Minho acquired a logging division) PD530. Moreover, the vast majority of them are similarly integrated to respondents in that the Malaysian companies purchase wood and produce moulded products.

The specificity of the financial statements is the most critical component of selecting financial statements. 19 CFR 351.408(c)(4) directs the Department to rely upon identical or comparable producers to value the financial ratios. In promulgating this regulation, the Department's Notice of Proposed Rulemaking states:

> Given the importance of manufacturing overhead, general expenses and profit in the calculation of normal value, {Commerce} believes it is important to seek information that is as accurate as possible. To this end, paragraph (c)(4) expresses a preference for using non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country for valuing manufacturing overhead, general expenses and profit. Because {Commerce} expects that these elements will vary widely across industries, we will attempt to obtain data that is as specific as possible to the subject merchandise.

*Notice of Proposed Rulemaking and Request for Public Comments: Antidumping Duties; Countervailing Duties*, 61 FR 7308 (February 27, 1996).

In a recent review of *Solar Cells from China*, the Department explained that this made clear that "specificity is an overriding criterion when choosing surrogate financial data" and explained "{h}ence, when selecting surrogate financial statements, Commerce prefers financial statements from companies that produce identical merchandise over companies that produce comparable merchandise provided that the surrogate value data are not distorted or otherwise unreliable, because it is Commerce's preference to match the surrogate companies' production experience with respondents' production experience." *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 62275 (October 2, 2020) and accompanying IDM at Comment 6 (relying on a financial statement from a producer of identical merchandise and declining to rely upon financial statements from multiple producers of comparable merchandise); *Circular Welded Carbon-Quality Steel Pipe Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 75,042 (October 28, 2016) and accompanying IDM at 19 ("Regarding the product mix of the companies, the Department's preference is to use the financial statements of a company that produces identical merchandise. In reviewing the record, we find that all of the companies for which financial statements were provided produce subject merchandise…The experience of a manufacturer that produces only steel pipes (whether only subject pipe or subject and non-subject) is a better match for our respondents, which also only have pipe as their primary business segment.").  Only the Malaysia financial statements are from companies that definitively produce identical merchandise and are also otherwise engaged solely in highly comparable industries on the full record of the wood mouldings case.  The Malaysian financial statements are the best available information to value the financial ratios.  Further, as discussed below, the Department's preference to rely on producers of identical merchandise and

to rely upon multiple financial statements also entails that Malaysia must be selected as the primary surrogate country.

C.    The Department's Selection of Brazil as the Primary Surrogate Country is Not Supported by Substantial Evidence.

The Department relied upon Brazil as the primary surrogate country.  A critical part of that decision was the Department's incorrect understanding that the Brazilian sawnwood surrogate values were equally specific and that Brazil sourced superior financial statements.  In fact, as demonstrated above, Malaysia sources the most specific surrogate values for Yinfeng's primary inputs, sawnwood.  *See also Certain Steel Threaded Rod Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 83,800 (November 22, 2016) and accompanying IDM at 8 (Relying on Bulgaria as the primary surrogate country because it has greater specificity for diameter of the steel inputs).  Further, Malaysia sources not only the most comparable financial statements, but also provides the largest number of comparable financial statements.

The Department has often made surrogate country determinations based on the comparability and quantity of financial statements. *See Certain Hardwood Plywood Products from the People's Republic of China; 2017-2018; Preliminary Results of Antidumping Duty Administrative Review*, 85 Fed. Reg. 7,270 (February 7, 2020) and accompanying Decision Memo at 18 (Commerce declined to use the financial statement from a Romanian company because only 50 percent of Sigstrat's revenue was from plywood products, while 47.3 percent of its revenue was from the sale of molded products (seats, backrests, chairs, and tables)) (unchanged in Final).  *See Certain Activated Carbon From the People's Republic of China; 2010-2011; Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 67,337 (Dep't Comm. Nov. 9, 2012), and accompanying IDM at Cmt. 1F (after preliminarily finding

