## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

_____

| | |
|---|---|
| FUJIAN YINFENG IMP & EXP ) | |
| TRADING CO., LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Court No. 21-00087 |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| COALITION OF AMERICAN MILLWORK ) | |
| PRODUCERS, ) | |
| ) | |
| Defendant-Intervenor. ) | |

_____)

### DEFENDANT'S RESPONSE TO PLAINTIFF'S
### MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Of Counsel:

SHELBY M. ANDERSON
Senior Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20005

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

CLAUDIA BURKE
Assistant Director

IOANA CRISTEI
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-0001

October 13, 2021

*Attorneys for Defendant*

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 .................................................................. 2

    I.     Administrative Determination Under Review .................................................. 2

    II.    Issues Presented For Review ........................................................................... 2

STATEMENT OF FACTS ........................................................................................... 2

SUMMARY OF ARGUMENT ..................................................................................... 7

ARGUMENT ............................................................................................................... 8

    I.     Standard Of Review ....................................................................................... 8

    II.    Legal Framework For Surrogate Value Selection ............................................ 8

    III.   Commerce's Determination That Brazilian Data Are The Best Available Information To Value Yinfeng's Factors Of Production Is Supported By Substantial Evidence ...................................................................................... 10

        A.   Commerce's Selection Of Surrogate Values For Radiata Pine And Fir Sawnwood Is Supported By Substantial Evidence ................................ 11

        B.   Commerce's Selection Of Surrogate Financial Statements Is Supported By Substantial Evidence And Otherwise In Accordance With Law .............. 15

            1.   Commerce Reasonably Declined To Rely On Less Contemporaneous Financial Statements Where Fully Contemporaneous Financial Statements For Identical Merchandise Producers Were Available .......................................................... 16

            2.   Commerce Reasonably Determined that Brazilian Financial Statements Are the Best Available Information from Which to Calculate Yinfeng's Financial Ratios ......................................... 18

               a.   Substantial Record Evidence Supports Commerce's Determination That Adami Produces Identical Merchandise ...................................................................................... 19

               b.   Substantial Record Evidence Supports Commerce's Determination That Adami And Duratex Are Better Surrogate Sources Than Minho And Classic Scene .......... 20

        C.   Commerce's Decision To Rely On Superior Brazilian GTA Data, Notwithstanding That Import Values Were Reported On An FOB Basis, Is Supported By Substantial Evidence ...................................................... 25

        D.   Commerce Addressed Yinfeng's Claims Regarding Labor, Truck Freight, Brokerage And Handling, And Acrylic Polymer And Adequately Explained Why It Continued To Rely On Brazil As The Primary Surrogate Country .............................................................................................. 28

    IV.  Commerce Conducted A Proper Investigation .................................................. 29

CONCLUSION ........................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Bristol Metals L.P. v. United States*,
  703 F. Supp. 2d 1370 (Ct. Int'l Trade 2010) ........................................................10, 12, 14, 15

*Ceramica Regiomontana, S.A. v. United States*,
  810 F.2d 1137 (Fed. Cir. 1987)......................................................................................8, 9

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ........................................................................................................ 8

*Dorbest Ltd. v. United States*,
  604 F.3d 1363 (Fed. Cir. 2010).......................................................................................24

*Fujitsu Gen. Ltd. v. United States*,
  88 F.3d 1034 (Fed. Cir. 1996) ......................................................................................... 8

*Garlic v. United States*,
  437 F. Supp. 3d 1347 (Ct. Int'l Trade 2020) ...................................................................29

*Heze Huayi Chem. Co. v. United States*,
  Court No. 20-00058, 2021 WL 3417972 (Ct. Int'l Trade Aug. 5, 2021)...........................24, 26

*Home Meridian Int'l. Inc. v. United States*,
  772 F.3d 1289 (Fed. Cir. 2014).......................................................................................10

*INS v. Elias-Zacarias*,
  502 U.S. 478 (1992) ........................................................................................................ 8

*Jiaxing Bro. Fastener Co. v. United States*,
  11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014) ...................................................................... 9

*Jiaxing Bro. Fastener Co. v. United States*,
  822 F.3d 1289 (Fed. Cir. 2016).......................................................................................9, 10

*Nation Ford Chem. Co. v. United States*,,
  166 F.3d 1373 (Fed. Cir. 1999)....................................................................................... 10, 12, 13

*PAM, S.p.A. v. United States*,
  582 F.3d 1336 (Fed. Cir. 2009)........................................................................................ 8

*Qingdao Sea-Line Trading Co. v. United States*,
  766 F.3d 1378 (Fed. Cir. 2014)........................................................................................ 9

*SeaH Steel Vina Corp. v. United States*,
  950 F.3d 833 (Fed. Cir. 2020)..........................................................................................16

*T.T. Int'l Co. v. United States*,
  439 F. Supp. 3d 1370 (Ct. Int'l Trade 2020) .......................................................16

*United States v. Great Am. Ins. Co. of New York*,
  738 F.3d 1320 (Fed. Cir. 2013).........................................................................29

*Jinxiang Yuanxin Imp. & Exp. Co. v. United States*,
  71 F. Supp. 3d 1338 (Ct. Int'l Trade 2015) ......................................19, 20, 21, 22

*Wheatland Tube Co. v. United States*,
  161 F.3d 1365 (Fed. Cir. 1998).......................................................................... 8

*Zhejiang DunAn Hetian Metal Co. v. United States*,
  652 F.3d 1333 (Fed. Cir. 2011).........................................................................10

**Statutes**

19 U.S.C. § 1677b(c) ...........................................................................................16

19 U.S.C. § 1677b(c)(1)(B).................................................................................8, 9

**Regulations**

19 C.F.R. § 351.301(c)(3) ...................................................................................30

19 C.F.R. § 351.408(c)(2) ..................................................................................9, 13

19 C.F.R. § 351.408(c)(4) ..................................................................................9, 16

19 C.F.R. § 408(c)(2)...........................................................................................28

**Administrative Determinations**

*Antidumping Duty Investigation of Common Alloy Aluminum Sheet from the People's Republic of China*,
  83 Fed. Reg. 57,421 (Dep't of Commerce Nov. 15, 2018)  ................................26

*Certain Aluminum Foil from the People's Republic of China*,
  83 Fed. Reg. 9282 (Dep't of Commerce Mar. 5, 2018)  ....................................26

*Certain Quartz Surface Products from the People's Republic of China*,
  84 Fed. Reg. 23,767 (Dep't of Commerce May 23, 2019)  ...............................26

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*,
  83 Fed. Reg. 35,616 (Dep't of Commerce July, 27, 2018)  ..........................18, 30

*Certain Steel Racks and Parts Thereof from the People's Republic of China*,
  74 Fed. Reg. 35,595 (Dep't of Commerce July 24, 2019)  ................................27

*Hydrofluorocarbon Blends from the People's Republic of China*,
   84 Fed. Reg. 17,380 (Dep't of Commerce Apr. 25, 2019) ....................................................26

*Wood Mouldings and Millwork Products from Brazil and the People's Republic of China*,
   85 Fed. Reg. 6502 (Dep't of Commerce Feb. 5, 2020) ......................................................... 3

*Wood Mouldings and Millwork Products from the People's Republic of China*,
   85 Fed. Reg. 48,669 (Dep't of Commerce Aug. 12, 2020) .................................................... 6

*Wood Mouldings and Millwork Products from the People's Republic of China*,
   86 Fed. Reg. 67 (Dep't of Commerce Jan. 4, 2021) ............................................................ 2

