NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr>
<td>

**FUJIAN YINFENG IMP & EXP TRADING CO., LTD.,**

                      **Plaintiff,**

    **v.**

**UNITED STATES,**

                   **Defendant,**

    **and**

**COALITION OF AMERICAN MILLWORK PRODUCERS,**

                  **Defendant-Intervenor.**

</td>
<td>

**Before: Hon. Gary S. Katzmann, Judge**

**Court No. 21-00087**

<u>**NON-CONFIDENTIAL VERSION**</u>

**Business Proprietary Information Removed from Page 14**

</td>
</tr>
</table>

## <u>COALITION OF AMERICAN MILLWORK PRODUCERS' RESPONSE BRIEF</u>

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Elizabeth S. Lee, Esq.

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Coalition of American Millwork Producers*

Dated: October 13, 2021

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................... 1

II.    RULE 56.2 STATEMENT ............................................................................ 1

     A.    Administration Decision Under Review ..................................................1

     B.    Issues Presented ...................................................................................1

III.   STATEMENT OF FACTS ........................................................................... 3

IV.   ARGUMENT ................................................................................................ 8

     A.    Commerce's Selection of Brazil as the Primary Surrogate Country Was Supported by Substantial Evidence, Reasonable, and in Accordance with Law ..........................................................................8

     B.    Commerce's Surrogate Value Selection for Sawnwood Was Supported by Substantial Evidence, Reasonable, and in Accordance with Law ...................................................................................16

     C.    Commerce's Selection of Surrogate Financial Statements Was Supported by Substantial Evidence, Reasonable, and in Accordance with Law ...................................................................................18

V.    CONCLUSION............................................................................................ 32

Ct. No. 21-00087                                     NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ancientree Cabinet Co. v. United States*,
    No. 20-00114, slip op. 21-87 (Ct. Int'l Trade July 12, 2021) ...............................17

*Fine Furniture (Shanghai) Ltd. v. United States*,
    353 F. Supp. 3d 1323 (Ct. Int'l Trade 2018) ........................................21

*FMC Corp. v. United States*,
    27 CIT 240 (2003) ....................................................19

*FMC Corp. v. United States*,
    87 F. App'x 753 (Fed. Cir. 2004) ........................................19

*Jiaxing Brother Fastener Co. v United States*,
    35 CIT 436, 774 F. Supp. 2d 1303 (2011) ...............................4, 19

*Jiaxing Brother Fastener Co. v. United States*,
    428 F. Supp. 3d 1364 (Ct. Int'l Trade 2020) ............................3

*NTSF Seafoods Joint Stock Co. v. United States*,
    487 F. Supp. 3d 1310 (Ct. Int'l Trade 2020) .............................23

*Sandvik Steel Co. v. United States*,
    164 F.3d 596 (Fed. Cir. 1998) ............................................17

*SeAH Steel Vina Corp. v. United States*,
    950 F.3d 833 (Fed. Cir. 2020) .........................................31, 32

*Shenzhen Xinboda Indus. Co. v. United States*,
    976 F. Supp. 2d 1333 (Ct. Int'l Trade 2014) .............................22

*Wuhan Bee Healthy Co. v. United States*,
    29 CIT 587, 374 F. Supp. 2d 1299 (2005) ................................8, 32

*Xiamen Int'l Trade and Indus. Co. v. United States*,
    37 CIT 1724, 953 F. Supp. 2d 1307 (2013) ...............................21

**Statutes**

19 U.S.C. § 1677b(c)(1) ..................................................3, 4, 18

19 U.S.C. § 1677b(c)(4) ....................................................3

Ct. No. 21-00087                                    NON-CONFIDENTIAL VERSION

28 U.S.C. § 2637(d) ............................................................................................17

**Regulations**

19 C.F.R. § 351.301(c)(3) ....................................................................................4

**Administrative Materials**

*Folding Metal Tables and Chairs From the People's Republic of China,*
    76 Fed. Reg. 2,883 (Dep't Commerce Jan. 18, 2011) ............................................22

*Antidumping Duties; Countervailing Duties,*
    61 Fed. Reg. 7,308 (Dep't Commerce Feb. 27, 1996)............................................22

*Cast Iron Soil Pipe Fittings From the People's Republic of China,*
    83 Fed. Reg. 33,205 (Dep't Commerce July 17, 2018) ..........................................10

*Certain Frozen Fillets From the Socialist Republic of Vietnam,*
    72 Fed. Reg. 13,242 (Dep't Commerce Mar. 21, 2007) ........................................23

*Certain Quartz Surface Products From the People's Republic of China,*
    84 Fed. Reg. 23,767 (Dep't Commerce May 23, 2019) ...........................................9

*Certain Steel Nails From the People's Republic of China,*
    79 Fed. Reg. 19,316 (Dep't Commerce Apr. 8, 2014)............................................23

*Certain Steel Racks and Parts Thereof From the People's Republic of China,*
    84 Fed. Reg. 35,595 (Dep't Commerce July 24, 2019) ..........................................10

*Chlorinated Isocyanurates From the People's Republic of China,*
    85 Fed. Reg. 67,709 (Dep't Commerce Oct. 26, 2020) ..........................................30

*Circular Welded Carbon-Quality Steel Pipe From the Socialist Republic of
    Vietnam,* 81 Fed. Reg. 75,042 (Dep't Commerce Oct. 28, 2016)..........................22

*Citric Acid and Certain Citrate Salts From the People's Republic of China,*
    80 Fed. Reg. 77,323 (Dep't Commerce Dec. 14, 2015) ........................................18

*Coated Free Sheet Paper from the People's Republic of China,*
    72 Fed. Reg. 60,632 (Dep't Commerce Oct. 25, 2007) ........................................31

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,
    From the People's Republic of China,* 82 Fed. Reg. 29,033 (Dep't Commerce
    June 27, 2017)....................................................................................................21

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,
    From the People's Republic of China,* 85 Fed. Reg. 62,275 (Dep't Commerce
    Oct. 2, 2020) ......................................................................................................22

**NON-CONFIDENTIAL VERSION**

*Freshwater Crawfish Tail Meat From the People's Republic of China*,
   82 Fed. Reg. 17,634 (Dep't Commerce Apr. 12, 2017)........................................................21

*Hardwood and Decorative Plywood From the People's Republic of China*,
   78 Fed. Reg. 58,273 (Dep't Commerce Sept. 23, 2013)........................................................20

*Multilayered Wood Flooring From the People's Republic of China*,
   82 Fed. Reg. 25,766 (Dep't Commerce June 5, 2017) ........................................................31

## I.      INTRODUCTION

On behalf of the Coalition of American Millwork Producers ("Petitioner"), we respectfully submit the following response to the opening brief filed by Plaintiff Fujian Yinfeng Imp & Exp Trading Co., Ltd. ("Yinfeng").  Pl.'s Rule 56.2 Mem. in Supp. of Mot. for J. Upon the Agency R. (July 23, 2021), ECF No. 18-2 ("Yinfeng Br.").

## II.     RULE 56.2 STATEMENT

### A.      Administration Decision Under Review

Yinfeng challenges the U.S. Department of Commerce's ("Commerce") final determination in the antidumping duty investigation on wood mouldings and millwork products ("WMMP") from the People's Republic of China ("China").  *See* Issues and Decision Memorandum accompanying *Wood Mouldings and Millwork Products From the People's Republic of China*, 86 Fed. Reg. 63 (Dep't Commerce Jan. 4, 2021) (final affirm. deter. of sales at less than fair value), P.R. 661 ("Final Determination").  *See also Wood Mouldings and Millwork Products From the People's Republic of China*, 86 Fed. Reg. 9,486 (Dep't Commerce Feb. 16, 2021) (amended final antidumping duty deter. and antidumping duty order), P.R. 681.[1]

### B.      Issues Presented

#### 1.      Whether Commerce's Selection of Brazil as the Primary Surrogate Country Was Supported by Substantial Evidence.

Yes.  Commerce's selection of Brazil as the primary surrogate country was supported by substantial evidence, reasonable, and in accordance with law.  The agency's final determination makes clear that it reviewed the record evidence as a whole and determined – as the fact-

---

[1]      Documents contained in the administrative record are identified by the name and date of the documents, followed by the confidential ("C.R.") and public ("P.R.") record numbers assigned to these documents in the respective administrative record indices filed with the Court on April 12, 2021.  *See* Administrative R., ECF No. 14 (Apr. 12, 2021).

finder – that the Brazilian Global Trade Atlas ("GTA") data and the financial statements for two of the Brazilian producers provided the best available information with which to value the respondent's factors of production ("FOP"). Commerce weighed the evidence and determined that the Brazilian data represented the best available information to serve as surrogate values ("SV"), and the agency's conclusions are consistent with its practice. Yinfeng simply disagrees with Commerce's conclusion and asks the Court to reweigh the evidence – challenging the agency's determination in a piecemeal manner. In doing so, Yinfeng fails to acknowledge the record as a whole and ignores the broad discretion that Commerce has to determine the best available information on a case-by-case basis.

