## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: The Honorable Gary S. Katzmann, Judge**

| | |
|---|---|
| FUJIAN YINFENG IMP & EXP TRADING CO., LTD. | ) |
| Plaintiff, | ) |
| v. | )   Court No. 21-00087 |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

### <u>PLAINTIFF'S REPLY BRIEF</u>

Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman
**deKieffer & Horgan, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*

Dated: November 15, 2021

## TABLE OF CONTENTS

I.      The Department's Surrogate Value Selection for Sawnwood is Not Supported by Substantial Evidence ................................................................................................ 2

II.     The Department's Surrogate Financial Statement Selection is Not Supported by Substantial Evidence ................................................................................................ 5

III.    The Department's Selection of Brazil as the Primary Surrogate Country is Not Supported by Substantial Evidence ........................................................................ 13

IV.     Conclusion and Prayer for Relief ............................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*Citic Trading Co. v. United States*, 27 C.I.T. 356 (Ct. Int'l Trade 2003). ......................................1

*Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262 (CIT 2006)............................................1

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 396 F. Supp. 3d 1134 (Ct. Int'l Trade. 2019)..............................................................................................................................5

*Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327 (Ct. Int'l Trade 2010)..........................1

*Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) ..............2

*Taian Ziyang Food Co. v. United States*, 637 F. Supp. 2d 1093 (Ct. Int'l Trade 2009).................2

*Vinh Hoan Corp. v. United States*, 2015 Ct. Intl. Trade LEXIS 156, *81 (2015) ..........................5

**Administrative Decisions**

*Certain Activated Carbon From the People's Republic of China; 2010-2011; Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 67,337 (Dep't Comm. Nov. 9, 2012)...12

*Certain Activated Carbon from China* Remand Results, CIT 16-185 (June 17, 2019)................14

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of the Second Administrative Review*, 72 Fed. Reg. 13,242 (March 2007) ................................................6

*Certain Steel Threaded Rod Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 83,800 (November 22, 2016)..........................................................................5

*Certain Steel Racks and Parts Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value* 84 Fed. Reg. 35,595 (July 24, 2019)...............13

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 62275 (October 2, 2020) ..........................................................................................5

*Folding Metal Tables and Chairs From the People's Republic of China: Final Results of 2007-2008 Deferred Antidumping Duty Administrative Review and Final Results of 2008-2009 Antidumping Duty Administrative Review*, 76 Fed. Reg. 2,883 (Jan. 18, 2011)....................6

*Refillable Stainless Steel Kegs From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, Postponement of Final Determination, and Extension of Provisional Measures*, 84 Fed. Reg. 25,745 (June 4, 2019) .......................................................14

*Steel Nails from the People's Republic of China: Final Results of Antidumping Duty Administrative Review: 2012-2013*, 80 Fed. Reg. 18816 (April 8, 2015) .....................................5

*Certain Steel Nails From the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Determination of No Shipments*; 2015–2016, 82 Fed. Reg. 42,291 (September 7, 2017) ................................................................5

*Steel Wire Garment Hangers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2010-2011*, 78 Fed. Reg. 28,803 (May 16, 2013)...........................................................................................................................12

Plaintiff Fujian Yinfeng Imp & Exp Trading Co., Ltd., ("Yinfeng" or "Plaintiff") hereby files their reply brief. *See* U.S. Response Brief (October 13, 2021); Def-Int. Response Brief (October 13, 2021); *Wood Mouldings and Millwork Products From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order*, 86 FR 9,486 (February 16, 2021*); see also Wood Mouldings and Millwork Products from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 63 (January 4, 2021) *incorporating* Issues & Decision Memorandum ("IDM"). Defendant and Defendant-Intervener maintain that Yinfeng is requesting this Court to merely reweigh the evidence. While the Department may have discretion in determining which surrogate values are the best available information to value Yinfeng's inputs, this discretion is "constrained by the underlying objective of [19 U.S.C. § 1677b(c)]; to obtain the most accurate dumping margins possible.." *Citic Trading Co. v. United States*, 27 C.I.T. 356, 365 (Ct. Int'l Trade 2003) n.12 (citations omitted). This Court must determine whether a reasonable mind could conclude that the Department relied upon the best available information. *Dorbest* at 1269, *citing Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1327 (2006) (add'l citations omitted). Further, while each review may stand alone, a foundational principal of administrative law that agency action is arbitrary if the agency offers insufficient reason for treating similar situations differently. *Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327, 1334 (Ct. Int'l Trade 2010) (citations omitted). In this proceeding, a reasonable mind cannot conclude that relying on Brazilian data was the best available information and relying on Brazil runs counter to Department practice regarding selecting the primary surrogate country.