Thailand to be the most suitable surrogate country, the Department changed its position in the final results, selecting the Philippines because multiple Philippines financial statements provided a broader market average than the sole Thai statement, satisfying the Department's "preference for using multiple financial statements."). This preference is based on the Department's understanding that there may be certain cost distortions in one company's financial situation, so using multiple financial statements reduces the potential for such distortions in the comparable industry. *See, e.g., Steel Wire Garment Hangers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2010-2011*, 78 Fed. Reg. 28,803 (May 16, 2013) and accompanying *Issues & Decision Memo* at Cmt. 1D. Malaysia sources seventeen financial statements from identical producers (and three additional comparable producers) while the record only has three financial statements from Brazilian companies primarily engaged in dissimilar production. Moreover, the abundance of wood mouldings producers in Malaysia and the presence of a robust wood moulding association also concretely demonstrate that Malaysia is a significant producer of identical merchandise and a superior surrogate country for the costs of a wood moulding producer.

Accordingly, based on established practice, Malaysia sources the superior surrogate financial data as well as surrogate value data for the primary woods inputs and therefore is the only reasonable choice as a primary surrogate country. In other words, a reasonable mind could not conclude that Brazil was home to the "best available information" to value Yinfeng's factors of production. The Court should order the Department to reconsider its surrogate country selection in light of these two issues alone. However, Malaysia also has yet further data advantages over Brazil.

**1.   Malaysia Reports Import Values on the Department's Preferred CIF Basis.**

The Brazil import values are reported on an FOB basis.  In contrast, the Malaysian import statistics are reported on a CIF basis.  The Department has determined that when it relies upon an import value it must include the cost of all movement charges incurred in shipping the input (i.e. CIF values) because that is the price most representative of an available domestic price for the input should no truly domestic source be available.  *See*, *e.g.*, *Wooden Bedroom Furniture From the People's Republic of China: Final Results and Final Rescission in Part*, 76 Fed. Reg. 49,729 (Aug. 11, 2011), and accompanying IDM at Cmt. 16.  Accordingly, the Department added marine insurance and ocean freight expenses to the Brazil FOB import values.  *See* Prelim. SV Memo at 2 PD553. The marine insurance and ocean freight expenses are merely "facts available" added to each import value to arrive at an approximate of a CIF value for each of the respondents' material and packing inputs, decreasing the accuracy of each value. While the Department can and did make adjustments to the FOB data—it was only a rough approximation of the actual CIF costs.

Indeed, the information available to <u>approximate</u> a CIF value in Brazil further demonstrates how much less specific and unreliable it is to merely approximate these costs. Notably, the Department itself put on the marine insurance and Descartes data.  Prelim. SV Memo at 2 & Attachments II-IV PD553. Petitioner failed to provide this information itself and the Department supplemented the record.  The Department relied upon marine insurance from RJG sourced from 2010—a full nine years prior to the POI. *Id*. at Attachment IV. The ocean freight prices relied upon are for shipping "wood products" from Fuzhou, China to the United States.  *Id*. at Attachment III. The rate is not related to the cost that a mouldings producer would pay to import raw materials into Brazil.

Each of the additions to the Brazilian FOB data consist of making <u>assumptions</u> and <u>estimations</u> about the costs incurred in place of actual movement expenses imbedded in the Malaysian data. The Department is essentially missing two inputs (ocean freight & marine insurance) <u>per import value</u> for this purpose in the Brazilian data—some 80 inputs (for 39 raw material inputs based upon import values).  In contrast, no such adjustment or approximation is needed to make use of the Malaysian data which is officially reported on a CIF basis. Accordingly, the Brazilian import prices are less specific and representative than the Malaysian import prices because the Department must make a hypothetical estimate of the movement expenses to arrive at a CIF price.

In response to this argument, the Department merely reiterated that it is not its practice to reject a surrogate country solely because it reports its import statistics on an FOB basis.  Final IDM at 21.  Of course, as demonstrated in this brief, this is not the only data deficiency in Brazil. Further, while the Department has not ruled out countries as potential surrogate countries that report their import statistics on an FOB basis, the Department has in several instances considered it in weighing the quality of data and preferred the country that reported on a CIF basis.  For example, in *Steel Racks from China*, the Department selected Romania over Brazil based on the quality of data, including the CIF import data:

> Nevertheless, as explained in Policy Bulletin 10.2, Commerce's practice is to adjust SV import data reported on an FOB basis to a CIF basis. Because the Brazilian SV data are reported on an FOB basis, Commerce would be required to make adjustments to value the Brazilian data on a CIF basis, consistent with our practice. Normally, international freight costs include not only the ocean freight portion of transporting the merchandise from one location to another, but also the other expenses associated with moving the goods, such as marine insurance… Conversely, the Romanian SV data are already reported on a CIF basis and require no adjustment because they include specific actual costs for inputs used in the production of subject merchandise.  While this difference alone may not necessarily be sufficient to determine that Romania is preferable to Brazil as a surrogate

country, the totality of the evidence, as discussed above, leads us to find that Romania is the appropriate primary surrogate country in this case.

*Certain Steel Racks and Parts Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value* (July 17, 2019) (unpublished) and accompanying IDM at 8-9.  Likewise, in two recent remands for *Activated Carbon from China*, the Department considered its preference for CIF data in selected Indonesia and Malaysia as primary surrogate countries instead of the Philippines, which reported data on an FOB basis:

> Additionally, we note that the Philippine GTA import data available on the record are on a free-on-board (FOB) basis.  Policy Bulletin 10.2 states that the Department normally obtains import prices that include the international freight costs of shipping the product to the port of the importing country....
> However, when the import statistics of the surrogate country do not include such costs, the Department has added SVs for international freight and foreign brokerage and handling charges to the calculation of normal value.
> **While the underlying record of this administrative review contains international freight SVs to put the Philippine GTA import data on a cost-insurance-and-freight (CIF) basis, the Malaysian GTA import data available on the record are already on a CIF basis.**

*Activated Carbon from China* Remand Results, CIT 16-185 (June 17, 2019) at 11 (emphasis supplied); *see also Activated Carbon from China* Remand Results, CIT 15-286 (June 17, 2019) at 10 (selecting Indonesia in part because its import statistics are on a CIF basis).

Accordingly, the Department should have also found that Malaysia is superior to Brazil because its import statistics, used to value the overwhelmingly majority of inputs, are reported on an *actual* CIF basis in accordance with the Department's preference and policy and practice. The Court should order the Department to follow its actual practice and take this serious deficiency into account when redetermining which surrogate country is best.

## 2.   Malaysia Sources the Best Available Information to Value Other Inputs.

Malaysia also sources superior data for other inputs, including labor, truck freight, brokerage & handling, and acrylic polymer. As stated above, the Department has a strong

preference to rely upon specific surrogate values.  The Malaysian labor rate is more specific than the Brazil labor rate.  The record contains a manufacturing labor rate from the Malaysian Government Department of Statistics.  The rate is specific to the "Manufacture of wood and products of wood and cork, except furniture."  Resp. Prelim. SVs at Exhibit 4 PD415.  Therefore, this manufacturing rate would include the production of wood mouldings and millwork.  The rate is also contemporaneous specifically with the 6-month POI. In contrast, the Brazilian labor rate is a general manufacturing rate, including all manufacturing sectors.  Therefore, the cost of labor includes highly dissimilar industries such as chemical manufacturing and steel processing.  Further, the rate is an annual 2019 labor rate, rather than specific to the 6-month POI.  In sum, the Malaysian labor rate is more specific and more contemporaneous; therefore, Malaysia once again is source to the best available information for another important surrogate value category: labor.

In addition, the truck freight and brokerage handling surrogate information from Malaysia is contemporaneous with the POI, while the Brazilian information is from prior to the POI.  The record contains the 2020 Doing Business in Malaysia report which covers data from 2019.  Resp. Prelim. SVs at Exhibit 7 PD415.  In contrast, the record only contains the 2019 Doing Business in Brazil report which covers data from 2018.  *See* Pet. Prelim. SVs at Exhibit 6 (the Doing Business 2019 report notes that "the most recent round of data collection for the project was completed in May 2018.") PD415.  Therefore, the Malaysian data for freight and B&H is more contemporaneous; again, preferred by the Department according to its standard surrogate value evaluation criteria, which take contemporaneity into account.