*Wood Mouldings and Millwork Products from the People's Republic of China*,
   86 Fed. Reg. 9486 (Dep't of Commerce Feb. 16, 2021) ....................................................... 2

*Xanthan Gum from the People's Republic of China*,
   82 Fed. Reg. 36,746 (Dep't of Commerce Aug. 7, 2017) .....................................................30

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

_____

|  |  |
|---|---|
| FUJIAN YINFENG IMP & EXP ) | |
| TRADING CO., LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Court No. 21-00087 |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| COALITION OF AMERICAN MILLWORK ) | |
| PRODUCERS, ) | |
| ) | |
| Defendant-Intervenor. ) | |

_____)

### DEFENDANT'S RESPONSE TO PLAINTIFF'S
### MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motion for judgment on the administrative record filed by plaintiff Fujian Yinfeng Imp & Exp Trading Co., Ltd. (Yinfeng). Yinfeng contests the Department of Commerce's final determination in the antidumping duty investigation of wood mouldings and millwork products from China. As we demonstrate below, Yinfeng's arguments are without merit. Accordingly, this Court should deny Yinfeng's motion for judgment on the agency record and sustain the final determination in its entirety.

## STATEMENT PURSUANT TO RULE 56.2

### I.      Administrative Determination Under Review

The administrative determination under review is *Wood Mouldings and Millwork Products from the People's Republic of China*, 86 Fed. Reg. 67 (Dep't of Commerce Jan. 4, 2021) (final determ.) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM) (P.R. 661),[1] *as amended by Wood Mouldings and Millwork Products from the People's Republic of China*, 86 Fed. Reg. 9486 (Dep't of Commerce Feb. 16, 2021) (amended final determ. and AD order) (*Order*). The *Final Determination* covers the period of investigation (POI) from January 1, 2019, through December 31, 2019.

### II.     Issues Presented For Review

1.  Whether Commerce's surrogate value selections for Yinfeng's radiata pine and fir sawnwood inputs are supported by substantial evidence.

2.  Whether Commerce's reliance on Brazilian financial statements over Malaysian financial statements to calculate surrogate financial ratios is supported by substantial evidence.

3.  Whether Malaysian surrogate values are superior in other respects, such that Commerce's selection of Brazil as the primary surrogate country is not supported by substantial evidence.

4.  Whether Commerce's determination to defer consideration of Yinfeng's final surrogate value submission to the final determination was procedurally unfair.

### STATEMENT OF FACTS

On January 8, 2020, the Coalition of American Millwork Producers (petitioner) filed an antidumping duty petition concerning imports of millwork products from China. On the basis of

---

[1] Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of the underlying investigation.

the petition, Commerce initiated a less-than-fair-value investigation of imports of millwork products from China on February 5, 2020. *See Wood Mouldings and Millwork Products from Brazil and the People's Republic of China*, 85 Fed. Reg. 6502 (Dep't of Commerce Feb. 5, 2020) (initiation of LTFV invs.). Following a respondent selection process, Commerce selected Yinfeng and Bel Trade Wood Industrial Co., Ltd. Youxi Fujian (Bel Trade) for individual examination in the investigation. *See* P.R. 145 at 1.

Yinfeng submitted its initial section D questionnaire response to Commerce on April 21, 2020. In this response, Yinfeng reported the factors of production used to manufacture subject merchandise, which include radiata pine and fir sawnwood. Initial Section D Response (Apr. 21, 2020) (C.R. 199) at Ex. D-5 (listing factors of production for subject merchandise). Yinfeng provided additional detail on these inputs in a supplemental section D response submitted on July 7, 2020, arguing that the inputs should be valued using Malaysian surrogate values for radiata pine and fir sawnwood that is "sawn lengthwise." *See* Suppl. Section D Response at D-14 & Ex. SQ1-34 (P.R. 511, C.R. 426).

On May 8, 2020, Commerce placed a memorandum on the record inviting comments on Commerce's surrogate country and surrogate value selections.[2] *See* P.R. 333. In this memorandum, Commerce identified Malaysia, Turkey, Russia, Mexico, Brazil, and Bulgaria as being at a level of economic development comparable to China. *See id.* at Attachment. Commerce indicated that surrogate value submissions received after June 17, 2020, may not be considered in the preliminary determination. *See id.*

---

[2] In antidumping duty proceedings involving non-market economy countries, Commerce values company factors of production and other cost information using surrogate values and surrogate financial information derived from a market economy country that is at a comparable level of economic development. *See* section II, *infra*.

On June 17, 2020, the petitioner submitted surrogate value information for Brazil and argued that Commerce should select Brazil as the primary surrogate country. Of relevance here, to value the radiata pine sawnwood used in Yinfeng's production process, the petitioner submitted Global Trade Atlas (GTA) data for Brazilian Harmonized Tariff Schedule (HTS) 4407.11.00 (describing "Pine 'Pinus spp.' sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness of > 6 mm"). To value Yinfeng's fir sawnwood, the petitioner submitted GTA data for 4407.12.00 (describing "Fir 'Abies spp.' and spruce 'Picea spp.' sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness of > 6 mm"). *See* Pet. Initial SV Submission (June 17, 2020), at Exs. 1-2 (P.R. 415, 418). Lastly, to calculate surrogate financial ratios, the petitioner submitted 2019 financial statements for three Brazilian companies—Adami S.A. (Adami), Duratex S.A. (Duratex), and Eucatex S.A. *See id.* at Ex. 8 (P.R. 416).

On June 17, 2020, Yinfeng and Bel Trade also jointly submitted surrogate value information for Malaysia and argued that Commerce should select Malaysia as the primary surrogate country. *See* Resp. Initial SV Submission (June 17, 2020) (P.R. 411-14). To value Yinfeng's radiata pine and fir sawnwood, Yinfeng submitted Malaysian import data for the same HTS subheadings (4407.11.00 and 4407.12.00, respectively). *See id.* at Ex. SV-2 (P.R. 413). To calculate financial ratios, Yinfeng and Bel Trade submitted 2018 financial statements for two Malaysian producers, Sri Ledang and Inter Moulding. *See id.* at Exs. SV-9, SV-10 (P.R. 411).

On July 6, 2020, Yinfeng and Bel Trade submitted "final" surrogate value information. In this submission, Yinfeng and Bel Trade provided an updated surrogate value summary sheet along with corresponding Malaysian GTA data and excerpts from the Malaysian tariff schedule. *See* Resp. Final SV Submission (July 6, 2020) at Ex. SV2-1 (P.R. 490), SV2-21 (P.R. 505).

Yinfeng claimed in the final surrogate value submission that its radiata pine and fir sawnwood inputs should be valued using Malaysian GTA data at the ten-digit level, rather than using the six-digit data previously submitted. The Malaysian ten-digit classifications separate radiata pine and fir sawnwood that is "sawn lengthwise," "sliced or peeled," or in an "other" physical form. *See id.* at Ex. SV2-21 (P.R. 505). Yinfeng and Bel Trade's final surrogate value submission also contained 18 new financial statements for Malaysian companies that Yinfeng and Bel Trade deemed to be "comparable and identical producers of subject merchandise." *See generally id.* at Exs. SV2-3 to SV2-20. Four of these financial statements (for LMT Superbonus Sdn Bhd (LMT Superbonus), Fine Quality Timber Sdn Bhd (Fine Quality), Haluan Mutiara Sdn Bhd (Haluan), and Chern Hinp Timber Trading Sdn Bhd (Chern Hinp)) related to fiscal years that partially overlapped with the six-month POI, while two of the financial statements (for Minho (M) Berhad (Minho) and Classic Scenic Berhad (Classic Scenic)) covered fiscal years that fully overlapped with the six-month POI.