### 2. Whether Commerce's Surrogate Value Selection for Sawnwood Was Supported by Substantial Evidence.

Yes. Commerce correctly concluded that the Brazilian HTS for sawnwood was specific to the respondent's input. This determination was supported by substantial evidence, consistent with the agency's practice, and thoroughly explained. Given this and the totality of the factors that Commerce relied on in finding that Brazil offered the best available information for SVs, together with the agency's well-established preference to value all FOPs from the primary surrogate country, the agency's determination was reasonable.

### 3. Whether Commerce's Selection of Surrogate Financial Statements Was Supported by Substantial Evidence.

Yes. Commerce reviewed the record as a whole, examining each of the twenty-three financial statements placed on the record, weighed the evidence as the fact-finder, and determined that the financial statements of two Brazilian producers were the best available information for surrogate financial ratios. Commerce's determination was supported by substantial evidence and thoroughly explained. Yinfeng simply disagrees with Commerce's conclusion and asks the Court

to reweigh the evidence.  Contrary to Yinfeng's claims, there were numerous flaws with the Malaysian financial statements that rendered them unsuitable for purposes of calculating surrogate financial ratios.  Yinfeng fails to demonstrate that Commerce acted unreasonably, particularly given the agency's broad discretion to determine the "best available information" to value FOPs on a case-by-case basis.

## III.   <u>STATEMENT OF FACTS</u>

Below, Petitioner lays out pertinent legal and factual background regarding the issues raised in Yinfeng's appeal.

In an antidumping duty proceeding involving a non-market economy ("NME"), such as China, normal value is determined on the basis of FOPs from the surrogate country or countries used to product subject merchandise.  *See* 19 U.S.C. § 1677b(c)(1), (4); *Jiaxing Brother Fastener Co. v. United States*, 428 F. Supp. 3d 1364, 1371 (Ct. Int'l Trade 2020).  When several countries are at a level of economic development comparable to the NME country and significant producers of comparable merchandise, Commerce evaluates the reliability and completeness of the data and generally selects the one with the best and most specific available data as the primary surrogate country.  *See Jiaxing Brother Fastener Co.*, 428 F. Supp. 3d at 1372.  The statute requires Commerce to use "the best available information" to value FOPs.  19 U.S.C. § 1677b(c)(1).  Commerce has discretion to determine what constitutes the best available information, which is not defined by statute.  *See id.*; *Jiaxing Brother Fastener Co.*, 428 F. Supp. 3d at 1372 (citing *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011)).  Commerce generally selects, to the extent practicable, SVs that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review.  *See Jiaxing Brother Fastener Co.*, 428 F. Supp. 3d at 1372 (citing *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d

1378, 1386 (Fed. Cir. 2014)).   As this Court has explained, "{w}hen reviewing Commerce's

decision as to what constitutes the 'best available information' under 19 U.S.C. § 1677b(c)(1), the

Court does not 'evaluate whether the information Commerce used was the best available, but rather

whether a reasonable mind could conclude that Commerce chose the best available information.'"

*Jiaxing Brother Fastener Co. v United States*, 35 CIT 436, 440, 774 F. Supp. 2d 1303, 1306 (2011)

(quoting *Dorbest Ltd. v. United States*, 30 CIT 1671, 1676, 462 F. Supp. 2d 1262, 1269 (2006)).

On January 28, 2020, Commerce initiated an antidumping duty investigation into WMMP

from Brazil and China.   *Wood Mouldings and Millwork Products From Brazil and the People's

Republic of China*, 85 Fed. Reg. 6,502 (Dep't Commerce Feb. 5, 2020) (initiation of less-than-

fair-value inv.'s), P.R. 117.   The period of investigation ("POI") for the China investigation was

July 1, 2019 through December 31, 2019.   *See id.* at 6,503.   On May 8, 2020, consistent with its

practice, Commerce set initial deadlines for interested parties to submit comments and rebuttal

comments on surrogate country selection and to submit publicly available information to value the

FOPs in the preliminary determination and rebuttal comments, respectively, in addition to

requesting information on the list of countries at the same level of economic development.   Letter

from Rebecca Trainor, Program Manager, AD/CVD Operations, Off. VIII to All Interested Parties,

re: *Antidumping Duty Investigation of Wood Mouldings and Millwork Products from the People's

Republic of China: Request for Economic Development, Surrogate Country and Surrogate Value

Comments and Information* (May 8, 2020), P.R. 333 ("Prelim SV Letter").   While Commerce

noted that interested parties may also submit SV information no later than 30 days before the

scheduled date of the preliminary determination, in accordance with 19 C.F.R. § 351.301(c)(3),

the agency expressly stated that for information to be considered in the preliminary determination,

parties must submit the information to Commerce no later than the established deadline of June

17, 2020.  *See id.* at 2.

On June 2, 2020, mandatory respondents Yinfeng and Bel Trade Wood Industrial Co., Ltd.

Youxi Fujian ("Bel Trade") (collectively, "Respondents") submitted surrogate country comments,

as did Petitioner.  Letter from Law Offices of deKieffer & Horgan, PLLC to Sec'y Commerce, re:

*Wood Mouldings and Millwork Products from the People's Republic of China: Surrogate Country*

*Comments* (June 2, 2020), P.R. 371-372; Letter from Wiley Rein LLP to Sec'y Commerce, re:

*Wood Mouldings and Millwork Products from the People's Republic of China: Surrogate Country*

*Comments* (June 2, 2020), P.R. 373-374; *see also* Memorandum from Ethan Talbott, through Irene

Darzenta Tzafolias, to James Maeder, re: *Antidumping Duty Investigation of Wood Mouldings and*

*Millwork Products from the People's Republic of China: Respondent Selection* (Mar. 2, 2020),

C.R. 60, P.R. 145.  On June 17, 2020, Respondents and Petitioner each submitted preliminary SV

submissions.  Petitioner argued that Brazil should be selected as the primary surrogate country,

and provided SV data from Brazil, including 2019 financial statements for three Brazilian

companies.  *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Wood Mouldings and*

*Millwork Products from the People's Republic of China: Surrogate Value Comments* (June 17,

2020), P.R. 415-418 ("Petitioner's Prelim SV Submission") at 1-3.  Respondents submitted that

Malaysia was a suitable choice for the primary surrogate country and provided SV data, including

2018 financial statements for two Malaysian companies.  Letter from Law Offices of deKieffer &

Horgan, PLLC to Sec'y Commerce, re: *Wood Mouldings and Millwork Products from the People's*

*Republic of China: Preliminary Surrogate Value Submission* (June 17, 2020), P.R. 411-414 at 1-

2.  On June 29, 2020, Petitioner and Respondents each submitted rebuttal comments to the

preliminary SV submissions.  Letter from Wiley Rein LLP to Sec'y Commerce, re: *Wood*

*Mouldings and Millwork Products from the People's Republic of China: Rebuttal Surrogate Value Comments* (June 29, 2020), P.R. 466-468 at 1; Letter from Law Offices of deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Wood Mouldings and Millwork Products from the People's Republic of China: Rebuttal Preliminary Surrogate Value Submission* (June 29, 2020), P.R. 459-465 at 1.

On July 6, 2020, Petitioner and Respondents each submitted their final SV submissions. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Wood Mouldings and Millwork Products from the People's Republic of China: Final Surrogate Value Submission* (July 6, 2020), P.R. 487-489 ("Petitioner's Final SV Submission") at 1; Letter from Law Offices of deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Wood Mouldings and Millwork Products from the People's Republic of China: Final Surrogate Value Submission* (July 6, 2020), P.R. 490-510 ("Respondents' Final SV Submission") at 1.  Respondents submitted 18 additional Malaysian financial statements.  *See* Respondents' Final SV Submission at 1-2.  On July 21, 2020, Petitioner submitted a rebuttal to Respondents' final SV submission.  Letter from Wiley Rein LLP to Sec'y Commerce, re: *Wood Mouldings and Millwork Products from the People's Republic of China: Rebuttal to Final Surrogate Value Comments* (July 21, 2020), P.R. 530 ("Petitioner's Final SV Rebuttal") at 1-2.  Petitioner and Respondents each filed comments in advance of Commerce's preliminary determination, which addressed, in part, selection of the primary surrogate country and SV data.  Letter from Wiley Rein LLP to Sec'y Commerce, re: *Wood Mouldings and Millwork Products from the People's Republic of China: Pre-Preliminary Determination Comments* (July 20, 2020), C.R. 481, P.R. 531 at 1-7; Letter from Law Offices of deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Wood Mouldings and Millwork Products from the People's Republic of China: Pre-Preliminary Comments* (July 23, 2020), P.R. 534 at 1-12.