1

Yinfeng challenges the Department's finding that the Brazilian sawnwood surrogate values were equally specific to the Malaysian sawnwood surrogate values, that the Brazilian financial statements were more comparable than the Malaysian financial statements, and the overall country selection related to the Department's findings for these issues.

**I.     The Department's Surrogate Value Selection for Sawnwood is Not Supported by Substantial Evidence.**

Yinfeng reported consuming radiata pine sawnwood and fir sawnwood of a thickness exceeding 6 mm, <u>sawn lengthwise</u>.  The United States does not dispute this fact.  Yinfeng argued that Malaysia provided the most specific HTS to value both of these inputs because only the Malaysian tariff schedule breaks out at the ten-digit level for sawnwood, providing separate HTS for sawnwood that is <u>only</u> sawn lengthwise, i.e. that is exactly specific to the input as consumed by Yinfeng.  Critically, the United States does not dispute this finding. U.S. Br. at 11.  The United States does not disagree that the Malaysian tariff schedule is more specific to Yinfeng's primary raw materials.  U.S. Br. at 12.  Instead, the United States merely maintains that the Brazilian tariff schedule was "sufficiently specific to Yinfeng's inputs" because the Brazilian HTS would *include* radiata pine and fir pine sawn lengthwise.  *Id*. ""Include" in this context only means that the Brazilian HTS is over broad including other radiata pine and fir sawnwood that is not sawn lengthwise.

The United States reiterates that the Department is not required to perfectly duplicate the respondent's exact production experience.  While the Department may be not be required to perfectly match the production experience, that is the Department's aim when it undertakes the task of ascertaining the *best* available information for the valuation of the factors of production.  The Department, as upheld by this Court, consistently finds "in sum, 'product

specificity' logically must be the primary consideration in determining 'best available information.' If a set of data is not sufficiently 'product specific,' it is of no relevance whether or not the data satisfy the other criteria set forth in Policy Bulletin 04.1." *See Taian Ziyang Food Co. v. United States*, 783 F. Supp. 2d 1292, 1330 (Ct. Int'l Trade 2011), *see also Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) (surrogate value selection justified where Commerce treated product-specificity as "more important factor" than other criteria); *Steel Nails from the People's Republic of China: Final Results of Antidumping Duty Administrative Review: 2012-201*3, 80 Fed. Reg. 18816 (April 8, 2015) and accompanying IDM at page 9 (Relying on Thailand as the primary surrogate country because the Thai tariff schedule provided greater specificity for the carbon content of the primary raw material steel inputs) (upheld on appeal); *Certain Steel Nails From the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Determination of No Shipments*; 2015–2016, 82 Fed. Reg. 42,291 (September 7, 2017) and accompanying Prelim. IDM (Relying on Thailand, consistent with several consecutive reviews, because it provided more detailed import data for the primary raw material steel inputs) (unchanged in final).  Relying on surrogate values that are the most product specific results in calculating the dumping margin as accurately as possible.  By this criterion alone, the Department should have relied on Malaysia as the primary surrogate country, because only Malaysia provided the most specific values for the primary inputs as consumed by Yinfeng.[1]

---

[1] As discussed below in the context of the best surrogate financial statements, there is a long-standing Department practice of favoring producers of identical over comparable merchandise, which principle was not honored when the Department asserted in this case that vaguely specific HTS are good enough for this purpose when selecting the key wood raw material surrogate values.

Further, as elaborated in the opening brief and below, the Brazilian import values are reported on an FOB basis.  The Department had to add estimated facts available values for marine insurance and ocean freight expenses to the Brazil FOB import values.  Therefore, not only does Malaysia provided the most specific HTS to value Yinfeng's main raw materials, but the Malaysian import value is also more reliable because it is reported on a CIF basis and no estimated costs must be added.  By every measure, Malaysia provides the best available information to value these primary inputs.