Finally, Malaysia provided a more specific HTS for Yinfeng's acrylic polymer input. Yinfeng reported this input in its FOP database. In the Preliminary Determination, the

Department relied upon HTS 3906.90 in Brazil to value acrylic polymers, which covers "Acrylic Polymers Nesoi, In Primary Forms."  Prelim. SV Memo.  However, the Malaysian record contains a more specific HTS, 3906.90.20 covering "Acrylic polymers, other than poly(methyl methacrylate), in dispersion."  Resp. Final SVs at Exhibit SV2-2. Yinfeng's acrylic polymer input is in dispersion and is not poly(methyl meethaacrylate).  Therefore, this HTS is more specific than the 6-digit HTS to Yinfeng's input.  *See* Yinfeng First Supplemental at Exhibit SQ1-34 and Exhibit SQ1-35 (July 7, 2020) CD425-428 PD511.  The 6-digit HTS in Brazil would include dissimilar acrylic polymers.

In sum, Malaysia provides the best available information to value surrogate values for the primary raw materials, financial ratios, all import values (CIF), labor expense, movement expenses, and acrylic polymers.

The only deficiency the Department has identified in Malaysia regards the wood scrap surrogate value.  Final IDM at 20.  The Department relied upon HTS 4401.40 in Brazil to value wood scrap/sawdust by-product[13].  However, as submitted by Yinfeng in its surrogate value submission, their wood scrap/sawdust by-product should be classified under HTS 4401.39 in Malaysia in accordance with the Malaysian HTS specific descriptions and record information. HTS 4401.39, which includes "Sawdust And Wood Waste And Scrap, Whether Or Not Agglomerated In Logs, Briquettes Or Similar Forms Other Than Pellets." *See* Yinfeng SV submission at Ex. 2 (June 17, 2020).  In other words, this Malaysian HTS includes wood scrap other than those agglomerated into pellets.  Yinfeng does not agglomerate their wood scrap into

---

[13] *See* Yinfeng Preliminary Calc Memo at 2 ("[t}hese forms of wood scrap do not appear to be agglomerated, we selected Brazilian import data from Harmonized Tariff Schedule (HTS) subheading number 440140 to value this input.").  CD518 PD665.

pellets.  The HTS description specifically says <u>whether or not agglomerated</u>, it does not specify

that the scrap must be agglomerated.  Therefore, this is an appropriate HTS in Malaysia to value

this input. Further, Malaysia had no imports under 4401.40 during the POI.  *See* Pet. Final SVs at

Exhibit 2. This supports the language in HTS 4401.39 in Malaysia shown above, that in Malaysia

all wood scraps, "whether or not agglomerated" are imported under HTS 4401.39.  For this

reason, there are no imports under 4401.40 in Malaysia.  Accordingly, relying upon HTS

4401.39 in Malaysia would be accurate and this should not constitute a deficiency in Malaysia.

However, even if the Court agreed with the Department's determination that HTS

4401.40 is the more accurate HTS classification for Yinfeng's wood scrap, the wood scrap is

minor in Yinfeng's cost components, in contrast with the primary inputs, i.e. pine/fir sawnwood,

where Malaysia provided more specific HTS at a 10 digit level while Brazil did not. Therefore,

the primary raw materials (and other surrogate values) that are more specific in Malaysia

outweigh any small potential specificity for this minor input.  No reasonable decision maker

would chose a minor issue to outweigh all the major advantages of Malaysia as the best surrogate

country.

In sum, Malaysia provides far superior information to value the primary wood inputs, far

superior information to value financial ratios, and superior information to value other inputs

including all import statistics being reported on a CIF basis.  The record is clear that Malaysia

offers the best available information of record.  A reasonable person could not conclude that

Brazil was the source of the best information individually or collectively for Yinfeng's factors of

production.  Plaintiff thus asks the Court to remand for the Department to reconsider its primary

surrogate country in light of the full surrogate value record.

**IV.    Conclusion and Prayer for Relief**

In light of the foregoing, the Department's *Final Results* were not supported by substantial evidence or in accordance with the law.  Plaintiff respectfully requests that the Court remand this case for redetermination of the issues consistent with the arguments presented in this brief.

Respectfully submitted,

 /s/ Gregory S. Menegaz

Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman*
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
Date: July 23, 2021                    *Counsel to Plaintiff*

*Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

33

## Word Count Certificate of Compliance

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **9,654** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*