The petitioner, Yinfeng, and Bel Trade also submitted factual information to rebut, clarify, or correct the parties' June 17, 2020 and July 6, 2020 surrogate value submissions. In particular, on June 29, 2020, the petitioner submitted factual information to rebut, clarify, or correct the 2018 Malaysian financial statements submitted by Yinfeng and Bel Trade. On this same date, Yinfeng and Bel Trade submitted factual information to rebut, clarify, or correct the "production and comparability" of the three Brazilian financial statements. *See* Resp. SV Rebuttal Submission (June 29, 2020) (P.R. 459). Finally, on July 21, 2020, the petitioner submitted information to "rebut and clarify the activities" of five of the 18 Malaysian companies for which financial statements had been provided. *See* Pet. SV Rebuttal Submission (July 21, 2020) (P.R. 530).

Commerce published its *Preliminary Determination* on August 12, 2020. *See Wood Mouldings and Millwork Products from the People's Republic of China*, 85 Fed. Reg. 48,669 (Dep't of Commerce Aug. 12, 2020) (prelim. affirm. LTFV determ) (P.R. 616), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 548). In the *Preliminary Determination*, Commerce selected Brazil as the primary surrogate country because of the superiority of the Brazilian surrogate values and financial statements. *See* PDM at 8-9. In making this determination, Commerce did not consider Yinfeng and Bel Trade's final surrogate value submission. Commerce found that this submission, while timely within the meaning of 19 C.F.R. § 351.301(c)(3)(i), was not received by the deadline it had set to ensure consideration in the *Preliminary Determination*. *See* PDM at 6. Therefore, Commerce indicated that it would not consider the submission for the final determination.

Following the submission of case and rebuttal briefs, Commerce published its *Final Determination* on January 4, 2021. In its *Final Determination*, Commerce continued to rely on Brazil as the primary surrogate country. *See* IDM at 19-23. Commerce found that the Brazilian GTA data on the record were complete, publicly available, contemporaneous, and specific to each input used by Yinfeng. *Id.* at 19-21. In contrast, Commerce found that Malaysian GTA data did not include imports for the particular type of wood scrap that Yinfeng generated during its production process. *Id.* at 21. Regarding surrogate financial ratios, Commerce continued to find that the 2019 Brazilian financial statements of Adami and Duratex were preferable to the 2018 Malaysian financial statements considered in the *Preliminary Determination*. *Id.* Additionally, Commerce evaluated the 18 financial statements that Yinfeng and Bel Trade submitted as part of their final surrogate value submission. *Id.* at 22; *see also* DOC Final SV Memo at 3-7 (Dec. 30, 2020) (P.R. 662). While Commerce found that two Malaysian financial

statements were fully contemporaneous with the POI and reflected production of in-scope merchandise, these financial statements were less representative of Yinfeng's and Bel Trade's production processes than the financial statements of Adami and Duratex. *See* IDM at 22.

Yinfeng subsequently initiated this litigation, in which Yinfeng contests Commerce's determination to value its inputs using Brazilian GTA data and surrogate financial statements.

## SUMMARY OF ARGUMENT

The Court should sustain the *Final Determination*, because Yinfeng has not demonstrated that Commerce's findings are unsupported by substantial evidence or otherwise not in accordance with law.

First, Commerce's decision to value Yinfeng's radiata pine and sawnwood inputs using Brazilian GTA data was reasonable because the Brazilian values are specific to Yinfeng's sawnwood inputs and the GTA data offer other advantages compared with the alternative Malaysian data. Second, Commerce's finding that Brazilian financial statements are the best available information for determining surrogate financial ratios is supported by substantial evidence, where Commerce found that these financial statements are fully contemporaneous with the POI and are more specific to wood product manufacturing (*i.e.*, identical and comparable merchandise) than alternative Malaysian statements. Third, Commerce appropriately adjusted Brazilian GTA values to include international delivery charges, consistent with its established practice for import values reported on a free-on-board (*i.e.*, freight-exclusive) basis. In so doing, Commerce reasonably found that the need for this adjustment (as well as the availability of slightly more specific or contemporaneous values for certain minor inputs) did not make Malaysian GTA data a preferable surrogate value source. Fourth, Commerce did not deprive Yinfeng of any procedural rights by deferring its consideration of Yinfeng's final surrogate value submission to the *Final Determination* (as it has done in other cases).

**ARGUMENT**

I.      **Standard Of Review**

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (citations omitted), but "less than the weight of the evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). The "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* The agency's conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483–84 (1992). Moreover, it is not necessary for Commerce to provide an explicit explanation where its path is reasonably discernible. *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998); *see also Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987) ("A court may 'uphold {an agency's} decision of less than ideal clarity if the agency's path may reasonably be discerned.'" (citation omitted)).

II.     **Legal Framework For Surrogate Value Selection**

In non-market economy proceedings, Commerce determines normal value by valuing the "factors of production utilized in producing the merchandise" plus "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1)(B). Factors of production include the "hours of labor required," "quantities of raw

materials employed," "amounts of energy and other utilities consumed," and "representative capital cost, including depreciation" expended in producing subject merchandise. *Id*. at § 1677b(c)(3).

Commerce values factors of production "based on the best available information regarding the value of such factors in a market economy country or countries considered to be appropriate by the administering authority." *Id*. § 1677b(c)(1). The statute does not define the term "best available information," and Commerce has broad discretion in reaching this determination. *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014). In practice, Commerce prefers surrogate values that are publicly available, specific to the input being valued, free of taxes and duties, reflective of broad market averages, and contemporaneous with the period under consideration. *See, e.g.*, *id.*; Non-Market Economy Surrogate Country Selection Process, *Policy Bulletin* 04.1 (2004), *http://enforcement.trade.gov/policy/bull04-1.html* (last visited September 2, 2021) (*Policy Bulletin* 04.1). Additionally, when valuing manufacturing, overhead, general expenses, and profit, Commerce normally looks to the financial statements of producers of identical or comparable merchandise in the surrogate country. *See* 19 C.F.R. § 351.408(c)(4). Commerce has a regulatory preference to use as much data as possible from a single primary surrogate country. *See* 19 C.F.R. § 351.408(c)(2); *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1294 (Fed. Cir. 2016). Accordingly, Commerce will "only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable." *See Jiaxing Bro. Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 132-33 (Ct. Int'l Trade 2014) (citations omitted), *aff'd*, *Jiaxing Bro.*, 822 F.3d 1289.

While the data Commerce relies on must be the best available, "there is no requirement that the data be perfect." *Jiaxing Bro.*, 822 F.3d at 1301 (quoting *Home Meridian Int'l. Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014)).  Nor is Commerce required to duplicate the precise experience of the manufacturer in the non-market economy.  *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999).  Instead, Commerce seeks to identify and rely on the record data that "most accurately represents the fair market value" of the relevant factor of production.  *Id.*

Given Commerce's discretion to determine the "best available information," and the fact-specific nature of this inquiry, a review of Commerce's determination should question "not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing*, 822 F.3d at 1301 (citing *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011)).  When Commerce provides a reasoned basis for its finding that the selected data satisfy its criteria and constitute better data than plaintiff's alternatives, the Court will refrain from "substitut{ing} its own evidentiary evaluation for Commerce's and its own judgment for the agency's in considering and weighing the relative importance of various criteria applied." *Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1376 (Ct. Int'l Trade 2010).