On August 5, 2020, Commerce issued its preliminary determination in the investigation. *See* Preliminary Decision Memorandum accompanying *Wood Mouldings and Millwork Products From the People's Republic of China*, 85 Fed. Reg. 48,669 (Dep't Commerce Aug. 12, 2020) (prelim. affirm. deter. of sales at less than fair value, postponement of final deter., and extension of provisional measures), P.R. 548 at 1 and 5-9.  The agency preliminarily determined that it  was appropriate to use Brazil as the primary surrogate country because it is (1) at the same level of economic development as China; (2) a significant producer of merchandise comparable to the subject merchandise; and (3) provided the best useable data and information with which to value FOPs, such as direct materials, labor, energy, and financial ratios, and used Brazilian import data and other publicly available sources form Brazil to calculate SVs for each mandatory respondent's FOPs. *See id.* at 9, 27.  To value factory overhead, SG&A expenses, and profit, Commerce relied on two of the three 2019 Brazilian financial statements on the record – from Adami SA-Woods ("Adami") and Duratex SA ("Duratex").  *See id.* at 6, 30.  Parties submitted case and rebuttal briefs. *See, e.g.*, Final Determination at 2.

On December 28, 2020, Commerce issued its final determination.  In the final determination, Commerce analyzed the parties' arguments regarding selection of the primary surrogate country and SV data. *See id.* at 17-23.  Commerce then explained its decision to continue relying on Brazil, rather than Malaysia, as the primary surrogate country.  *Id.* at 19.  The agency explained its findings that the Brazilian GTA data and Brazilian producers' financial statements provided the best available information with which to value Yinfeng/Mangrove's FOPs.[2]  *See id.*

---

[2]      In the final determination, Commerce applied adverse facts available to the other mandatory respondent Bel Trade.  As such Bel Trade was no longer eligible for a separate rate and was found to be part of the China-wide entity.  *See* Final Determination at 4-6.

at 19-22; *see also* Memorandum from Brian C. Smith, through Rebecca Trainor, to The File, re:

*Antidumping Duty Investigation of Wood Mouldings and Millwork Products from the People's*

*Republic of China: Final Determination Surrogate Value Memorandum* (Dec. 28, 2020), P.R. 662-

663 ("Final SV Memo").

## IV.   ARGUMENT

### A.   Commerce's Selection of Brazil as the Primary Surrogate Country Was Supported by Substantial Evidence, Reasonable, and in Accordance with Law

Yinfeng challenges Commerce's selection of Brazil as the primary surrogate country.  *See*

Yinfeng Br. at 25-32.  Instead, Yinfeng argues that Commerce should have selected Malaysia as

the primary surrogate country.  *See id.*  Yinfeng challenges Commerce's determination in a

piecemeal manner, and in doing so, fails to acknowledge the record as a whole and asks the Court

to reweigh the evidence before the agency.  This ignores the broad discretion that Commerce has

to determine the "best available information" on a case-by-case basis.  *See, e.g.*, *Wuhan Bee*

*Healthy Co. v. United States*, 29 CIT 587, 597, 374 F. Supp. 2d 1299, 1308 (2005) (quoting *Peer*

*Bearing Co. v. United States*, 25 CIT 1199, 1208, 182 F. Supp. 2d 1285, 1298 (2001)).   As

discussed below, Commerce's selection of Brazil as the primary surrogate country was supported

by substantial evidence and sufficiently explained.  Yinfeng's arguments fail to demonstrate that

Commerce acted unreasonably and must be rejected.[3]

---

[3]      Yinfeng also opines in its brief that Commerce acted arbitrarily in not considering the parties' final SV submissions in the agency's preliminary determination.  *See* Yinfeng Br. at 4-5. Yinfeng speculates that if Commerce had considered the parties' final SV submissions for the preliminary determination, the agency would have allegedly not made errors in the final determination, which is unsubstantiated.  *See id.*  Ultimately, Yinfeng does not actually raise this as a challenge to the agency's determination, and thus, these arguments are moot.  *See id.* at 1. Nonetheless, Petitioner notes that Commerce explained in its final determination that its practice is to provide parties with an opportunity to submit SV data for consideration in the preliminary determination and establish a time to consider that SV data, and also that it is not uncommon for Commerce to be unable to consider SV data submitted on the later, regulatory deadline for the

Yinfeng first argues that Malaysia reports import values on Commerce's preferred cost-of-insurance-and-freight ("CIF") basis, while the Brazil import values are reported on a free on board ("FOB") basis.[4]  Yinfeng Br. at 27.  As Yinfeng recognizes, however, Commerce added marine insurance and ocean freight expenses to the Brazil FOB import values, to make them equivalent to a CIF basis.  *Id.*; Final Determination at 21.  In fact, Commerce routinely relies on FOB import values, adjusting to a CIF-basis.  *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Quartz Surface Products From the People's Republic of China*, 84 Fed. Reg. 23,767 (Dep't Commerce May 23, 2019) (final affirm. deter. of sales at less than fair value, and final affirm. deter. of critical circumstances) at 63 ("{A}ttempting to limit Commerce's selection of surrogate value source countries to countries that report import data on a CIF basis could have the effect of unreasonably limiting the potential pool of surrogate value source countries.  Here . . . we have applied ocean freight and marine insurance, which reasonably reflect the derivation of CIF values from Mexican FOB values.  Therefore, we agree . . . that just because the Malaysian values are reported on a CIF basis, whereas the Mexican data is reported on an FOB basis, it does not render the Malaysian data superior, and we find that the Mexican import data adjusted for ocean freight and marine insurance are reliable sources from which to value the respondents' FOPs.")

---

preliminary determination.  *See* Final Determination at 23.  However, Commerce considers in its final determinations all SV data submitted prior to or on the regulatory deadline, which the agency did in the investigation here.  *See id.*  Yinfeng points to no authority that requires Commerce to consider SV submissions made by the regulatory deadline in its preliminary determinations.  *See* Yinfeng Br. at 4-5.  Moreover, Commerce explicitly stated in the letter establishing the preliminary deadline for SV submissions that "{f}or information to be considered in the preliminary determination, you must submit the information to Commerce no later than" the preliminary deadline.  *See* Prelim SV Letter at 2.  Yinfeng was fully on notice that it must submit information by the preliminary deadline to be considered in the preliminary determination.

[4]      Yinfeng's arguments regarding the SV for sawnwood and the surrogate financial statements are addressed below.  *See* Yinfeng Br. at 6-26.

(citations omitted); Issues and Decision Memorandum accompanying *Cast Iron Soil Pipe Fittings From the People's Republic of China*, 83 Fed. Reg. 33,205 (Dep't Commerce July 17, 2018) (final affirm. deter. of sales at less than fair value and final deter. of critical circumstances, in part) at 15-16. The agency also explained in the final determination, Commerce has addressed this issue in multiple proceedings "noting that CIF import data are not necessarily superior to FOB import data, and limiting potential surrogate countries to those with CIF import data unreasonably limits the pool of potential surrogate countries." *See* Final Determination at 21. Thus, Yinfeng's critique of Commerce's selection is unpersuasive.

Yinfeng's reliance on *Certain Activated Carbon from the People's Republic of China* and *Certain Steel Racks and Parts Thereof From the People's Republic of China* ("*Steel Racks from China*") is misplaced. *See* Yinfeng Br. at 28-29. In both of those proceedings, Commerce selected the primary surrogate country after considering a number of factors. *See* Final Results of Redetermination Pursuant to Court Remand, *Jacobi Carbons AB v. United States*, Consol. Court No. 16-00185 (Ct. Int'l Trade June 17, 2019), ECF No. 139 at 10-11; Final Results of Redetermination Pursuant to Court Remand, *Jacobi Carbons AB v. United States*, Consol. Court No. 15-00286 (Ct. Int'l Trade June 17, 2019), ECF No. 147 at 9-11; Issues and Decision Memorandum accompanying *Certain Steel Racks and Parts Thereof From the People's Republic of China*, 84 Fed. Reg. 35,595 (Dep't Commerce July 24, 2019) (final affirm. deter. of sales at less than fair value) ("*Steel Racks from China* IDM") at cmt. 1. In fact, in *Steel Racks from China*, Commerce expressly stated that the fact that one data set is reported on a CIF basis alone may not be sufficient to determine that such data set is preferable. *Steel Racks from China* IDM at 8-9.