The United States attempts to deflect the overwhelming facts, by arguing that Malaysia lacked a surrogate value for the particular type of wood scrap that Yinfeng generated during its production.  U.S. Br. at 13.  Of course, as Yinfeng already argued lacking a particular scrap material HTS cannot reasonably make Brazil superior to Malaysia when Malaysia provided more specific HTS for Yinfeng's **primary** raw materials (and superior financials, as discussed below).

The United States faults Yinfeng with pointing to no evidence that scrap is such a minor cost consideration.  *Id.*  Of course, as is obvious in the very description, the wood scrap is a mere scrap while the two sawnwoods are the overwhelming primary raw materials for the input.  The relative significance of each is self-evident.  By-products are by definition are less valuable; otherwise, they would be co-products.  *See* Yinfeng Section D (April 21, 2020) at 7 (containing Department's instructions on by-products and co-products); PD303.  Wood shavings and end pieces necessarily are worth far less than the main raw materials.  Further, Yinfeng has also presented another reasonable HTS to value Yinfeng's wood scrap is available in Malaysia, HTS 4401.39.  Yinfeng R56.2 Br. at 31-32.  The record does not

4

completely lack a Malaysian HTS to value this minor scrap material.

The Department has a long-standing practice of relying on the surrogate country that provides the overall best-available information to value surrogate values. *Jiangsu Zhongji Lamination Materials Co. v. United States*, 396 F. Supp. 3d 1134, 1347 (Dep't Comm. 2019) (Commerce selects the primary surrogate country from the qualified candidates by deciding which country offers the best available information and the best factors data in accordance with Policy Bulletin 04.1.); *Vinh Hoan Corp. v. United States*, 2015 Ct. Intl. Trade LEXIS 156, *81 (2015) ("The best primary surrogate country in this case that provides the best available information for most inputs is Indonesia."); *see also Certain Steel Threaded Rod Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 83,800 (November 22, 2016) and accompanying IDM at 8 (Relying on Bulgaria as the primary surrogate country because it has greater specificity for diameter of the steel inputs).  Malaysia provides the best available information to value the primary wood raw materials that compose the wood moulding products subject of the Order in question.  According to department practice and the record of this proceeding, the Department should have relied upon Malaysia to value these inputs, and as the primary surrogate country.  An evaluation of the potential financial statements in the two countries also only supports reliance on Malaysia.

## II.    The Department's Surrogate Financial Statement Selection is Not Supported by Substantial Evidence.

The Department relied upon two Brazilian surrogate financial statements: Adami and Duratex. Final IDM at 22.  The record contained six Malaysian financial statements from producers of identical merchandise that were contemporaneous with the POI.  *See* Resp. Final SVs at Exhibit SV2-3 (summarizing the Malaysian financial statements) PD490-507.  Only

two of the Malaysia financial statements were contemporaneous with the entire POI.  Yinfeng

maintains even if the determination is only between those two Malaysian statements and the

two Brazilian statements, the record still supports finding that the Malaysian statements are

superior.  However, the full comparison to all six contemporaneous Malaysian statements

must still be made.

The United States remarks that it was not contrary to practice to disregard the four

Malaysian companies that were not fully contemporaneous because there were two Brazilian

and two Malaysian statements from companies that produce identical and comparable

merchandise that were fully contemporaneous with the POI.  U.S. Br. at 16.  While the extent

of contemporaneity may be one consideration, it is Department practice to consider a

statement contemporaneous so long as it overlaps the POR[2], the Department's primary

consideration in selecting surrogate financial statement is the comparability of the financial

producer.  *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules*

*Final Results of Antidumping Duty Administrative Review and Final Determination of No*

*Shipments; 2017-2018*, 85 FR 62275 (October 2, 2020) ("[S]pecificity is an overriding

criterion when choosing surrogate financial data" and "{h}ence, when selecting surrogate

---

[2] *See Folding Metal Tables and Chairs From the People's Republic of China: Final Results of 2007-2008 Deferred Antidumping Duty Administrative Review and Final Results of 2008-2009 Antidumping Duty Administrative Review*, 76 Fed. Reg. 2,883 (Jan. 18, 2011) and accompanying IDM, at Cmt. 2C (When considering contemporaneity, however, the Department does not select one set of financial statements over another simply because the overlap with the POR is larger. Rather the Department finds that as long as the potential surrogate statement covers a portion of the POR, it is deemed contemporaneous and appropriate for use if it meets the remaining criteria.); *see also Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of the Second Administrative Review*, 72 Fed. Reg. 13,242 (March 2007) and accompanying IDM at Comment 9A (where the Department found a statement overlapping 12 months of the POR and one overlapping 8 months of the POR were both contemporaneous).