## III.   Commerce's Determination That Brazilian Data Are The Best Available Information To Value Yinfeng's Factors Of Production Is Supported By Substantial Evidence

In the *Final Determination*, Commerce reasonably found that Brazilian GTA data and financial statements provide the best available information with which to value Yinfeng's factors of production.  *See* IDM at 19-23.  As such, consistent with its regulatory preference to source as much data as possible from a single country, Commerce relied on Brazil as the primary surrogate country in the investigation.  *See id.*  Yinfeng argues that Commerce's determination was

unsupported by substantial evidence and that Commerce should have concluded that Malaysian GTA data and financial statements are superior to Brazilian data. In particular, Yinfeng asserts: (1) that Malaysian GTA data for radiata pine and fir sawnwood are more specific to the inputs used in Yinfeng's production process than Brazilian GTA data; (2) that Malaysian financial statements are preferable to the Adami and Duratex financial statements upon which Commerce relied in the *Final Determination*, because they better reflect Yinfeng's production activities; (3) that Malaysian GTA data are superior because they are reported on a cost, insurance, and freight (CIF) basis (*i.e.*, they include international freight charges), while Brazilian data are reported on a free-on-board (FOB) basis (*i.e.*, international freight charges must be added to the values); and (4) that Malaysian data for other inputs (labor, truck freight, brokerage and handling, and acrylic polymer) are more specific and contemporaneous than the Brazilian counterparts.

As discussed below, Yinfeng's arguments amount to nothing more than a disagreement with how Commerce weighed the available record evidence. Because Commerce's determination is supported by substantial evidence and in accordance with law, the Court should sustain the *Final Determination* in its entirety.

### A. Commerce's Selection Of Surrogate Values For Radiata Pine And Fir Sawnwood Is Supported By Substantial Evidence

Parties submitted GTA data on the record of the underlying investigation for imports of radiata pine and fir sawnwood into Brazil and Malaysia. The Brazilian and Malaysian tariff schedules provide slightly different classifications for these inputs. Both tariff schedules contain specific subheadings for radiata pine and fir sawnwood that is chipped lengthwise, sliced or peeled, and of a thickness exceeding 6 millimeters, but the Malaysian tariff schedule further breaks out at the ten-digit level sawnwood that is "sawn lengthwise," "sliced or peeled" or "other." *See* Resp. Final SV Submission (July 6, 2020) at SV2-21 (P.R. 505). Yinfeng argued

before Commerce that the Malaysian tariff schedule offers greater specificity for its sawnwood inputs, as it exclusively consumes sawnwood that is "sawn lengthwise."

Notwithstanding this argument, Commerce found in the *Final Determination* that Brazilian GTA data were sufficiently specific to Yinfeng's sawnwood inputs. IDM at 20. Commerce also found that the Brazilian data offered other advantages because they included imports for wood scrap generated during Yinfeng's production process (while Malaysian data did not). *See id*. Yinfeng disputes these findings. *See* Yinfeng Br. at 6-13, 31-32. However, as detailed below, Commerce's *Final Determination* is supported by substantial evidence and should be sustained.

Regarding the specificity of Brazilian data, Yinfeng argued below that Brazil reports radiata pine and fir sawnwood imports at the six-digit classification level whereas Malaysia reports at the more specific ten-digit level. *See* Resp. Case Br. at 17. Commerce found that Brazilian data were actually reported at the eight-digit level and, more importantly, that (like Malaysia) the Brazilian tariff schedule included the relevant wood species consumed by Yinfeng (*i.e.*, radiata pine and fir) and wood sawn lengthwise. *See* IDM at 20. In this respect, the Brazilian and Malaysian GTA data are *both* specific to Yinfeng's inputs insofar as *both* sources include radiata pine and fir sawn lengthwise.

Although Yinfeng argues that Malaysian ten-digit GTA data are *more* specific because the Malaysian tariff schedule separates radiata pine and fir sawn lengthwise from other forms of sawnwood, Commerce is not required to "duplicate the exact production experience" of each respondent. *See Nation Ford*, 166 F.3d at 1377 (quotation marks and citation omitted). Nor did Commerce's decision to rely on Brazil as the primary surrogate country hinge on a finding that Malaysian and Brazilian GTA data capture pricing at precisely the same level of granularity. To

the contrary, Commerce explained that its decision to rely on Brazilian GTA data was also informed by the fact that Malaysian GTA data did not include any imports for the particular type of wood scrap that Yinfeng generated during its production process.[3]  *See* IDM at 20.  Because Commerce cannot calculate a surrogate value for a scrap offset without any import data, Commerce reasonably relied on Brazilian GTA data where they provided a complete set of surrogate values for each raw material input that satisfied each of Commerce's surrogate value selection criteria.  *See* 19 C.F.R. § 351.408(c)(2) (establishing preference for valuing all inputs in primary surrogate country); IDM at 20 (explaining that Brazilian GTA data are complete, publicly-available, contemporaneous, and specific to each input used to produce the subject merchandise).

Yinfeng also disputes Commerce's factual finding that scrap values are missing from the record and contends, in any event, that scrap is a "minor" cost component and that such a minor deficiency cannot "outweigh all the major advantages of Malaysia as the best surrogate country."  *See* Yinfeng Br. at 32.  Both of these arguments lack merit.

As to Yinfeng's first claim, Yinfeng asserts that its scrap is properly classified under Malaysian HTS 4401.39 rather than Malaysian HTS 4401.40 (which does not include any POI imports).  *See id.*  Malaysian HTS 4401.39 covers "Sawdust and wood waste and scrap, agglomerated, in logs, briquettes, pellets or similar forms: Other," while Malaysian HTS 4401.40 covers "Sawdust and wood waste and scrap, not agglomerated."  *See* Resp. Final SV Submission at Ex. SV2-21 (P.R. 504).  Though Yinfeng acknowledges that it "does not agglomerate {its} wood scrap into pellets," *see* Yinfeng Br. at 31-32, Yinfeng nonetheless asserts that its scrap

---

[3]  As discussed in the following section of this brief, Commerce also found Brazilian financial statements to be superior to those on the record from Malaysian companies.  *See* section III.b, *infra*.

should be valued under HTS 4401.39 (which is expressly limited to agglomerated scrap). Yinfeng bases this argument on an incorrect reading of the Malaysian tariff schedule. While Malaysian HTS 4401 generally covers scrap "*whether or not agglomerated* in logs, briquettes, pellets, or similar forms," *see* Resp. Final SV Submission at Ex. SV2-21 (P.R. 504) (emphasis added), the six-digit classifications clearly differentiate between scrap that is agglomerated and not agglomerated. Commerce, thus, correctly found that Yinfeng's scrap is more appropriately classified under HTS 4401.40 because it is in "both powder and shaving forms" and does "not appear to be agglomerated"—a finding that Yinfeng itself admits is accurate. *See* Prelim. Calc. Memo at 2 (P.R. 559); IDM at 20 & n.130 (citing Prelim. Calc. Memo at 2).