Yinfeng also challenges the reliability of the marine insurance and ocean freight data, emphasizing that Commerce added these data to the record. Yinfeng Br. at 27. Specifically,

Yinfeng argues that Commerce relied upon marine insurance from RJG sourced from 2010 and ocean freight prices for shipping "wood products" from Fuzhou, China to the United States, and that the rate is not related to the cost that a mouldings producer would pay to import raw materials into Brazil. *Id.* It is commonplace for Commerce to add factual information to the record itself in an AD proceeding. If Yinfeng disagreed with the marine insurance and ocean freight rates on the record, it had the opportunity to provide alternative data for consideration. Commerce expressly provided interested parties the opportunity to submit rebuttal factual information in response to the information placed on the record by the agency to value FOPs in the preliminary determination, and Yinfeng chose not to submit any alternative data. *See* Memorandum from Ethan Talbott and Michael K. Bowen, through Rebecca Trainor, to The File, re: *Less-Than-Fair-Value Investigation of Wood Mouldings and Millwork Products from the People's Republic of China; Surrogate Values for the Preliminary Determination* (Aug. 7, 2020), P.R. 553-557 at 2. Having failed to do so, Yinfeng cannot use this as a basis to argue that Commerce should not have relied on Brazil as the primary surrogate country. Ultimately, Yinfeng's main argument appears to be that the addition of ocean freight and marine insurance in itself is problematic because it consists of making assumptions and estimations, whereas actual movement expenses are imbedded in the Malaysian data. *See* Yinfeng Br. at 28. Again, Commerce routinely adds international freight expenses to FOB import data used for SVs in its proceedings. Yinfeng fails to demonstrate that Commerce acted unreasonably here.

Yinfeng next argues that Malaysian sources provide the best available information to value certain of its inputs. *See id.* at 29-32. However, while the Brazilian data had imports for every HTS category required to value all of the respondent's inputs, the Malaysian data was actually missing imports for the particular type of wood scrap that the respondent generates from its

production process – an important input.  *See* Final Determination at 20; *see also* Letter from Wiley

Rein LLP to Sec'y Commerce, re: *Wood Mouldings and Millwork Products from the People's*

*Republic of China: Resubmission of Petitioner's Rebuttal Brief* (Dec. 3, 2020), C.R. 515, P.R. 655

("Petitioner's Rebuttal Br.") at 3.  Recognizing this, Yinfeng argues that the respondent's wood

scrap/sawdust by-product should have been classified under Malaysian HTS 4401.39, which

Yinfeng claims includes "Sawdust And Wood Waste And Scrap, *Whether Or Not Agglomerated*

*In Logs*, *Briquettes* Or Similar Forms Other Than Pellets."  Yinfeng Br. at 31.  Yinfeng confirms

that the respondent does not agglomerate its wood scrap into pellets, but claims that this HTS

description includes the specific language "whether or not agglomerated" and does not specify that

the scrap must be agglomerated.  *See id.* at 32.  Thus, Yinfeng argues that this is an appropriate

HTS in Malaysia to value this input.  *Id.*  This is incorrect.  As Petitioner explained in its rebuttal

brief in the investigation, respondents incorrectly read the HTS category descriptions.  *See*

Petitioner's Rebuttal Br. at 5-6.

As shown in the official Malaysian HTS code applicable in 2019 that was submitted by

respondents, HTS 4401.39 covers sawdust and wood waste and scrap, agglomerated in any form

other than wood pellets:

Ct. No. 21-00087                                                    NON-CONFIDENTIAL VERSION

**Chapter 44**
**Wood and articles of wood; wood charcoal**

| (1)<br>Heading | (2)<br>Subheading | (3)<br>Description | (4)<br>Unit of<br>Quantity | (5)<br>Rate of Import Duty by % under<br>ACFTA |
|---|---|---|---|---|
| | | | | 2019 and subsequent years |
| 44.01 | | Fuel wood, in logs, in billets, in twigs, in faggots or in similar forms; wood in chips or particles; sawdust and wood waste and scrap, whether or not agglomerated in logs, briquettes, pellets or similar forms. | | |
| | | -   Fuel wood, in logs, in billets, in twigs, in faggots or in similar forms : | | |
| | 4401.11.00 00 | -   -   Coniferous | kg | 0 |
| | 4401.12.00 00 | -   -   Non-coniferous | kg | 0 |
| | | -   Wood in chips or particles: | | |
| | 4401.21.00 00 | -   -   Coniferous | kg | 0 |
| | 4401.22.00 00 | -   -   Non-coniferous | kg | 0 |
| | | -   Sawdust and wood waste and scrap, agglomerated, in logs, briquettes, pellets or similar forms : | | |
| | 4401.31.00 00 | -   -   Wood pellets | kg | 0 |
| | 4401.39.00 00 | -   -   Other | kg | 0 |
| | 4401.40.00 00 | -   Sawdust and wood waste and scrap, not agglomerated | kg | 0 |

389

Copyright of the Attorney General's Chambers of Malaysia

*See* Respondents' Final SV Submission at Exhibit SV2-21, p. 1. and 389; *see also* Petitioner's

Rebuttal Br. at 5-6.

Thus, HTS 4401.39 is not the appropriate HTS category for the respondent's wood scrap,

which does not appear to be agglomerated.  *See* Yinfeng Br. at 31 n.13 (quoting Commerce's

finding in the preliminary determination that the respondent's wood scrap does not appear to be

agglomerated); *see also* Memorandum from Michael Bowen and Ethan Talbott, through Rebecca

Trainor, to The File, re: *Antidumping Duty Investigation of Wood Mouldings and Millwork*

*Products from the People's Republic of China: Preliminary Determination Margin Calculation*

*for Yinfeng* (Aug. 5, 2020), C.R. 494-498, P.R. 559 at 2.  In contrast, while Malaysian HTS 4401.40

covers sawdust and wood waste and scrap "*whether or not agglomerated*," as Yinfeng admits,

there were no imports under 4401.40 in Malaysia during the POI.  *See* Yinfeng Br. at 32;

Petitioner's Final SV Submission at Exhibit 2.  Yinfeng argues that the fact that there were no

imports under 4401.40 in Malaysia – an HTS category specifically delineated in the Malaysian

tariff code – supports the conclusion that in Malaysia, all wood scrap – whether or not

**BUSINESS PROPRIETARY INFORMATION**
**HAS BEEN DELETED**

agglomerated – is imported under HTS 4401.39. This is illogical and unsubstantiated. *See* Yinfeng Br. at 32. Rather, this demonstrates that the Malaysian data were missing imports for one of the respondent's inputs. While Yinfeng argues that wood scrap is minor in the respondent's cost components – as Commerce explained in the final determination – "it is clear that valuing this input with import data under the incorrect HTS subheading would result in inaccurately calculating the offset to Yinfeng/Mangrove's normal value calculation." *See* Final Determination at 20. Moreover, wood scrap was clearly a major input, as Petitioner explained in its rebuttal brief, with Yinfeng's FOP database showing that wood scrap constitutes [          ] the starting wood amount and that [                                                         ].
*See* Petitioner's Rebuttal Br. at 4.