financial statements, Commerce prefers financial statements from companies that produce identical merchandise over companies that produce comparable merchandise… because it is Commerce's preference to match the surrogate companies' production experience with respondents' production experience.").  The four supposedly "less" contemporaneous Malaysian financial statements are from companies that are more comparable than the two Brazilian statements.  According to the Department's well-established preferences for comparability, all (or any) of the six companies (the two the Department did consider and the four "less" contemporaneous) should be selected over the two Brazilian financial statements.

Minho and Classic Scenic were the two Malaysian statements the Department did consider because their financial statements fully overlapped with the POR.  Final IDM at 22.  First, Yinfeng wishes to clarify the United States insinuation that there is something less representative about these two companies because they are investment holding companies whose financial statement consolidate data for multiple subsidiaries is without merit.  U.S. Br. at 21.  It is very common that the financial statements relied upon by the Department are holdings companies.  This has no bearing on the ratios when, as the United States also acknowledges, the financial statement of the companies is the consolidated finances of the underlying subsidiaries.  The comparability of the subsidiaries is fully reflected in the financial statement.

However, the United States also continues that the subsidiaries of these two companies, and thereby the company's financial statements, are less comparable.  An examination of the record does not support this finding.  Minho lists manufacturing moulded timber and moulded timber products among its primary business.  In particular, the company

states it "has a capacity of 10 million linear feet of moulding per month. The company's product range includes general and specific mouldings…." Exhibit SV2-3 at company information page 5, PD490-507.  Minho is actually the only financial statement on the record that quantifies its production of identical merchandise.  Minho is clearly a significant producer of identical subject merchandise.  The other businesses of the company include manufacturing sawn timber, trading timber and timber products, sawmilling and timber equipment, and manufacturing paper bags from wood.  *Id*. at note 29.  The United States argues these other businesses are not comparable.  U.S. Br. at 21-22.  However, as discussed further below, these industries are far more comparable than the other divisions of the Brazilian companies.

Classic Scenic Berhad is primarily engaged in the manufacturing of picture frame mouldings (identical merchandise), and its only other business is highly similar production of other timber products.  This company is the largest wooden picture frame manufacturer in Malaysia. Exhibit SV2-4 at company information page 1, PD490-507.  Critically, its identical subject merchandise sales revenue represented over 88.95% of its revenue, or 49,873,761 out of 56,067,131 RM.  *See* Exhibit SV2-4 at Note 15, PD490-507.  The company is overwhelmingly dedicated to identical merchandise, and its only other manufacturing division, manufacture of timber products, is highly comparable.  The United States mentions that the company also has two subsidiaries that are property holding or rental companies.  U.S. Br. at 21.  However, this does not consider the overwhelming extent to which the company's revenue is represented by identical merchandise production.  Moreover, again, the extent of dissimilar production in the Brazilian companies is far greater.

Adami S/A, one of the Brazilian companies, has a forestry division, energy division, chemical division, and paper/cardboard box division.  The company cultivates large forests.  *See* Resp. Rebuttal SVs (June 29, 2020) at Exhibit SVR-1 PD459; *see also* Adami Financial Statement at note 10 (discussing biological assets) PD415.  The company produces its own energy as well.  The company is at a vastly different level of integration than respondents.  The manufacturing costs, raw materials, and equipment and labor involved in growing and harvesting trees is not comparable to the costs of companies, such as respondents, that purchase lumber and make downstream lumber and moulded products.

Even if the company produces some subject merchandise, as the United States contends, the company's financial statement and webpage make clear that any production of moulded products is comparatively very minor.  In the company's webpage printout, after a lengthy introduction of the company's paper and cardboard production, hydroelectric plant, forest replenishment, saw mill and pulp production, adds only one sentence that mentions the company "was recently expanded and modernized for the production of blocks, blancs, frames, among other products destined for the foreign market". *See* Pet Prelim. SVs at Exhibit 8 PD415. Moulded products manifestly are not a significant portion of this company's manufacturing and each of the divisions of the company are dramatically different than production of wood mouldings.