Regarding Yinfeng's second claim that scrap is only a "minor" cost component, Yinfeng cites no support for its characterization of scrap as "minor," nor did Commerce accept this premise in the *Final Determination*. *See* Yinfeng Br. at 32; IDM at 20. Instead, Commerce found that although parties disagreed on the significance of wood scrap to the valuation process, "it is clear that valuing this input with import data under the incorrect HTS subheading would result in inaccurately calculating the offset to {Yinfeng's} normal value calculation." *See* IDM at 20. Commerce reasonably declined to rely on an incorrect surrogate value when it had complete surrogate value information for Brazil that satisfied its selection criteria and (as discussed below) superior Brazilian financial statements on the record. This Court should not accept Yinfeng's invitation to reweigh the evidence by substituting its own judgment for that of Commerce. *See, e.g.*, *Bristol Metals*, 703 F. Supp. 2d at 1376 (providing that the Court should not "substitute its own evidentiary evaluation for Commerce's and its own judgment for the agency's in considering and weighing the relative importance of various criteria applied").

**B.  Commerce's Selection Of Surrogate Financial Statements Is Supported By Substantial Evidence And Otherwise In Accordance With Law**

In the *Final Determination*, Commerce evaluated each of the 20 Malaysian financial statements on the record.  Commerce found that 18 of the statements were either not contemporaneous at all or only partially contemporaneous with the POI.  *See* IDM at 21-22. Given the availability of fully contemporaneous financial statements from producers of identical merchandise in Brazil, Commerce reasonably declined to rely on these 18 statements considering its preference "to use financial statements of producers of subject merchandise that cover the entire POI, as they best reflect the respondent's production experience during the POI."  *See id.* at 22.  As to the remaining two statements that were fully contemporaneous with the POI and otherwise met Commerce's selection criteria, Commerce analyzed each statement and concluded that the Brazilian financial statements for Adami and Duratex were the best available information to value Yinfeng's financial ratios.

Yinfeng argues that Commerce's determination is not supported by the record.  *See* Yinfeng Br. at 13-25.  In particular, Yinfeng argues that in making this decision, Commerce: (1) incorrectly dismissed the four Malaysian financial statements that were only partially contemporaneous with the POI; and (2) failed to adequately support its preference for Adami and Duratex's financial statements over the two fully-contemporaneous and purportedly more comparable Malaysian financial statements (for Minho and Classic Scenic).  *See id.*  As discussed below, Commerce's reliance on Brazilian financial statements is supported by substantial evidence and should be sustained.

1. Commerce Reasonably Declined To Rely On Less Contemporaneous
Financial Statements Where Fully Contemporaneous Financial
Statements For Identical Merchandise Producers Were Available

Yinfeng argues that Commerce improperly dismissed the Malaysian financial statements of LMT Superbonus, Fine Quality, Haluan, and Chern Hinp, which captured between two to four months of the six-month POI. According to Yinfeng, Commerce's "primary concern" in selecting surrogate financial statements is specificity and that each of the four producers manufacture identical merchandise. *See* Yinfeng Br. at 14. Yinfeng also argues that Commerce treats a financial statement as contemporaneous so long as it at least partially overlaps the relevant period under consideration. *See id.* at 15-16.

Despite Yinfeng's categorical claims regarding Commerce's practice in selecting surrogate financial statements, Commerce does not "have an established hierarchy that automatically gives certain characteristics (*i.e.*, contemporaneity or specificity) more weight than others." *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 83 Fed. Reg. 35,616 (Dep't of Commerce July, 27, 2018) (final results of AD admin. review), and accompanying Issues and Decision Memorandum at 44. Instead, Commerce makes a determination in each case as to what is the "best available information" with which to value a respondent's factors of production. *See* 19 U.S.C. § 1677b(c); *see also SeaH Steel Vina Corp. v. United States*, 950 F.3d 833, 842 (Fed. Cir. 2020) ("Commerce's 'best available information' analysis is context and fact dependent."). Generally speaking, Commerce selects financial statements based on the specificity, contemporaneity, and quality of the data. *See T.T. Int'l Co. v. United States*, 439 F. Supp. 3d 1370, 1382 (Ct. Int'l Trade 2020). Additionally, in accordance with 19 C.F.R. § 351.408(c)(4), Commerce prefers financial statements from producers of identical or comparable merchandise in the surrogate country.

16

Here, the record contains four fully-contemporaneous financial statements from producers of identical merchandise in countries found to be at a comparable level of economic development to China (*i.e*, Malaysia and Brazil). In these circumstances, Commerce reasonably declined to rely on partially-contemporaneous financial statements for LMT Superbonus, Fine Quality, Haluan, and Chern Hinp when there were better alternatives on the record. *See* IDM at 22 (finding that fully contemporaneous statements "best reflect the respondent's production experience during the POI"). Indeed, when faced with similar facts in other proceedings, Commerce has preferred fully contemporaneous data. *See, e.g.*, *Fresh Garlic from the People's Republic of China*, 84 Fed. Reg. 61,023 (Dep't of Commerce Nov. 12, 2019) (final results of NSR), and accompanying IDM at 15 (relying on Romanian surrogate values where they were contemporaneous with the period of review and the alternative Mexican data were "not fully contemporaneous"); *Magnesium from Israel*, 84 Fed. Reg. 65,781 (Dep't of Commerce Nov. 29, 2019) (final affirm. LTFV determ.), and accompanying IDM at 19 (relying in similar circumstances on financial statements for a single company where they were "more contemporaneous and, as such, a superior alternative" as compared with financial statements overlapping only nine months of the POI).

Additionally, Yinfeng misstates the record in arguing that Commerce "did not consider" the partially-contemporaneous financial statements. *See* Yinfeng Br. at 17. While Commerce ultimately declined to rely on the financial statements given that they only partially overlapped the POI, Commerce also provided a "more detailed analysis" of the financial statements in its final surrogate value memorandum. *See* IDM at 22 & n.144. For example, Commerce found that LMT Superbonus's principal activities are "trading logs, sawn timber and timber pallets"; Fine Quality's principal activities are "timber grading and dealing in timber and rubber wood";

Haluan's principal activities are "trading in timber products," including the "distribution, marketing and manufacturing of quality tropical timber and semi-finished products"; and Chern Hinp's principal activities are "the trading of timber and provision of timber moulding services and labor supply." *See* DOC Final SV Memo at 4-5 (P.R. 662). In other words, while Commerce found some evidence that each of these four companies produced identical merchandise, *see* IDM at 22, each company was principally engaged in additional business activities such that they were not clearly superior to the fully-contemporaneous statements that Commerce analyzed in greater detail in the *Final Determination*. Yinfeng does not address or even acknowledge these findings, let alone explain why they are unsupported by substantial evidence. In sum, Yinfeng has identified no basis to set aside Commerce's *Final Determination* not to rely on the partially contemporaneous financial statements of LMT Superbonus, Fine Quality, Haluan, and Chern Hinp.