Thus, Yinfeng's claims that the Malaysian data contained import data *more* specific to some of the respondent's inputs fail to demonstrate that Commerce acted unreasonably in selecting Brazil as the primary surrogate country when the alternative data set was *missing* import data specific to the respondent's [                    ] major input. In contrast, Commerce found that "the Brazilian GTA data are both reliable and comprehensive with respect to providing SVs for *all the relevant inputs*." Final Determination at 21 (emphasis added). For these reasons, Yinfeng's arguments that Malaysia sources superior data for labor, truck freight, brokerage & handling, and acrylic polymer[5] fail to demonstrate that Commerce acted unreasonably, particularly given the

---

[5]      With respect to the acrylic polymer input in particular, Yinfeng argues that Malaysia provides a more specific HTS 3906.90.20 covering "{a}crylic polymers, other than poly(methyl methacrylate), in dispersion," while the Brazilian HTS 3906.90 that Commerce relied on covers "Acrylic Polymers Nesoi, In Primary Forms." Yinfeng claims that the respondent's acrylic polymer input is in dispersion and is not poly(methyl methacrylate), and thus that the Malaysian HTS is more specific than the six-digit Brazilian HTS. Yinfeng Br. at 31. However, as Commerce explained in its final determination, the Brazilian HTS 3906.90.00 also covers acrylic polymers in primary forms (excluding poly methyl methacrylate) and is just as specific for valuing this input. While Commerce acknowledged Yinfeng's argument that the respondent's acrylic polymer is also

agency's discretion in determining what constitutes the best available information.  Yinfeng Br. at

29-31.  While Commerce acknowledged respondents' arguments with respect to these individual

inputs, *see* Final SV Memo at 2-3, the agency also generally explained that its preference is to

value all SVs from a single surrogate country, particularly where there are usable values from the

primary surrogate country.  *See id.*

   In addition, Petitioner explained in the investigation that Malaysia's wood products are

almost exclusively made from tropical hardwood.  Yinfeng explains that its primary inputs are

pine/fir sawnwood, Yinfeng Br. at 32, further demonstrating that Malaysia is inferior to Brazil as

a surrogate country.  *See* Petitioner's Rebuttal Br. at 10-12.  While respondents argued that the

scope of the investigation does not exclude tropical woods or hardwoods, the fact remains that if

Malaysian producers primarily use tropical hardwoods, then they would not be able to replicate

the financial ratios of a producer that only consumes softwood pine.  Petitioner's Rebuttal Br.

at 11-12.  It is perfectly reasonable, and consistent with agency practice, for Commerce to select

surrogate financial ratios for companies with production processes that most closely match those

of the respondents.

   Thus, Commerce properly considered the record evidence as a whole, weighed the

evidence as the factfinder, and properly selected Brazil as the surrogate country in the underlying

investigation.  That Yinfeng would have preferred a different conclusion does not mean that the

agency's determination was unsupported by substantial evidence or unreasonable.

---

dispersed, the agency reasonably concluded that this selection is but one of many data considered
in its surrogate country selection.  Final SV Memo at 2.

**B.**   **Commerce's Surrogate Value Selection for Sawnwood Was Supported by Substantial Evidence, Reasonable, and in Accordance with Law**

Yinfeng also challenges Commerce's SV selection for sawnwood.[6]   Yinfeng Br. at 6-13.

Yinfeng contends that Commerce's decision contained three mistakes of fact.   *Id.* at 7.   First,

Yinfeng opines that Commerce relied upon the Brazilian six-digit HTS 4407.11 and 4407.12 to

value sawnwood, not the eight-digit Brazilian HTS code as Commerce claims.   *Id.*   However, as

Commerce explained in the final determination, "the six-digit HTS subheadings in Commerce's

preliminary determination SV spreadsheet were abbreviated because the seventh and eighth digits

were both zero based on the Brazilian HTS information also provided in the petitioner's SV

submission.   For example, if the Brazilian HTS subheading number reflected in Commerce's SV

summary chart was 440711, the actual unabbreviated HTS subheading number was 44071100."

Final Determination at 20 (citations omitted).   Ultimately, Yinfeng itself concedes that there is no

distinction between the six-digit and eight-digit level of an HTS when the seventh and eighth digits

are "00."   Yinfeng Br. at 7.   Thus, Yinfeng's argument is moot.

Second, because the six-digit and eight-digit HTS codes are the same, Yinfeng argues that

Commerce was incorrect in stating that "as the Brazilian HTS subheadings also extend to eight

digits, we find them to be just as specific as the Malaysian HTS subheadings in this regard" because

the addition of "00" at the end of the HTS entails that the country has no more specific delineated

---

[6]    Petitioner notes that to the extent Yinfeng is arguing that Commerce should have relied on a different SV for sawnwood even if Commerce selected Brazil as the primary surrogate country, as opposed to challenging solely Commerce's findings with respect to the SV for sawnwood in making its surrogate country selection, Yinfeng did not raise this argument in its administrative case brief and thus failed to exhaust its administrative remedies with respect to this argument. Yinfeng's arguments with respect to the SV for sawnwood were made in the context of arguing that Commerce should select Malaysia as the primary surrogate country.   *See* Letter from Law Offices of deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Wood Mouldings and Millwork Products from the People's Republic of China: Respondents' Common Issue Case Brief* (Nov. 3, 2020), P.R. 634 ("Respondents' Case Br.") at 17-20.

HTS.  *Id.* at 7-8; Final Determination at 20.  Yinfeng fails to provide necessary context from Commerce's determination.  Commerce made this statement in the final determination to address respondents' argument that the HTS subheadings for the Brazilian GTA data are less specific than those for the Malaysian data solely because the Brazilian HTS numbers are limited to six digits. Final Determination at 19; Respondents' Case Br. at 17-18.

Third, Yinfeng argues that Commerce incorrectly stated that the Brazilian HTS and the Malaysian HTS were both specific to wood "sawn lengthwise."  Yinfeng Br. at 8.  In short, Yinfeng argues that the Brazilian eight-digit HTS covers more than wood sawn lengthwise, while the Malaysian 10-digit HTS covers only wood sawn lengthwise.  *Id.* at 10-11.  However, Commerce accurately stated in the final determination that the Brazilian HTS includes wood sawn lengthwise and thus reasonably concluded that the Brazilian HTS is sufficiently specific to the respondent's input.  *See* Final Determination at 20; *see also Ancientree Cabinet Co. v. United States*, No. 20-00114, slip op. 21-87 at 29 (Ct. Int'l Trade July 12, 2021) ("{T}here is no general principle requiring Commerce to select the most specific surrogate HTS heading because it is within Commerce's discretion 'to select a reasonable surrogate in light of each criteria outlined in Policy Bulletin 04.1.'" (quoting *United Steel and Fasteners, Inc. v. United States*, 469 F. Supp. 3d 1390, 1398 (Ct. Int'l Trade 2020))).  Petitioner also notes that Yinfeng did not raise in its case brief in the investigation the arguments that slicing and peeling is further processing that Yinfeng's purchases have not undergone and that Yinfeng further processes its own sawnwood, and thus, failed to exhaust its administrative remedies with respect to these arguments.  *See* Yinfeng Br. at 10; Respondents' Case Br. at 17-18.; *see also* 28 U.S.C. § 2637(d); *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998).  Again, however, the Brazilian HTS for sawnwood is specific to the respondent's input because it covers sawnwood that is sawn lengthwise.  Given this

and the totality of the factors that Commerce relied on in determining that Brazil offers the best available information for SVs, the agency's determination was reasonable, particularly given Commerce's preference for deriving surrogate data from a single country, which this Court has upheld. *See, e.g.*, Issues and Decision Memorandum accompanying *Citric Acid and Certain Citrate Salts From the People's Republic of China*, 80 Fed. Reg. 77,323 (Dep't Commerce Dec. 14, 2015) (final results of antidumping duty admin. rev.; 2013-2014) ("*Citric Acid from China* IDM") at 12.

### C.   Commerce's Selection of Surrogate Financial Statements Was Supported by Substantial Evidence, Reasonable, and in Accordance with Law

Commerce's selection of surrogate financial statements was supported by substantial evidence, and the agency properly relied on the financial statements in selecting Brazil as the primary surrogate country.[7] *See* Final Determination at 21-22. Commerce examined all twenty-three financial statements placed on the record, weighed the evidence, and sufficiently explained its determination that the financial statements of two of the Brazilian producers – Adami and Duratex – were the best available information for surrogate financial ratios. *Id.*; Final SV Memo at 3-7. Yinfeng simply disagrees with Commerce's conclusion and effectively asks the Court to reweigh the evidence. Again, however, as this Court has explained, "{w}hen reviewing Commerce's decision as to what constitutes the 'best available information' under 19 U.S.C.

---

[7]     Petitioner again notes that to the extent Yinfeng is arguing that Commerce should have relied on certain Malaysian financial statements for the surrogate financial ratios even if Commerce selected Brazil as the primary surrogate country, as opposed to challenging solely Commerce's findings with respect to the surrogate financial statements in making its surrogate country selection, Yinfeng did not raise this argument in its administrative case brief and thus failed to exhaust its administrative remedies with respect to this argument. Yinfeng's arguments with respect to the surrogate financial statements were made in the context of arguing that Commerce should select Malaysia as the primary surrogate country. *See* Respondents' Case Br. at 5-17.