The second Brazilian company, Duratex, operates three divisions: deca (ceramic, metal, electronic showers), wood, and ceramic tiles.  Already two of these divisions are not remotely comparable to wood mouldings or the wood industry at all.  The United States contends those different divisions are immaterial because it could segregate out the financial data for its wood

division.  However, its wood division involves forestry.  Duratex "has over 150 thousand

hectares of land and cultivates eucalyptus using advances technology."  Resp. Rebuttal SVs at

Exhibit SVR-2 (excerpts from Duratex's webpage) PD459.  The company has 7 forestry units.

For the rest of its forestry division, Duratex describes that they produce medium density particle

board, medium density fiber board, and laminated vinyl tile flooring.  *Id*.  The company is not

focused on any moulding operations.

The Department also declined to consider equally the other four Malay financial

statements from Fine Quality, Haluan Mutiara, Chern Hinp, and LMT Superbonus.  Fine

Quality Timber produces many different types of mouldings and finger-joints. It is a member

of Malaysia Wood Moulding & Joinery Council and listed moulding among its main products.

Its only other business is in processing timber.  All of its manufacturing processes are

identical or highly comparable.  *See* Exhibit SV2-9 (containing the financial statement and

company information) PD490-507.  The company lists the machinery used in its production,

namely moulders, lamination lines, boring machines, sanding lines, lacquering lines, etc.  *Id*.

at company information page 14 (typical production flow). Yinfeng uses the same machines

and processes to produce subject merchandise.  *See* Yinfeng Section D response at Exhibit D-

3 CD199 PD303. As described, Fine Quality's core business is "manufacturing general and

engineered mouldings included design and provider of manufacturing solution". *Id*. at

company information page 10.  In addition, its scope of physical products includes <u>softwood</u>

and hardwood mouldings. *Id*. at 896.

Haluan Mutiara is primarily engaged in the production of moulded products including

handrail, paneling, cornice, staircases, and it also produced the intermediate finger-joint

product.  And, as a member of the Malaysian Wood Moulding & Joinery Council, it listed its main products as including skirting mouldings. The only other products the company produces are wood timber products.  *See* Exhibit SV2-10 PD490-507.  Chern Hinp Timber Trading Sdn Bhd, as a member of the Malaysia Wood Moulding & Joinery council, listed its main products as including door frames and skirting moulding.  *See* Exhibit SV2-11 PD490-507. Therefore, this company produces identical merchandise.  LMT Superbonus Sdn Bhd is also a producer of mouldings and a member of the Malaysia Wood Moulding & Joinery Council.  Door frame and skirting moulding were listed as its main products, with its raw materials were listed as pallets and sawn timber.  *See* Exhibit SV2-8 PD490-507. The company produces identical merchandise, such as mouldings, and is representative of the financial ratios in the mouldings industry.

The record establishes that the Malaysian financial statements are superior to the Brazilian financial statements.  While both the Brazilian and Malaysian statements have some non-comparable production, the Malaysian statements are more focused on comparable production of processed wood.  Minho and Classic Scenic in fact are the only statements that quantify their production of identical merchandise; for Classic Scenic it represented 90% of its production.  The record far more concretely establishes the extent of comparability of the Malaysian companies.

Moreover, even if Court found that a reasonable mind could select from among all of the statements (Malaysian and Brazilian alike) that had evidence of some identical production and some non-comparable production, Malaysia would still be preferable because it sources multiple financial statements.  The Department has a long-standing preference to rely upon a

larger number of financial statements to reduce the potential for distortions in a particular statement or statements. *See, e.g., Steel Wire Garment Hangers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2010-2011*, 78 Fed. Reg. 28,803 (May 16, 2013) and accompanying *Issues & Decision Memo* at Cmt. 1D ("Using multiple financial statements in this review is consistent with the Department's preference of using multiple financial statements to determine surrogate financial ratios.  Using multiple financial statements allows the Department to average the factory overhead, SG&A, and profit ratios and, thus, to normalize any potential distortions that may arise from using those of a single producer. Thus, by using the average of multiple surrogate companies, we arrive at a broader-based surrogate valuation that minimizes the particular circumstances of any one producer."); *Certain Activated Carbon From the People's Republic of China; 2010-2011; Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 67,337 (Dep't Comm. Nov. 9, 2012), and accompanying IDM at Cmt. 1F (after preliminarily finding Thailand to be the most suitable surrogate country, the Department changed its position in the final results, selecting the Philippines because the three Philippines financial statements provided a broader market average than the sole Thai statement, satisfying the Department's "preference for using multiple financial statements.").