> 2. Commerce Reasonably Determined that Brazilian Financial Statements Are the Best Available Information from Which to Calculate Yinfeng's Financial Ratios

Yinfeng further claims that the Brazilian financial statements of Adami and Duratex were not the best available information for calculating Yinfeng's financial ratios. In this regard, Yinfeng claims: (1) that Adami does not produce identical merchandise; and (2) that Adami and Duratex are "large conglomerates" that are engaged in a range of business sectors and that operate at a different level of integration than Yinfeng. *See* Yinfeng Br. at 18-25. Yinfeng contends that, in contrast, the financial statements of Minho and Classic Scene reflect "identical or highly comparable" production at a similar level of integration as Yinfeng. *See* Yinfeng Br. at 16-17, 23. Because Yinfeng fails to demonstrate that Commerce's weighing of the record evidence was unreasonable, this Court should sustain Commerce's *Final Determination* with respect to the selection of surrogate financial statements.

a.  *Substantial Record Evidence Supports Commerce's Determination*
*That Adami Produces Identical Merchandise*

As an initial matter, Yinfeng's claim that Adami does not produce identical merchandise is belied by record evidence and rests on pure speculation.  In this regard, Adami's 2019 financial statements report revenues from sales of "wood processing products such as frames, pine panels, doors, door and pellet kits."  *See* Pet. SV Submission at Ex. 8A at 119 (P.R. 416). Similarly, Adami's website states that it began producing sawn, raw, and processed wood in 1994, and that its processed wood production included "blocks, blan{k}s, panels and frames" from processed wood.  *See id.* at 131, 133.  As of 2020, Adami described its "main products" as including "pallets, panels, frames, doors, {and} door kits" among other products, and items such as crown mouldings and frames are listed among Adami's product offerings.  *See* Resp. Rebuttal SV Submission at Ex. SVR-1 (P.R. 459).  Commerce reasonably found that these products describe in-scope (*i.e.*, identical) merchandise, because the *Order* specifically includes wood blocks, blanks, and building components such as "interior paneling," and wooden door components such as frames, frame kits, and frame trim.  *See Order* at App. 1.

Yinfeng seeks to substitute its judgment for that of Commerce in weighing the record evidence regarding Adami.  For example, Yinfeng argues that Adami's website indicates that it only "recently expanded and modernized" its facilities to produce blocks, blanks, panels, and frames, which suggests that at most the company produced a "very small or inconsequential amount of mouldings" and that the financial results would be skewed by start-up operation expenses. Yinfeng Br. at 20.  This argument is speculative, and Yinfeng cites no probative record evidence that would support its hypothesis.  *See, e.g.*, *Jinxiang Yuanxin Imp. & Exp. Co. v. United States*, 71 F. Supp. 3d 1338, 1351 (Ct. Int'l Trade 2015) ("It is well established that speculation does not constitute substantial evidence.").  In fact, available record evidence

supports the opposite conclusion. At the top of the same website cited by Yinfeng, Adami notes that it "started to produce blocks, blan{k}s, panels, and frames" in 1994, meaning that any "recent" expansion merely improved existing production facilities. This conclusion finds support in Adami's financial statements, which (as noted above) indicate that Adami generated revenue from sales of millwork products during the POI. *See* Petitioner Initial SV Submission at Ex. 8A at 119 (P.R. 416). Thus, Yinfeng's contentions lack merit.

> b. *Substantial Record Evidence Supports Commerce's Determination That Adami And Duratex Are Better Surrogate Sources Than Minho And Classic Scene*

Yinfeng also asserts that Adami has multiple divisions capturing more than just wood production, including forestry, energy, chemical, and paper/cardboard box divisions. *See* Yinfeng Br. at 19. According to Yinfeng, the manufacturing and overhead costs associated with growing and harvesting trees, as well as producing chemicals, energy, and boxes, are not comparable to the costs of manufacturing millwork products. Regarding Duratex, Yinfeng asserts that in addition to wood products, Duratex operates two product divisions for deca (including ceramic, metal, and electronic showers) and ceramic tiles that are not "remotely comparable" to millwork products. *See id*. at 20-21. Yinfeng further contends that even Duratex's wood products division is primarily devoted to forestry and dissimilar wood products such as particle board, medium density fiber board, and laminated wood flooring. Finally, Yinfeng argues that Duratex's financial statements reflect the performance of subsidiaries in non-economically comparable countries such as Belgium, Colombia, and Uruguay and, as such, are not comparable for this reason as well. *Id*.

Before addressing Yinfeng's specific arguments regarding the Brazilian data, it is important to recall that Commerce is not considering the Brazilian statements in a vacuum. While Commerce must select the "best available information" for valuing financial ratios, this

information need not be perfect and what is the "best available" will necessarily vary with each case. Therefore, any assessment of the Brazilian statements should begin with a similar evaluation of Yinfeng's preferred Malaysian financial statements. In this regard, and as described below, Commerce found in the *Final Determination* that Minho and Classic Scene "have multiple divisions not involved with the subject merchandise" and, unlike Yinfeng, "timber trading and extraction operations and activities." *See* IDM at 22.

Minho in particular is an investment holding company whose financial statements consolidate data for multiple subsidiaries. The holding company describes the group of subsidiaries as a "well diversified and fully integrated business entity involved in a wide range of activities" that include property development and building construction, chemical services and custom kiln drying, rough sawntimber trading and logging, manufacturing of paper bags, and "plantation." *See* Resp. Final SV Submission at Ex. SV2-3 (P.R. 490) at Company Information (following Minho Group 2019 Annual Report); *see also id.* at Minho Group 2019 Annual Report at 3, 10, 104-05, 121 (describing main business segments and subsidiaries' principal business activities). Only certain of Minho's consolidated entities are directly engaged with wood products, and only one (Victory Enterprise Sdn Bhd) is involved with identical merchandise among other items (including sawntimber and garden furniture). *See id.* at 104-05; *see also generally* DOC Final SV Memo at 3 & n. 14. Another subsidiary, Lionvest Corporation (Pahang) Sdn. Bhd. is involved in timber trading, timber extraction, and forestry operations at an "integrated timber complex," while Lionvest Timber Industries Sdn. Bhd. operates a sawmill that manufactures rough sawntimber products using logs sourced primarily from the group's own logging concessions. Resp. Final SV Submission at Ex. SV2-3 (P.R. 490) at Minho Group 2019 Annual Report at 104-05 and Company Information. As pictures on Minho's website suggest,

rough sawntimber is an upstream and less processed form of wood than millwork products.  Pet. SV Rebuttal Submission at Ex. 1 (P.R. 530).

Classic Scenic is also an investment holding company and its 2019 annual report consolidates the financial data of four active subsidiaries.  *See generally* DOC Final SV Memo at 4 & n. 19-21 (citing Yinfeng Final SV Submission (P.R. 490) at SV2-3 at Classic Scenic Group 2019 Annual Report at 11).  Of the four active subsidiaries, one subsidiary (Finesse Moulding (M) Sdn. Bhd) manufactures what appears to be identical merchandise in the form of wooden picture frame mouldings, a second subsidiary manufactures other timber products including wooden pallets, and the remaining two subsidiaries are property holding and rental companies.  *See* Yinfeng Final SV Submission (P.R. 490) at SV2-3 at 11 and Company Information (Corporate Profile).

Turning now to Yinfeng's arguments regarding the Brazilian financial statements upon which Commerce relied in the *Final Determination*, like Minho and Classic Scenic, Adami and Duratex are engaged in production activities beyond the manufacturing of millwork products. Additionally, like Minho, Adami and Duratex appear to maintain forestry units that supply wood for downstream wood products.  *See* IDM at 22.  When faced with no single financial statement that perfectly approximates Yinfeng's own production experience, Commerce reasonably found that the data for the two Brazilian producers "best represents the industry under investigation, as they are limited more to wood products and are less inclusive of industries unrelated to the merchandise under investigation."  *See* IDM at 22.