§ 1677b(c)(1), the Court does not 'evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'" *Jiaxing Brother Fastener Co.*, 35 CIT at 440, 774 F. Supp. 2d at 1306 (quoting *Dorbest*, 30 CIT at 1676, 462 F. Supp. 2d at 1269). This Court has also held that "{w}hen Commerce is faced with the decision to choose between two reasonable alternatives and one alternative is favored over the other in their eyes, then they have the discretion to choose accordingly." *See FMC Corp. v. United States*, 27 CIT 240, 251 (2003), *aff'd*, *FMC Corp. v. United States*, 87 F. App'x 753 (Fed. Cir. 2004).

Yinfeng specifically challenges Commerce's reliance on Adami's and Duratex's financial statements instead of six Malaysian financial statements (from Minho (M) Berhad ("Minho"), Classic Scenic Berhad ("Classic Scenic"), LMT Superbonus Sdn Bhd ("LMT"), Fine Quality Timber Sdn Bhd ("Fine Quality"), Haluan Mutiara Sdn Bhd ("Haluan Mutiara"), and Chern Hinp Timber Trading Sdn Bhd ("Chern Hinp")) that it claims are from producers of identical merchandise that were contemporaneous with the POI.[8]  *See* Yinfeng Br. at 13; Final Determination at 21-22. Petitioner again notes that Yinfeng raises piecemeal challenges to

---

[8]     Yinfeng also notes that the record contains twenty Malaysian financial statements in total, claiming that seventeen of these statements were from producers of identical merchandise and that six of these statements were from producers of identical merchandise and were contemporaneous with the POI. Yinfeng Br. at 13 n.10. Yinfeng does not specifically argue that Commerce should have relied on one of the statements other than the six that it claims are from producers of identical merchandise and were contemporaneous with the POI. *See id.* at 13-25. Thus, Yinfeng's comment is moot. Notwithstanding, Petitioner notes that Commerce does not select surrogate financial statements or the primary surrogate country purely based on the number of financial statements submitted, irrespective of the quality of the data. Indeed, eleven of these twenty statements did not overlap with the POI at all. *See* Final SV Memo at 3-7; Final Determination at 21. And Yinfeng itself apparently concedes that three of these statements were not from producers of subject merchandise. *See* Yinfeng Br. at 13 n.10. This leaves just six Malaysian statements for consideration, which also were not the best available information compared to the two Brazilian statements that Commerce selected.

Commerce's determination, ignoring Commerce's framework for its decisions and the agency's broad discretion to determine the best available information on a case-by-case basis. Specifically, Commerce has explained what when selecting financial statements for purposes of calculating surrogate financial ratios, its policy is:

> {T}o use data from one or more market-economy surrogate companies based on the "specificity, contemporaneity, and quality of the data." Section 773(c)(1) of the Act states that "the valuation of the factors of production shall be based on the best available information regarding the values of such factors . . . ." In accordance with 19 CFR 351.408(c)(4), {Commerce} normally will use non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country to value manufacturing overhead, general expenses, and profit. In determining the suitability of surrogate values, {Commerce} considers the available evidence with respect to the particular facts of each case and evaluates the suitability of each source on a case-by-case basis. Accordingly, when examining the merits of financial statements on the record, {Commerce} does not have an established hierarchy that automatically gives certain characteristics more weight than others. Rather, {Commerce} must weigh available information with respect to each situation and make a product and case-specific decision as to what constitutes the "best" available information. Furthermore, the CIT has recognized {Commerce}'s discretion in selecting the best surrogate values on the record.

*See* Issues and Decision Memorandum accompanying *Hardwood and Decorative Plywood From the People's Republic of China*, 78 Fed. Reg. 58,273 (Dep't Commerce Sept. 23, 2013) (final deter. of sales at less than fair value) at 60-61 (citations omitted). Commerce weighed the record evidence and determined that the two Brazilian financial statements constituted the best available information, consistent with its practice. The Court should decline Yinfeng's request to reweigh the evidence. Yinfeng also makes inaccurate claims regarding the evidence, which Petitioner addresses below.

First, Yinfeng argues that Commerce erred in rejecting four of the six Malaysian financial statements because they did not cover the entire POI, which was July 1, 2019 through December 31, 2019. *See* Yinfeng Br. at 14. These four statements each overlapped with only two, three, or four months of the six-month POI. *See id.* Yinfeng claims that Commerce's primary concern

when selecting financial statements is specificity. *Id.* at 14, 23-24. Contrary to Yinfeng's suggestions, Commerce has consistently explained that it does not have an established hierarchy that automatically gives certain characteristics, such as specificity or contemporaneity, more weight than others when examining the merits of financial statements on the record. Instead, Commerce weighs the available information with respect to each situation and makes a product- and case-specific decision as to what constitutes the "best available information." *See, e.g.*, Issues and Decision Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 82 Fed. Reg. 29,033 (Dep't Commerce June 27, 2017) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2014-2015) at 66-67; Issues and Decision Memorandum accompanying *Freshwater Crawfish Tail Meat From the People's Republic of China*, 82 Fed. Reg. 17,634 (Dep't Commerce Apr. 12, 2017) (final results of antidumping duty. admin. rev. and new shipper rev.; 2014-2015) at 10.

This has also been affirmed by this Court. *See, e.g.*, *Xiamen Int'l Trade and Indus. Co. v. United States*, 37 CIT 1724, 1727-28, 953 F. Supp. 2d 1307, 1312-13 (2013) (noting that Commerce considers various factors in its SV selection and "has not identified a hierarchy among these factors, and the weight accorded to a factor varies depending on the facts of each case."); *Fine Furniture (Shanghai) Ltd. v. United States*, 353 F. Supp. 3d 1323, 1341-42 (Ct. Int'l Trade 2018) (rejecting argument that Commerce has established hierarchy prioritizing specificity and affirming the selection of more contemporaneous but less specific labor data). The authorities that Yinfeng relies on do not actually require Commerce to determine the suitability of financial statements solely based on specificity, regardless of what the agency finds with respect to the reliability of the surrogate data, including with respect to contemporaneity or the other criteria that

the agency considers. *See Shenzhen Xinboda Indus. Co. v. United States*, 976 F. Supp. 2d 1333, 1368 (Ct. Int'l Trade 2014); Issues and Decision Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 85 Fed. Reg. 62,275 (Dep't Commerce Oct. 2, 2020) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2017-2018) at cmt. 6; Issues and Decision Memorandum accompanying *Circular Welded Carbon-Quality Steel Pipe From the Socialist Republic of Vietnam*, 81 Fed. Reg. 75,042 (Dep't Commerce Oct. 28, 2016) (final deter. of sales at less than fair value) at 19-20; *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,345 (Dep't Commerce Feb. 27, 1996).

Yinfeng also asserts that Commerce has found a company's financial statement to be contemporaneous as long as its reporting period overlaps with a part of the period of review. Yinfeng Br. at 15. But here, Commerce had suitable financial statements on the record for producers of identical or comparable merchandise that covered the entire POI. *See* Final Determination at 21-22. Commerce explained in the final determination that in situations similar to the one in the investigation here, it "has preferred to use financial statements of producers of subject merchandise that cover the entire POI, as they best reflect the respondent's production experience during the POI." *See id.* at 22. Yinfeng fails to demonstrate that the agency's decision to rely on financial statements that cover the entire POI instead of financial statements that overlap with only two to four months of the POI was unreasonable, nor do the cases that Yinfeng cites require such a conclusion. *See* Issues and Decision Memorandum accompanying *Folding Metal Tables and Chairs From the People's Republic of China*, 76 Fed. Reg. 2,883 (Dep't Commerce Jan. 18, 2011) (final results of 2007-2008 deferred antidumping duty admin. rev. and final results of 2008-2009 antidumping duty admin. rev.) at cmt. 2C; Issues and Decision Memorandum

accompanying *Certain Frozen Fillets From the Socialist Republic of Vietnam*, 72 Fed. Reg. 13,242 (Dep't Commerce Mar. 21, 2007) (final results of the second admin. rev.) at cmt. 9A; Issues and Decision Memorandum accompanying *Certain Steel Nails From the People's Republic of China*, 79 Fed. Reg. 19,316 (Dep't Commerce Apr. 8, 2014) (final results of the fourth antidumping duty admin. rev.) ("*Steel Nails from China* IDM") at cmt. 2A. Commerce was not required to rely on all financial statements with some overlap with the POI, as Yinfeng suggests. *See* Yinfeng Br. at 16. Yinfeng also asserts that Commerce has a longstanding interest in relying on multiple financial statements. *See id.* at 14. (citing *NTSF Seafoods Joint Stock Co. v. United States*, 487 F. Supp. 3d 1310, 1318 (Ct. Int'l Trade 2020)). But in *NTSF Seafoods*, the two financial statements that Commerce relied on to calculate surrogate financial ratios were from the same surrogate country. *See NTSF Seafoods*, 487 F. Supp. 3d at 1316. Indeed, Commerce prefers to use financial statements from the primary surrogate country where available. *See Steel Nails from China* IDM at 8. Moreover, *NTSF Seafoods* does not stand for the proposition that Commerce must use all financial statements on the record irrespective of the suitability of the financial statements as surrogates simply because there exist multiple statements. *See NTSF Seafoods*, 487 F. Supp. 3d at 1316-18.