Accordingly, based on established practice, Malaysia sources the superior surrogate financial data as well as surrogate value data for the primary woods inputs and therefore is the only reasonable choice as a primary surrogate country.  In other words, a reasonable mind could not conclude that Brazil was home to the "best available information" to value Yinfeng's factors of production.  The Court should order the Department to reconsider its surrogate country

selection in light of these two issues alone.  However, Malaysia also has yet further data advantages over Brazil.

III.     **The Department's Selection of Brazil as the Primary Surrogate Country is Not Supported by Substantial Evidence.**

Lastly, the United States dismisses Yinfeng's arguments concerning the superiority of the Malaysian import values being on a CIF basis and the greater specificity in the Malaysian tariff schedule for various other significant inputs including labor, truck freight, brokerage & handling, and acrylic polymer.  While each of these issues on their own may not demand selection of Malaysia over Brazil, the superiority of these more minor issues only underpins that a reasonable mind only could conclude that Malaysia sources the best available information and should be the primary surrogate country in this investigation.

Indeed, the Department itself has found that the FOB-basis import statistics issue weighs into its surrogate country determination and is at least a tie-breaker between multiple potential surrogate countries:

> Nevertheless, as explained in Policy Bulletin 10.2, Commerce's practice is to adjust SV import data reported on an FOB basis to a CIF basis. Because the Brazilian SV data are reported on an FOB basis, Commerce would be required to make adjustments to value the Brazilian data on a CIF basis, consistent with our practice. Normally, international freight costs include not only the ocean freight portion of transporting the merchandise from one location to another, but also the other expenses associated with moving the goods, such as marine insurance… Conversely, the Romanian SV data are already reported on a CIF basis and require no adjustment because they include specific actual costs for inputs used in the production of subject merchandise.  While this difference alone may not necessarily be sufficient to determine that Romania is preferable to Brazil as a surrogate country, the totality of the evidence, as discussed above, leads us to find that Romania is the appropriate primary surrogate country in this case.

*Certain Steel Racks and Parts Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 35,595 (July 24, 2019) and

accompanying IDM at 8-9; *Refillable Stainless Steel Kegs From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, Postponement of Final Determination, and Extension of Provisional Measures*, 84 Fed. Reg. 25,745 (June 4, 2019) and accompanying IDM at 10 ("However, the Brazilian SV data are reported on a free-on-board (FOB) basis, while the Malaysian are reported on a cost, insurance and freight (CIF) basis. Commerce prefers to rely on SVs reported on a CIF basis because they include the costs associated with purchasing these inputs from foreign exporters, including brokerage and handling, marine insurance, and international freight because this is the price that is most representative of a domestic price for the input in the surrogate country.") (unchanged in final); *Activated Carbon from China* Remand Results, CIT 16-185 (June 17, 2019) at 11 (selecting Malaysia instead of the Philippines because, in part, Malaysia provides CIF basis import statistics); *see also Activated Carbon from China* Remand Results, CIT 15-286 (June 17, 2019) at 10 (selecting Indonesia in part because its import statistics are on a CIF basis).

Malaysia also sources superior data for other inputs, including labor, truck freight, brokerage & handling, and acrylic polymer.  Yinfeng R56.2 Br. at 30-31 (explaining the greater specificity and contemporaneity of these various inputs).  In sum, Malaysia provides superior information to value the primary wood inputs, superior information to value financial ratios, and superior information to value other inputs, including all import statistics being reported on a CIF basis.  The record is clear that Malaysia offers the best available information of record.  A reasonable person could not conclude that Brazil was the source of the best information individually or collectively for Yinfeng's factors of production.  Plaintiff thus asks the Court to

14

remand for the Department to reconsider its primary surrogate country in light of the full surrogate value record and its established practice.

**IV.      Conclusion and Prayer for Relief**

In light of the foregoing, the Department's *Final Results* were not supported by substantial evidence or in accordance with the law.  Plaintiff respectfully requests that the Court remand this case for redetermination of the issues consistent with the arguments presented in this brief.

Respectfully submitted,

/s/ Gregory S. Menegaz

Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman*
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
Date: November 15, 2021                   *Counsel to Plaintiff*

*Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **4,177** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DeKieffer & Horgan, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*