In this regard, and as noted in the *Final Determination*, Adami is primarily engaged in the production of wood products and does not have the varied business activities of Minho and Classic Scenic.  *See id.*; *see also* Pet. SV Submission at Ex. 8A at 93 (P.R. 416) (describing

Adami's operational context); Resp. Rebuttal SV Submission at Ex. SVR-1 (P.R. 459)
(describing Adami's main products as "sawn and processed wood, pallets, panels, frames, doors,
door kits, modulated, packaging paper, sheets and corrugated boxes, electricity and the planting
of productive forests, since production seedlings until harvest"). For example, Adami does not
appear to be engaged in timber trading like Minho and Classic Scenic and, like Yinfeng,
processes timber into further manufactured products. Additionally, Adami does not have
subsidiaries that are engaged in dissimilar property development and rental services. While
Yinfeng is correct that Adami also has forestry operations, the same is true of Minho (which, as
detailed above, maintains an "integrated timber complex"). Lastly, Yinfeng's concern about
Adami producing chemical paste is misplaced considering that Minho is likewise engaged in kiln
drying and chemical preservative treatment. *See* Resp. Final SV Submission at Ex. SV2-3 at
Minho Group 2019 Annual Report at 121 and Company Information (P.R. 490).

Similarly, Duratex operates three main business units, one of which is engaged
exclusively in wood products (including particle and fiber board, flooring, and forestry), and two
of which focus on ceramic products. Notwithstanding these diversified operations, Duratex's
financial statements report relevant financial data by business unit. *See* IDM at 22. As such,
Commerce was able to calculate surrogate financial ratios just for Duratex's wood products
division; the fact that Duratex also manufactures ceramic products is, thus, irrelevant. *Compare*
Yinfeng Br. at 20-21. For this same reason, Yinfeng's concern about Duratex operating in
multiple countries is largely allayed by Commerce's ability to isolate financial data specific to
the wood products division (which is based only in Brazil and Colombia).[4] Finally, although

---

[4] Despite having operations in Colombia, Duratex is oriented towards the Brazilian market. In
this regard, Duratex is a leader in the Brazilian market, is headquartered in Sao Paolo, and
operates all but 3 of its 20 industrial units out of Brazil. *See* Resp. Rebuttal SV Submission at
Ex. SVR-2 (P.R. 459).

Yinfeng is correct that Duratex's wood division does not solely manufacture millwork products, the same is true of Minho and Classic Scenic. As described above, Minho also manufactures paper bags and rough sawntimber among other varied business activities (including timber trading and logging, property development, and chemical services) and Classic Scenic also manufactures wooden pallets among other varied business activities (including the provision of property holding and rental services). It was not unreasonable for Commerce to prefer Duratex's financial statements to those of Minho and Classic Scenic under the circumstances, given that they were more specific to wood products (*i.e.*, identical and comparable merchandise). It is not the role of Yinfeng or this Court to reweigh the evidence and the reasonable conclusions that Commerce drew therefrom.

Finally, Yinfeng asserts that Commerce often makes surrogate country determinations based on the quantity of the financial statements available from a particular country. According to Yinfeng, Commerce prefers to use multiple statements to avoid cost distortions that may exist in a single company's financial statements. *See* Yinfeng Br. at 25-26. Although Yinfeng is correct that Commerce generally prefers to use multiple financial statements, this preference is not dispositive. *See, e.g.*, *Heze Huayi Chem. Co. v. United States*, Court No. 20-00058, 2021 WL 3417972, at *15 (Ct. Int'l Trade Aug. 5, 2021) (sustaining Commerce's decision to rely on single financial statement where alternatives were unusable or not the best available information) (citing *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1373 (Fed. Cir. 2010)); *see also Corrosion Inhibitors from the People's Republic of China*, 86 Fed. Reg. 7363 (Dep't of Commerce Jan. 29, 2021) (final affirm LTFV determ.), and accompanying IDM at 9 (disagreeing that "having three Mexican financial statements provides a more accurate calculation compared to one Malaysian

financial statement" because the Mexico operations were "less comparable" to that of the mandatory respondents).

Here, consistent with its practice, Commerce relied on multiple (*i.e.*, two) financial statements from Brazilian producers of identical or comparable merchandise. The mere fact that Malaysian statements are more numerous does not necessarily make Malaysia a preferable source for surrogate financial ratios, and Commerce reasonably declined to elevate numerosity above the superior comparability of the Brazilian data. In any event, as discussed above, Commerce found that only two of the Malaysian financial statements satisfied the breadth of its surrogate selection criteria. In this respect, Malaysian statements are no more numerous than Brazilian statements—for both countries, there are two useable financial statements on the record and Commerce acted reasonably in averaging only the Brazilian statements.

### C. Commerce's Decision To Rely On Superior Brazilian GTA Data, Notwithstanding That Import Values Were Reported On An FOB Basis, Is Supported By Substantial Evidence

As set forth above, Commerce appropriately found that Brazilian data were the best available information for valuing Yinfeng's factors of production in the *Final Determination*. Because the Brazilian GTA data reported import values on an FOB basis, Commerce added international delivery charges (*i.e.*, marine insurance and ocean freight) to convert the import values to freight-inclusive CIF values. *See* IDM at 20-21. Although Yinfeng recognizes that this adjustment was consistent with Commerce's practice, Yinfeng asserts that Commerce should have relied on Malaysian import values in the first instance because they already included the relevant delivery charges and required no adjustment. According to Yinfeng, Commerce failed to consider this superior aspect of the Malaysian import values in weighing the quality of the Brazilian and Malaysian data. Yinfeng is incorrect.

Commerce's *Policy Bulletin 10.2* provides that "in situations where the surrogate country import statistics do not include international freight costs, the Department will add international freight and foreign brokerage and handling charges to the import value." *See Policy Bulletin 10.2* at 1. This practice stems from Commerce's policy concern that limiting surrogate country selection to "countries that report import data on a CIF basis could have the effect of unreasonably limiting the potential pool of surrogate value source countries." *See Certain Quartz Surface Products from the People's Republic of China*, 84 Fed. Reg. 23,767 (Dep't of Commerce May 23, 2019), and accompanying IDM at 62-63. Therefore, rather than disregard FOB sources entirely, Commerce will adjust FOB import values to a CIF basis where they are the best available information for valuing a respondent's factors of production. *See, e.g.*, *id.; Hydrofluorocarbon Blends from the People's Republic of China*, 84 Fed. Reg. 17,380 (Dep't of Commerce Apr. 25, 2019) (final admin. review); *Certain Aluminum Foil from the People's Republic of China*, 83 Fed. Reg. 9282 (Dep't of Commerce Mar. 5, 2018) (final affirm. LTFV determ.), and accompanying IDM at 13-14; *Antidumping Duty Investigation of Common Alloy Aluminum Sheet from the People's Republic of China*, 83 Fed. Reg. 57,421 (Dep't of Commerce Nov. 15, 2018) (final affirm. LTFV determ.), and accompanying IDM at 26. This Court has determined that Commerce's practice is reasonable. *See Heze Huayi Chem. Co. v. United States*, Court No. 20-00058, 2021 WL 3417972, at *21 (CIT Aug. 5, 2021).