Second, Yinfeng argues that the Malaysian financial statements – whether considering all six statements or the two that are the most contemporaneous with the POI – are far more comparable than the Brazilian financial statements. Yinfeng Br. at 16. As discussed above, Commerce's decision not to rely on the four Malaysian financial statements that did not cover the entire POI was reasonable. Notwithstanding, there were additional flaws that rendered these four statements and the two Malaysian statements that cover the entire POI not the best available information for purposes of surrogate financial ratios.

First, in addition to not being the most contemporaneous with the POI, the financial statements of LMT, Fine Quality, Haluan Mutiara, and Chern Hinp suffered from additional flaws. In particular, while Yinfeng argues that these companies produce identical merchandise, *see* Yinfeng Br. at 14, the record evidence – mainly the financial statements that the respondents submitted – indicated that this may not be the case, as Petitioner explained in its rebuttal brief and Commerce recognized.  For instance, Chern Hinp's (whose financial statement period overlapped the POI by only two months) business activities are "principally in the trading of timber and provision of timber moulding services and labor supply."  *See* Respondents' Final SV Submission at Exhibit SV2-11, p. 1, 13; Final SV Memo at 5.  Offering "moulding *services* and labor *supply*" is not the same as producing moulding products, and Chern Hinp's "moulding services" could cover any aspect of the sale or installation of moulding.  *See* Petitioner's Rebuttal Br. at 14.  Based on its financial statements, Chern Hinp does not even own a production facility.  *See id.*  Its balance sheet called "STATEMENT OF FINANCIAL POSITION AS AT 31ST AUGUST 2019" indicated that its total "Plant and Equipment" assets equal 879,998 RM, or $211,412 – [9] too insignificant for an entire manufacturing facility.  *See* Respondents' Final SV Submission at Exhibit SV2-11, p. 8.  Financial note 6, moreover, demonstrated that this entire amount represents equipment, indicating that Chern Hinp has no production facility.  *See* Petitioner's Rebuttal Br. at 14-15; Respondents' Final SV Submission at Exhibit SV2-11, p. 25.  Thus, the evidence indicated that Chern Hinp does not produce subject merchandise but may be a labor supply company which assists moulding producers.  *See* Petitioner's Rebuttal Br. at 15.  Commerce appropriately declined to rely on a financial statement from a company that does not appear to produce the subject

---

[9]      The average POI exchange rate using Commerce's exchange rate database is .240241 USD/RM.  *See* Petitioner's Rebuttal Br. at 14 n.51.

merchandise, and which appears to merely offer services to the industry. *See id.* These financial ratios would not be reflective of Chinese moulding producers. *See id.*

Haluan Mutiara's financial statements (which overlapped with the POI by only two months) similarly did not indicate that the company produces moulding. *See* Respondents' Final SV Submission at Exhibit SV2-10, p.1; Final SV Memo at 5; Petitioner's Rebuttal Br. at 15. Haluan Mutiara's website claimed that they "market variety species of high tropical timber" and then listed 19 different species of tropical wood. *See* Petitioner's Rebuttal Br. at 15-16; Respondents' Final SV Submission at Exhibit SV2-10 (company website). Although the company information provided by respondents suggested that Haluan Mutiara is a moulding producer of tropical wood, the company's financial statements demonstrated that this must be more of an aspiration than reality, because Haluan Mutiara does not appear to have a production facility. *See* Petitioner's Rebuttal Br. at 16. Its balance sheet called "STATEMENT OF FINANCIAL POSITION AS AT 31ST AUGUST 2019" indicated that its total "Property, Plant and Equipment" assets equaled 109,505 RM, or a mere $26,308.[10] *See* Respondents' Final SV Submission at Exhibit SV2-10, p. 9. Financial note 5 showed that this total included a motor vehicle, an air conditioner, a signboard, and office equipment, among other small items, but it did not include any property or significant equipment needed for production. *See* Petitioner's Rebuttal Br. at 16; Respondents' Final SV Submission at Exhibit SV2-10, p. 22-23. Thus, Haluan Mutiara does not appear to produce subject merchandise. Commerce appropriately declined to rely on a financial statement for a company that does not appear to even have a production facility. These financial ratios would not be representative of Chinese moulding producers.

---

[10]     The average POI exchange rate using Commerce's exchange rate database is .240241 USD/RM. *See id.* at 16 n.53.

LMT (whose financial statements overlapped with the POI by four months) is primarily involved in selling logs, sawn timber, and timber pallets, and there was no indication in the financial statements that the company produces subject merchandise.  *See* Respondents' Final SV Submission at Exhibit SV2-8, p. 2; Petitioner's Rebuttal Br. at 16.  Further, that the company may be a member of "Malaysia Wood Moulding & Joinery Council" does not necessarily mean that the company produces moulding.  *See* Yinfeng Br. at 18.  There was no information on the record that clearly indicated that this company produced subject merchandise, and the closest product that it apparently made is wooden pallets, which is not comparable.  *See* Petitioner's Rebuttal Br. at 16.

The principal activities of Fine Quality (whose financial statements overlapped with three months of the POI) "are to carry on the business in timber grading and dealing in timber and rubber wood."  Respondents' Final SV Submission at Exhibit SV2-9, p. 1, 14 (fin. note 1).  Again, there was no indication in the financial statements that the company produces subject merchandise.  While the respondents argued in the investigation that the company information that they submitted shows that "Fine Quality's core business is 'manufacturing general and engineered mouldings included design and provider of manufacturing solution,'" Respondents' Case Br. at 6, which Yinfeng again argues here, Yinfeng Br. at 17, in actuality, the website stated "re-manufacturing" of mouldings, which was not defined and seems to be an entirely different business model.  Regardless, Fine Quality's audited financial statements stated that its principal activities "are to carry on the business in timber *grading* and *dealing* in timber and rubber wood."  *See* Petitioner's Rebuttal Br. at 17 (emphasis added).

In sum, contrary to Yinfeng's assertion, that the record failed to demonstrate that these four Malaysian companies produced identical or comparable merchandise.  This further demonstrates that Commerce's decision to not rely on these four Malaysian financial statements when there were

other suitable financial statements available for producers of identical or comparable merchandise that were also more contemporaneous with the POI was reasonable.

The two remaining Malaysian financial statements contained similar flaws. For instance, Commerce explained that Minho and Classic Scenic have multiple divisions not involved with the subject merchandise and timber trading and extraction operations and activities, neither of which Yinfeng has. *See* Final Determination at 22. The record evidence demonstrates this. First, Minho's Corporate Structure chart in its financial statements showed that the company, through numerous subsidiaries, is involved in many different operations, including timber, industrial paper bags, and property management. Respondents' Final SV Submission at Exhibit SV2-3, p. 3. However, according to its financial statements, Minho itself "is principally engaged in investment holding activities." *Id.* at Exhibit SV2-3, p. 30. One of Minho's fourteen listed subsidiaries, Victory Enterprise Sdn. Bhd. ("Victory Enterprise"), *see id.* at Exhibit SV2-3, p. 3, does appear to produce mouldings, but this company was combined with all the other subsidiaries in Minho's financial statements and the resulting financial ratios would not reflect the ratios of moulding production. Yinfeng claims that "the company states it 'has a capacity of 10 million linear feet of moulding per month. The company's product range includes general and specific mouldings,'" in arguing that Minho lists manufacturing moulded timber and moulded timber products among its primary business. Yinfeng Br. at 16. What Yinfeng omits is that this quotation is from Minho's website description of its subsidiary *Victory Enterprise*. *See* Respondents' Final SV Submission at Exhibit SV2-3 (company website). Clearly, Minho is a large conglomerate and its financial ratios would reflect that, rather than being specific to wood mouldings production. In addition, Minho's subsidiaries produce tropical wood: "Major species treated at these plants are Dark Red Meranti, Light Red Meranti, Merbau, Kempas, Keruing, Nyatoh, Kembang Semangkok,

Mempisang and Kasah," unlike the Chinese respondents.   Petitioner's Final SV Rebuttal at Exhibit 1.