Commerce followed its practice in the *Final Determination*. After "careful consideration of the surrogate producer financial data on the record" and the "quality of the GTA import data on the record," Commerce found that "Brazil continues to provide the best {surrogate value} data without needing to consider the difference in delivery terms" as a potential "tie-breaker" among equally reliable and complete data alternatives. *See* IDM at 21. In this regard, the cases

that Yinfeng cites in its brief are distinguishable.   In *Steel Racks from China*, Commerce relied on freight-inclusive  Romanian data rather than Brazilian  data where "the totality of the evidence" suggested that Romania provided  superior data (including,  as in this case, superior financial statements).   *Certain Steel Racks and Parts Thereof from the People's Republic of China*, 74 Fed. Reg. 35,595  (Dep't of Commerce July 24, 2019)  (*Steel Racks from China*), and accompanying IDM at 7-9.  In so doing, Commerce  expressly clarified  that the difference in delivery terms alone was not "sufficient to determine that Romania is preferable to Brazil as a surrogate country."  *See id.* at 9.  Similarly,  in *Activated Carbon from China*, Commerce cited the fact that Malaysian imports values were on a CIF basis as one of many factors that caused it to select Malaysia as a surrogate country in that remand redetermination.   For example, the Malaysian data also included a surrogate value for a key raw material input,  and the competing Philippines  data did not.  *See Jacobi Carbons AB v. United States*, Consol. Court No. 16-00185, Slip Op. 19-28 (CIT March 5, 2019),  Final Results of Redetermination  Pursuant to Court Remand  (*Activated Carbon from China*).

Yinfeng also takes exception to the reliability  of the surrogate values that Commerce used to value ocean freight and marine insurance.  Specifically,  Yinfeng asserts that Commerce's adjustment for marine insurance relies on data predating the POI by nine years and the ocean freight values are for shipping  "wood products" from China to the United States and do not reflect what a mouldings  producer would pay to import into Brazil.  *See* Yinfeng Br. at 27. Beyond this mere assertion, Yinfeng does not explain  why the values are unreliable  or why any imprecision  is disqualifying  given the otherwise superior aspects of the Brazilian data. Moreover, while Yinfeng recognizes that Commerce's practice is to add international  delivery charges to FOB import  values, Yinfeng did not submit  any alternative  freight data during the

underlying investigation. And despite complaining that Commerce added international delivery values to the record on its own accord, *see* Yinfeng Br. at 27, Yinfeng did not submit information to rebut, clarify, or correct the values even when afforded with an opportunity to do so. *See* Commerce Prelim SV Memo (August 7, 2020) at 2 (P.R. 553). Therefore, the Court should sustain Commerce's *Final Determination* in this regard.

### D. Commerce Addressed Yinfeng's Claims Regarding Labor, Truck Freight, Brokerage And Handling, And Acrylic Polymer And Adequately Explained Why It Continued To Rely On Brazil As The Primary Surrogate Country

In the *Final Determination*, consistent with 19 C.F.R. § 408(c)(2), Commerce valued all of Yinfeng's factors of production using data from the primary surrogate country (*i.e.*, Brazil). As such, Commerce relied upon Brazilian rates for labor, truck freight, brokerage and handling, and acrylic polymers. Yinfeng argues that Malaysian data offered greater specificity and/or contemporaneity for these minor inputs. *See* Yinfeng Br. at 30-31.

Commerce addressed these arguments in its *Final Determination* and explained why they did not merit changing the primary surrogate country in the investigation. Regarding acrylic polymers, Commerce found that the Brazilian and Malaysian HTS subheadings were both specific to acrylic polymers in primary forms (which is what Yinfeng reported consuming during the POI). While acknowledging that the Malaysian tariff schedule offers a more detailed breakout for the specific type of primary acrylic polymer used by Yinfeng (*i.e.*, acrylic polymer in dispersed form), Commerce found that this input was "but one of many data considered in our surrogate country selection decision." *See* DOC Final SV Memo at 2 (P.R. 662). Similarly, regarding labor, truck freight, and brokerage and handling, Commerce found that Yinfeng's claims were "valid" insofar as Malaysian values were slightly more specific or contemporaneous than their Brazilian counterparts, but nonetheless found that this slight superiority was just one of

many data considerations that Commerce balanced in rendering its *Final Determination*. *See id.* at 2-3.

In sum, Commerce reasonably found that any slight superiority in the Malaysian data with respect to specificity and/or contemporaneity for these inputs did not outweigh the otherwise superior aspects of the Brazilian data. Again, Yinfeng entirely fails to address these findings or explain why Commerce's weighing of the evidence was unreasonable. Therefore, the Court should dismiss Yinfeng's arguments in this regard.

## IV.   Commerce Conducted A Proper Investigation

Lastly, Yinfeng begins its brief by "not{ing} a procedural unfairness" in the underlying investigation. *See* Yinfeng Br. at 5. In particular, Yinfeng argues that Commerce contravened its past practice in deferring its consideration of Yinfeng's final surrogate value submission to the *Final Determination*. According to Yinfeng, Commerce's deferral "prejudiced" Yinfeng's ability to defend itself in the investigation. *Id.* at 4-6. The Court should summarily dismiss Yinfeng's arguments in this regard.

As an initial matter, Yinfeng's vague objection is wholly undeveloped. Yinfeng does not identify specific arguments or claims that it would have raised had Commerce considered its final surrogate value submission in the *Preliminary Determination*. Nor does Yinfeng request any particular relief; in fact, this claim was not raised at all in its complaint. As this Court has previously found, "{i}t is well-settled that undeveloped arguments, such as this one, are 'deemed waived.'" *See Coal. for Fair Trade in Garlic v. United States*, 437 F. Supp. 3d 1347 (Ct. Int'l Trade 2020) (quoting *United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013)). Therefore, the Court should not attempt to articulate claims for Yinfeng that it simply has not made.

In any event, Yinfeng cannot seriously argue that it was deprived of any procedural rights before Commerce. When Commerce solicited surrogate value information, it stated that information received after June 17, 2020, may not be considered in the preliminary determination. However, consistent with its regulation, Commerce stated that it would continue to accept factual information to value the factors of production up until 30 days before the preliminary determination. *See id.* (citing 19 C.F.R. § 351.301(c)(3)). Therefore, Yinfeng was on notice that Commerce may not have the resources to consider new factual information submitted after June 17, 2020, for the preliminary determination, especially where such factual information consisted of 18 new financial statements among other data. Despite Yinfeng's arguments otherwise, it was not "arbitrary" for Commerce to enforce an explicit deadline of which all parties were aware. Nor does Commerce, as Yinfeng asserts, have a "practice" of considering surrogate value submissions submitted after an established deadline. *See, e.g.*, *Xanthan Gum from the People's Republic of China*, 82 Fed. Reg. 36,746 (Dep't of Commerce Aug. 7, 2017) (prelim. results AD admin. review), and accompanying PDM at 16 (deferring consideration to final determination of surrogate values received after specified deadline). That Commerce may have done so in certain cases based on a case-specific assessment of its resources does not mean that Commerce is precluded from reaching a different assessment in another proceeding.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' motion for judgment on the administrative record and sustain Commerce's *Final Determination* in its entirety.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Claudia Burke
CLAUDIA BURKE
Assistant Director

/s/ Ioana Cristei

OF COUNSEL:                              IOANA CRISTEI
                                         Trial Attorney
Shelby M. Anderson                       U.S. Department of Justice,
Senior Attorney                          Civil Division
Office of the Chief Counsel              Commercial Litigation Branch
For Trade Enforcement & Compliance       P.O. Box 480
                                         Ben Franklin Station
                                         Washington, DC 20044
                                         Tel: (202) 305-0001


October 13, 2021                         Attorneys for Defendant United States

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Rules of this Court in that it contains 8,691 words, including text, footnotes, and headings.


/s/ Ioana Cristei