Similarly, Classic Scenic "is an investment holding company, with subsidiaries principally engaged in the manufacturing of wooden picture frame mouldings, and wooden pallets." Respondents' Final SV Submission at Exhibit SV2-4.   As Yinfeng acknowledges, Classic Scenic is overwhelmingly dedicated to producing picture frames.   *See* Yinfeng Br. at 16.   In fact, "{f}or the financial year ended 31 December 2019, export of wooden picture frame mouldings accounted for approximately 89% of the Group's revenue, whereas the remaining 11% was contributed by the local sales of wooden pallets."   Respondents' Final SV Submission at Exhibit SV2-4, p. 4. "{P}icture frame components three feet and under in individual lengths" were explicitly excluded from the scope of the investigation.   *Wood Mouldings and Millwork From Brazil and the People's Republic of China*, 85 Fed. Reg. at 6,508.   While larger picture frames are subject merchandise, it is only one type of product covered by the scope and is a stand-alone product.   However, Classic Scenic *only* produces picture frames, and thus, the company's financial results would not have resulted in representative financial ratios.   Moreover, Classic Scenic exports 99.5% of its picture frames and sells 82% of those frames to the United States.   Respondents' Final SV Submission at Exhibit SV2-4, p. 63 (fin. note 15.1).   Because the surrogate financial ratios are used to calculate a representative normal value in the comparison market, which is then compared to the United States, relying on financial ratios based on sales predominantly made to the United States would not be representative.   Because Classic Scenic only sells 0.5% of its picture frames in Malaysia, it would not have been a good source for financial ratios.[11]

---

[11]      That is, 0.5% = 252,850 / 49,873,761.

In contrast, Commerce's findings that Adami and Duratex (for which the agency had financial statements covering the entire POI) are producers of identical or comparable merchandise is well supported by the record. *See* Final Determination at 21. While Commerce acknowledged that Adami and Duratex also have timber extraction operations, the agency found that Adami's principal operations are the production of wood products (including the subject merchandise). *See id.* at 22. In fact, Adami was documented in the underlying petition in the investigation as a Brazilian entity believed to be a producer/exporter of subject merchandise, Petitions for the Imposition of Antidumping and Countervailing Duties, *Wood Mouldings and Millwork Products from Brazil and the People's Republic of China*, vol. I (Jan. 8, 2020), C.R. 7, P.R. 2 at 10 and Exhibit I-11, p. 47, and was even listed in the respondent selection memorandum of the parallel antidumping duty investigation on WMMP from Brazil as a top 10 Brazilian exporter of subject merchandise to the United States. Petitioner's Rebuttal Br. at 13-14. While Yinfeng quotes the portion of Adami's website that states that the company "was *recently* expanded and modernized for the production of blocks, blancs, frames, among other products destined for the foreign market," Yinfeng Br. at 20, that same website provides further detail, stating that "{i}n 1994, the company implemented a modern sawmill for the production of sawn, raw and processed wood. In the processing area, it started to produce *blocks*, *blancs*, *panels* and frames." Petitioner's Prelim SV Submission at Exhibit 8A, p. 130-134.

With respect to Duratex, while Yinfeng opines that the Brazilian company operates three divisions – wood, deca (ceramic, metal, electronic showers), and ceramic tiles, Yinfeng Br. at 20, Commerce explained that Duratex's financial data enable the agency to derive financial ratios specific to its wood products division. *See* Final Determination at 22. While Yinfeng also emphasizes that Duratex has subsidiaries in other non-economically comparable countries, its

reliance on *Chlorinated Isocyanurates From the People's Republic of China* for the assertion that this alone renders Duratex's financial statements unusable is misguided.  Yinfeng Br. at 21.  In that case, there were a number of reasons underlying Commerce's conclusion that the financial statements at issue were not the best available information for surrogate financial ratios.[12]  *See* Preliminary Decision Memorandum accompanying *Chlorinated Isocyanurates From the People's Republic of China*, 85 Fed. Reg. 67,709 (Dep't Commerce Oct. 26, 2020) (prelim. results of antidumping duty admin. rev., and prelim. deter. of no shipments; 2018-2019) ("*Chlorinated Isocyanurates from China* PDM").

Yinfeng also argues that the level of integration of Adami and Duratex are dissimilar to that of Yinfeng because the Brazilian companies maintain a forestry division.[13]  *See* Yinfeng Br. at 22.  While Commerce may examine the level of integration of companies in evaluating the suitability of financial statements for surrogate financial ratios, the agency has previously found that the fact that the surrogate company's production process may not be an exact match to the experience of respondents is not necessarily a disqualifying factor.  *See* Issues and Decision Memorandum accompanying *Multilayered Wood Flooring From the People's Republic of China*, 82 Fed. Reg. 25,766 (Dep't Commerce June 5, 2017) (final deter. of no shipments, and final partial rescission of antidumping duty admin. rev.; 2014-2015) at 8; Issues and Decision Memorandum accompanying *Coated Free Sheet Paper from the People's Republic of China*, 72 Fed. Reg. 60,632

---

[12]     For instance, Commerce found that the company was a holding company composed of 64 subsidiaries operating in multiple industries with numerous product lines in multiple countries, including some foreign entities operating in hyperinflationary economies.  *See Chlorinated Isocyanurates from China* PDM at 25.

[13]     A number of the Malaysian companies similarly are involved in forestry operations, timber extraction, and/or logging.  *See* Final SV Memo at 3-7; Final Determination at 22; Petitioner's Final SV Rebuttal at Exhibit 1; Yinfeng Br. at 23.

(Dep't Commerce Oct. 25, 2007) (final deter. of sales at less than fair value) at 20-21 ("{W}hile {Commerce} does consider whether the production process of potential surrogate companies is comparable to that of NME respondents, it is not {Commerce}'s practice to match individual companies to their potential surrogates.").  The Federal Circuit has also explained that Commerce may use the financial statements of companies with differing integration levels where the agency finds that better information is not available.  *See SeAH Steel Vina Corp. v. United States*, 950 F.3d 833, 841-42 (Fed. Cir. 2020) (citing *Home Meridian Int'l Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014) ("The data on which Commerce relies to value inputs must be the 'best available information,' but there is no requirement that the data be perfect.")).  Commerce clearly reviewed the record evidence as a whole and provided a thorough explanation of its reasoning. The agency's conclusion that after comparing the financial data for Brazilian producers Adami and Duratex and Malaysian producers Minho and Classic Scenic, the data for the Brazilian producers best represent the industry under investigation, as they are more limited to wood products and less inclusive of industries unrelated to the merchandise under investigation, and because the data pertained to the primary surrogate country, is supported by substantial evidence, reasonable, and in accordance with law.  *See* Final Determination at 22-23.

In sum, Commerce's final determination makes clear that the agency reviewed the record evidence as a whole and determined – as the fact-finder – that the Brazilian GTA data and the financial statements for two of the Brazilian producers provided the best available information with which to value the respondent's FOPs.  *See id.* at 22.  For this reason, Commerce's selection of Brazil as the primary surrogate country was supported by substantial evidence, reasonable, and in accordance with law.  While there is no requirement that the data be perfect, Commerce weighed the evidence and determined that the Brazilian data represented the best available information.

*See SeAH Steel*, 950 F.3d at 841-42 (citing *Home Meridian*, 772 F.3d at 1296) ("The data on which Commerce relies to value inputs must be the 'best available information,' but there is no requirement that the data be perfect."). Yinfeng simply disagrees with Commerce's conclusion and asks the Court to reweigh the evidence. However, Yinfeng fails to demonstrate that Commerce acted unreasonably, particularly given the agency's broad discretion to determine the "best available information" on a case-by-case basis, *see, e.g.*, *Wuhan Bee Healthy*, 29 CIT at 597, 374 F. Supp. 2d at 1308 (quoting *Peer Bearing*, 25 CIT at 1208, 182 F. Supp. 2d at 1298), as well as the agency's preference for deriving surrogate data from a single country, which this Court has upheld. *See, e.g.*, *Citric Acid from China* IDM at 12. Accordingly, the Court should reject Yinfeng's request to reweigh the evidence.

## V.  CONCLUSION

For the reasons discussed above, Petitioner respectfully submits that this Court should affirm Commerce's final determination in the antidumping duty investigation into WMMP from China.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Elizabeth S. Lee, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Coalition of American Millwork Producers*

Dated: October 13, 2021

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for the Coalition of American Millwork Producers' Response Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 9,996 words.

*/s/ Timothy C. Brightbill*
(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

Coalition of American Millwork Producers
(Representative Of)

October 13, 2021
(Date)