Slip Op. 22-151

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| FUJIAN YINFENG IMP & EXP TRADING CO., LTD.,<br><br>        Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>  and<br><br>COALITION OF AMERICAN MILLWORK PRODUCERS,<br><br>        Defendant-Intervenor. | Before: Gary S. Katzmann, Judge<br>Court No. 21-00087<br><br>*PUBLIC VERSION* |

## OPINION

[Plaintiff's Motion for Judgment on the Agency Record is denied and Commerce's Final Determination is sustained.]

Dated: <u>December 21, 2022</u>

<u>Gregory S. Menegaz</u> and <u>Alexandra H. Salzman</u>, deKieffer & Horgan, PLLC, of Washington, D.C., argued for Plaintiff Fujian Yinfeng Imp & Exp Trading Co., Ltd. With them on the briefs were <u>J. Kevin Horgan</u>.

<u>Timothy C. Brightbill</u> and <u>Laura El-Sabaawi</u>, Wiley Rein, LLP, of Washington, D.C., argued for Defendant-Intervenor Coalition of American Millwork Producers. With them on the briefs were <u>Elizabeth S. Lee</u>.

<u>Iona Cristei</u>, Trial Attorney, Commercial Litigation Branch, U.S. Department of Justice, Washington, D.C., for Defendant United States. With her on the briefs and supplemental briefs were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>Jeanne E. Davidson</u>, Director, and <u>Claudia Burke</u>, Assistant Director. Of Counsel <u>Shelby M. Anderson</u>, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance.

  Katzmann, Judge: This case concerns Fujian Yinfeng Imp. & Exp. Trading Co.'s ("Yinfeng" or "Plaintiff") challenge to the Department of Commerce's ("Commerce") selection of Brazil, rather than Malaysia, as the primary surrogate country ("PSC") in its antidumping duty investigation of wood mouldings and millwork products from China, a nonmarket economy ("NME") country.[1] See Wood Mouldings and Millwork Products from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, 86 Fed. Reg. 63 (Dep't Commerce Jan. 4, 2021), P.R. 667 ("Final Determination"), and accompanying Issues and Dec. Mem., ECF No. 14-5, P.R. 661 ("IDM"), as amended by Wood Mouldings and Millwork Products from the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order, 86 Fed. Reg. 9,486 (Dep't Commerce Feb. 16, 2021), P.R. 680 ("Am. Final Determination"). Yinfeng argues that where Malaysia offers better data to value its factors of production and noninput costs, among other advantages, no reasonable mind might accept Brazil as the superior PSC. The court assesses that each of Commerce's constituent determinations underpinning its overall PSC selection is supported by substantial evidence and otherwise in accordance with law, and that Yinfeng has raised no arguments sufficient to undermine Commerce's multifactorial selection of Brazil. Accordingly, Plaintiff's Motion for Judgment on the Agency Record is denied, and Commerce's Final Determination is sustained.

**BACKGROUND**

### I. *Legal and Regulatory Framework for Primary Surrogate Country Selections*

  The Tariff Act of 1930 empowers Commerce to investigate allegations that a product is being "dumped." Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1047 (Fed Cir.

---

[1] "An NME country, such as China, is 'any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise.'" Shandong Rongxin Imp. & Exp. Co. v.

2012) (discussing 19 U.S.C. § 1673).  "Dumping occurs when a foreign company sells a product

in the United States for less than 'fair value' -- that is, for a lower price than its [normal value]."

Jiangsu Zhongji Lamination Materials Co., (HK) v. United States, 43 CIT __, __, 396 F. Supp. 3d

1334, 1340 (2019) (quoting Sioux Honey, 672 F.3d at 1046).  Accordingly, Commerce determines

whether dumping is occurring by comparing the export price[2] of the subject merchandise with its

"normal value," typically the price at which the subject merchandise is sold for consumption in

the home market.  See 19 U.S.C. § 1677b(a)(1)(B)(i).

When the subject merchandise is exported from an NME country and Commerce finds that

the available information is inadequate to reliably calculate normal value, Commerce values the

merchandise using surrogate values derived from another market economy country -- referred to

as the "primary surrogate country" ("PSC"); such surrogate values cover "the factors of production

utilized in producing the merchandise" -- which include, but are not limited to, labor, raw

materials, energy, and depreciation -- as well as "general expenses and profit plus the cost of

containers, coverings, and other expenses."  Id. § 1677b(c)(1)(A)–(B), (c)(3)(A)–(D).

Concerning "factors of production," Commerce is required by statute to use "the best

available information" in selecting surrogate values.  Id. § 1677b(c)(1)(B).  The term "best

---

United States, 42 CIT __, __, 331 F. Supp. 3d 1390, 1394 (2018) (alteration in original) (quoting
19 U.S.C. § 1677(18)(A)).

[2] Although not before the court in this case, for the sake of completeness, we note that the statute
also contemplates assessing dumping by comparing normal value to constructed export price,
which is:

> the price at which the subject merchandise is first sold (or agreed to be sold) in the
> United States before or after the date of importation by or for the account of the
> producer or exporter of such merchandise or by a seller affiliated with the producer
> or exporter, to a purchaser not affiliated with the producer or exporter.

19 U.S.C. § 1677a(b).

available information" is not further defined, affording Commerce "broad discretion" in making

such determinations.  Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed.

Cir. 2014); see also QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011)

(citing Ad Hoc Shrimp Trade Action Comm. v. United States, 618 F.3d 1316, 1322 (Fed. Cir.

2010)).  Commerce typically selects surrogate values for factors of production that are "(1)

publicly available; (2) contemporaneous with the period of investigation . . . ; (3) a broad market

average covering a range of prices; (4) from an approved surrogate country; (5) specific to the

input in question; and (6) tax exclusive." Ancientree Cabinet Co. v. United States, 45 CIT __, __,

532 F. Supp. 3d 1241, 1249 (2021) (citation omitted).  There is no hierarchy among these criteria.

United Steel & Fasteners, Inc v. United States, 44 CIT __, __, 469 F. Supp. 3d 1390, 1397–99

(2020).

      Concerning "general expenses and profit . . . and other expenses," 19 U.S.C. §

1677b(c)(1)(B), Commerce values these noninput factors of production by deriving ratios from

financial statements of producers of identical or comparable merchandise in the surrogate country.

See 19 C.F.R. § 351.408(c)(4); see also Ad Hoc Shrimp, 618 F.3d at 1319–20 (citing Dorbest Ltd.

v. United States, 604 F.3d 1363, 1368 (Fed. Cir. 2010)).  Here too, Commerce requires surrogate

financial statements that provide "the best available information" and has "broad discretion,"

Weishan Hongda Aquatic Food Co. v. United States, 917 F.3d 1353, 1364–1365 (Fed. Cir. 2019),

to evaluate financial statements based on their specificity, contemporaneity, data quality, and

comparability with the NME producers' production experience, see T.T. Int'l Co. v. United States,

44 CIT __, __, 439 F. Supp. 3d 1370, 1382 (2020); see also Shenzhen Xinboda Indus. Co. v. United

States, 38 CIT __, __, 976 F. Supp. 2d 1333, 1368 (2014).  Where possible, Commerce prefers to

use multiple financial statements to calculate surrogate financial ratios.  See NTSF Seafoods Joint Stock Co. v. United States, 44 CIT __, __, 487 F. Supp. 3d 1310, 1318 (2020).

Typically, Commerce derives both factors of production and noninput costs of production from one surrogate country.  See 19 C.F.R. § 351.408(c)(2), (4).  Although it is Commerce's general practice to "value all factors in a single surrogate country," id. § 351.408(c)(2), the agency may also "mix and match" surrogate country values where a non-primary country provides some values that are more accurate, Lasko Metal Prods., Inc. v. United States, 16 CIT 1079, 1080–82, 810 F. Supp. 314, 316–17 (1992), aff'd, 43 F.3d 1442 (Fed. Cir. 1994).  Commerce will "determine the 'best available information' in a reasonable manner on a case-by-case basis."  Timken Co. v. United States, 25 CIT 939, 947, 166 F. Supp. 2d 608, 616 (2001) (citing Lasko Metal, 43 F.3d at 1446); see also Hardwood and Decorative Plywood from the People's Republic of China: Final Determination of Sales at Less than Fair Value, 78 Fed. Reg. 58,273 (Dep't Commerce Sept. 23, 2013), and accompanying Issues and Dec. Mem. Cmt. 7C at 60 (Sept. 16, 2013) ("Hardwood & Decorative Plywood from China IDM") ("In determining the suitability of surrogate values, [Commerce] considers the available evidence with respect to the particular facts of each case and evaluates the suitability of each source on a case-by-case basis.").  While the controlling statute "does not say – anywhere -- that [surrogate values] must be ascertained in a single fashion," Lasko Metal, 43 F.3d at 1446, Commerce is at all times constrained by the statutory purpose "to facilitate the determination of dumping margins as accurately as possible," id. (quoting Allied–Signal Aerospace Co. v. United States, 996 F.2d 1185, 1191 (Fed. Cir. 1993)).

## II.      Factual and Procedural Background

### A.      Initiation of Commerce's Less-Than-Fair-Value Investigation

On January 8, 2020, the Coalition of American Millwork Producers ("the Coalition" or "Defendant-Intervenor") filed an antidumping petition concerning imports of wood mouldings and millwork products from China.  See Pets. for Imposition of Antidumping & Countervailing Duties (Jan. 8, 2020), P.R. 2.  In response, on February 5, 2020, Commerce initiated a less-than-fair-value ("LTFV") investigation into wood mouldings and millwork products from China imported during the period of investigation ("POI") of July 1, 2019 through December 31, 2019.  Wood Mouldings and Millwork Products from Brazil and the People's Republic of China: Initiation of Less-Than-Fair-Value Investigations, 85 Fed. Reg. 6,502, 6,503 (Dep't Commerce Feb. 5, 2020), P.R. 117. Yinfeng, a mandatory respondent[3] in the investigation, was selected for individual examination[4]. See Resp't Selection Mem. at 1, 5–6 (Dep't Commerce Mar. 2, 2020), P.R. 145.

---

[3] In antidumping investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f–1(c)(2), which provides:

> If it is not practicable to make individual weighted average dumping margin determinations . . . because of the large number of exporters or producers involved in the investigation or review, [Commerce] may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to-
>
> > (A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection, or
> >
> > (B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

[4] "In [antidumping] proceedings involving [NME] countries, including China, Commerce presumes that exporters and producers are state-controlled, and [thus] assigns them a single state-wide rate." Changzhou Wujin Fine Chem. Factory Co. v. United States, 701 F.3d 1367, 1370 (Fed. Cir. 2012) (discussing 19 C.F.R. § 351.107).  However, "[t]his presumption is rebuttable; a

On May 8, 2020, Commerce invited all interested parties to submit information to aid Commerce's selection of a surrogate country and surrogate values. See Req. for Econ. Dev., Surrogate Country & Surrogate Value Cmts. & Info. at 1 (Dep't Commerce May 8, 2020), P.R. 333 ("Req. for SV Cmts.").[5]  In its Request for Comments, Commerce stated that it would not consider information received after June 17, 2020 or rebuttal comments received after June 29, 2020 -- except as permitted by 19 C.F.R. § 351.301(c)(3) -- in reaching its preliminary determination.  See id. at 2.  Yinfeng subsequently submitted surrogate value information advocating for Commerce to select Malaysia as the surrogate country on both June 17, 2020, see Resp't's Prelim. Surrogate Value Subm. at 1 (June 17, 2020), P.R. 411-414 ("Resp't's Prelim. SV Subm."), and July 6, 2020, see Resp't's Final Surrogate Value Subm. at 1 (July 6, 2020), P.R. 490-510 ("Resp't's Final SV Subm.").  The Coalition submitted surrogate value information advocating for the selection of Brazil as the surrogate country on the same dates.  See Pet'r's Prelim. Surrogate Value Cmts. at 2 (June 17, 2020), P.R. 415-418 ("Pet'r's Prelim. SV Cmts.");
see also Pet'r's Final Surrogate Value Subm. (July 6, 2020), P.R. 487-489.

The Coalition's Preliminary Surrogate Value Comments, filed on June 17, 2020, provided data from Global Trade Atlas ("GTA")[6] to value Yinfeng's primary inputs of radiata pine

---

company that demonstrates sufficient independence from state control may apply to Commerce for a separate rate." Id. Here, Commerce concluded that Yinfeng was entitled to a separate rate.

[5] Commerce provided interested parties with a non-exhaustive list of six countries that the agency determined to be at the same level of economic development as China, which included: Malaysia, Turkey, Russia, Mexico, Brazil, and Bulgaria.  See Req. for SV Cmts. Attach. I at 2.

[6] Global Trade Atlas "is an online trade data system" that advertises it "allows users to view world trade flows for products of interest using the latest import/export data from the official sources of more than 70 Countries."  Glob. Trade Atlas, Glob. Trade Info. Servs., www[.]gtis[.]com/English/GTIS_GTA[.]html (last visited Dec. 16, 2022).  [Please note, in order to disable links to outside websites, the court has removed the "http" designations and bracketed

sawnwood and fir sawnwood using the Brazilian Harmonized Tariff Schedule[7] ("HTS") subheadings 4407.11.00 and 4407.12.00, respectively.  See Pet'r's Prelim. SV Cmts. at Exs. 1–2. These HTS subheadings cover pine and fir wood that has been "sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness > 6 mm."  Id. at Ex. 2.  To calculate surrogate financial ratios, the Coalition submitted financial statements from three Brazilian companies: Adami S.A. ("Adami"), Duratex S.A. ("Duratex"), and Eucatex S.A. ("Eucatex").  See id. at Exs. 8A–8C.

In contrast, Yinfeng's Preliminary Surrogate Value Submission, also filed on June 17, 2020, provided data from Trade Data Monitor[8] to value its radiata pine sawnwood and fir sawnwood inputs using the Malaysian HTS subheadings 4407.11.00 and 4407.12.00, respectively.[9]  See Resp't's Prelim. SV Subm. at Ex. SV-2.  To calculate surrogate financial ratios, Yinfeng submitted financial statements from two Malaysian producers: Sri Ledang and Inter

---

the periods within hyperlinks.  For archived copies of any webpages cited in this opinion, please consult the docket.]

[7] "Harmonized Tariff Schedules" derive from the international Harmonized System ("HS"), which "is a standardized numerical method" "used by customs authorities around the world to identify [traded] products when assessing duties and taxes and for gathering statistics."  Harmonized Sys. (HS) Codes, Int'l Trade Admin., www[.]trade[.]gov/harmonized-system-hs-codes (last visited Dec. 20, 2022).  "The HS assigns specific six-digit codes [to] . . . commodities."  Id.  Although the first six-digit are standardized across countries, individual nations may "add longer codes to the first six digits for further [country-specific] classification," generally at the eight- or ten-digit level. Id.

[8] Trade Data Monitor is another "supplier of trade statistics" that advertises it "collects monthly import and export statistics from customs agencies, statistics institutes and other sources in over 110 countries, then uses proprietary software to assemble, organize, and publish the data in user-friendly charts."  Prods., Trade Data Monitor, www[.]tradedatamonitor[.]com/products/ (last visited Dec. 16, 2022).

[9] These HTS subheadings from Malaysia match those submitted by the Coalition from Brazil.

Moulding.  See id. at Exs. SV-9, SV-10.

Yinfeng's Final Surrogate Value Submission, filed on July 6, 2020, provided three relevant updates to its earlier submission.  First, it included Malaysian surrogate value data from GTA.  See Resp't's Final SV Subm. at Ex. SV2-1.  Second, it provided data for its radiata pine sawnwood and fir sawnwood inputs using the Malaysian HTS subheadings 4407.11.00.10 and 4407.12.00.10, respectively.  See id. at Ex. SV2-21.  These ten-digit HTS subheadings[10] describe pine and fir wood that has been "sawn lengthwise" and "of a thickness exceeding 6 mm."  See id.  Third, Yinfeng supplied eighteen new financial statements from additional Malaysian companies.  See id. at Exs. SV2-3–SV2-20.

### B.      *Preliminary Determination*

On August 12, 2020, Commerce published its preliminary finding that millwork products from China "are being, or are likely to be, sold in the United States at [LTFV]."  Wood Mouldings and Millwork Products from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures, 85 Fed. Reg. 48,669, 48,669 (Dep't Commerce Aug. 12, 2020), P.R. 616 ("Preliminary Determination"), and accompanying Prelim. Dec. Mem., P.R. 548 ("PDM").  At such time, Commerce also announced its selection of Brazil as the PSC on the grounds that the Brazilian GTA data offered superior surrogate values for valuing Yinfeng's factors of production,[11] and that the Brazilian producers' financial statements were likewise

---

[10] The Malaysian HTS subheadings that Yinfeng submitted in its Preliminary Surrogate Value Submission were at the eight-digit level.

[11] Commerce explained that GTA is its preferred source for surrogate value data.  PDM at 8.

superior.[12]  PDM at 8–9.  Commerce did not consider either Yinfeng's or the Coalition's July 6, 2020 submissions in reaching its Preliminary Determination because the submissions did not meet the Commerce-imposed deadline.  Id. at 6.  However, Commerce stated that it would consider the parties' July 6, 2020 surrogate value submissions in rendering the Final Determination.  Id.

### C.    Final Determination

In the Final Determination, issued on January 4, 2021, Commerce reiterated its conclusion that millwork products from China "are being, or are likely to be, sold in the United States at [LTFV]," see Final Determination at 63, and ultimately assigned Yinfeng a final dumping margin of 45.49 percent, see Am. Final Determination at 9,487.[13]  After considering all the submitted data, including Yinfeng's Final Surrogate Value Submission, Commerce continued to rely on Brazil as the PSC, from which it derived all surrogate values.  See IDM at 19–23.

One basis for Commerce's continued selection of Brazil as the PSC was the quality and contemporaneity of the surrogate producers' financial statements available on the record.  See IDM at 21–22.  In rendering its Final Determination, Commerce considered the additional eighteen financial statements from Malaysian producers submitted by Yinfeng, see Resp't's Final SV Subm. at Exs. SV2-3–SV2-20; PDM at 6, and provided a brief summary of items it "noted" for each company, see Final Determination Surrogate Value Mem. at 3–7 (Dep't Commerce Dec. 28, 2020), P.R. 662-663 ("Final SV Mem.").  Although Yinfeng argued before the agency that six of

---

[12] Commerce stated that "although Adami, Duratex, Sri Ledang and Inter Moulding are producers of identical or comparable merchandise, Adami's and Duratex's [ -- the Brazilian companies -- ] financial statements are more contemporaneous with the POI than the financial statements for [the Malaysian companies,] Sri Ledang and Inter Moulding."  Id. at 9.

[13] Yinfeng's pre-amendment dumping margin rate was 44.60 percent.  See Final Determination at 64.

these additional Malaysian financial statements[14] were "contemporaneous with the POI" and "far

superior to the [Brazilian] financial statements" of Adami and Duratex, Commerce rejected four

of these statements because they were not contemporaneous with the entire POI and the agency

maintains it has a preference for full contemporaneity.[15]  See IDM at 18, 21–22.  This left

Commerce with a total of four financial statements from producers of the subject merchandise that

were contemporaneous with the entire POI:  two from Brazil (Adami and Duratex) and two from

Malaysia (Classic Scenic and Minho).  See id. at 22.  Ultimately, Commerce determined that

Adami and Duratex were superior to Minho and Classic Scenic because the production experience

of the former two companies better aligned with that of Yinfeng.  See id.  Specifically, Commerce

determined that "the two Brazilian producers . . . are limited more to wood products and [are] less

inclusive of industries unrelated to the merchandise under investigation."  Id.

     Commerce also based its final PSC selection on its determination that "the Brazilian GTA

data are the best available data for valuing" Yinfeng's "[factors of production] because they are

complete, publicly-available, contemporaneous, and specific to each input used by the respondent

to produce the subject merchandise during the POI."  Id. at 19.  Commerce found that the eight-

digit Brazilian HTS and the Malaysian ten-digit HTS "note[] the same inputs at the same

specificity," but that the "Brazilian GTA data, unlike the Malaysian GTA data, include imports for

the particular type of wood scrap that Yinfeng[] generates from its production process" such that

---

[14] Namely the Malaysian financial statements from Chern Hinp Timber Trading Sdn Bhd ("Chern Hinp"); Haluan Mutiara Sdn Bhd ("Haluan Mutiara"); Minho (M) Berhad ("Minho"); Fine Quality Timber Sdn Bhd ("Fine Quality"); Classic Scenic Berhad ("Classic Scenic"); and LMT Superbonus Sdn Bhd ("LMT Superbonus").  See IDM at 21 n.139.

[15] Commerce acknowledged that it found evidence that all six Malaysian companies were producers of the subject merchandise.  See id. at 22.

the agency could calculate a more accurate offset to Yinfeng's normal value using the Brazilian

data.  Id. at 20.

In so selecting the Brazilian GTA data, Commerce rejected Yinfeng's argument that the

Malaysian GTA data is superior because it is reported on a cost, insurance, and freight ("CIF")

basis, as opposed to a free on board ("FOB") basis, as Brazil's data is.[16]  See id. at 20–21.

Commerce reasoned that because it had the necessary surrogate data to adjust the Brazilian GTA

FOB import values -- and in light of the overall superiority of the Brazilian GTA data -- it was

unnecessary to use the CIF reporting as a "tiebreaker," as Commerce has done in the past.  Id. at

21.

Finally, while Commerce acknowledged the superiority of the Malaysian data in valuing

labor, truck freight, brokerage & handling, and acrylic polymer (hereinafter "other inputs"),

Commerce explained that this was an insufficient reason to depart from Brazil as the PSC given

that those inputs are just a few of many data points considered in the surrogate country selection.

See Final SV Mem. at 2–3.

Thus, after weighing the totality of the evidence, Commerce selected Brazil as the PSC and

derived all surrogate values from there.  IDM at 19–23.

### D.    *Procedural History*

Yinfeng initiated this litigation on March 3, 2021 to contest Commerce's overall selection

of Brazil -- instead of Malaysia -- as the PSC, see Compl. ¶ 19, Mar. 3, 2021, ECF No. 6, and

moved for judgment on the agency record on July 23, 2021, see Pl.'s Mem. in Supp. of Mot. for J.

---

[16] When data is reported on a CIF basis that means it already "include[s] the costs associated with
purchasing . . . inputs from foreign exporters, including brokerage and handling, marine insurance,
and international freight," while data reported on an FOB basis does not.  See Jiangsu, 396 F. Supp.
3d at 1343 n.2.

on Agency R., July 23, 2021, ECF No. 18 ("Pl.'s Br."). The Defendant United States ("the Government," that is Commerce, as represented by the U.S. Department of Justice) and the Coalition each responded in opposition to Yinfeng's Motion on October 13, 2021, <u>see</u> U.S. Gov't's Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R., Oct. 13, 2021, ECF No. 25 ("Def.'s Br."); Def.-Inter.'s Resp. in Opp'n to Pl.'s Mot. For J. on the Agency R., Oct. 13, 2021, ECF No. 26 ("Def.-Inter.'s Br."), to which Yinfeng replied on November 15, 2021, <u>see</u> Pl.'s Reply Br., Nov. 15, 2021, ECF No. 28 ("Pl.'s Reply Br.").

In advance of oral argument, the court presented questions to the litigants, <u>see</u> Ct.'s Qs. for Oral Arg., Apr. 1, 2022, ECF Nos. 34–35, and the parties responded in writing on April 14, 2022, <u>see</u> Pl.'s Resp. to Ct.'s Apr. 1, 2022 Qs., Apr. 14, 2022, ECF No. 39 ("Pl.'s Oral Arg. Subm."); Def.'s Resp. to Ct.'s Apr. 1, 2022 Qs., Apr. 14, 2022, ECF No. 38 ("Def.'s Oral Arg. Subm."); Def.-Inter.'s Resp. to Ct.'s Apr. 1, 2022 Qs., Apr. 14, 2022, ECF No. 36 ("Def.-Inter.'s Oral Arg. Subm."). After examining the parties' written responses, the court presented parties with supplemental questions to be addressed at oral argument. <u>See</u> Ct.'s Supp. Qs. for Oral Arg., Apr. 18, 2022, ECF No. 41. Oral argument was held on April 19, 2022. ECF No. 42. Following oral argument, the parties submitted post-oral argument briefing to the court. Pl.'s Post-Arg. Subm., Apr. 26, 2022, ECF No. 44; Def.'s Post-Arg. Subm., Apr. 26, 2022, ECF No. 45; Def.-Inter.'s Post-Arg. Subm., Apr. 26, 2022, ECF No. 43.

Finally, to aid its deliberation, the court submitted supplemental questions to the parties on July 13, 2022 for answers in writing. <u>See</u> Ct.'s July 13, 2022 Suppl. Qs., July 13, 2022, ECF No. 47. With the parties' responses in hand, <u>see</u> Pl.'s Resp. to Ct.'s July 13, 2022 Suppl. Qs., July 22, 2022, ECF No. 48 ("Pl.'s Suppl. Qs. Resp."); U.S. Gov't's Resp. to Ct.'s July 13, 2022 Suppl. Qs., July 22, 2022, ECF No. 49 ("Def.'s Suppl. Qs. Resp."); Def.-Inter.'s Resp. to Ct.'s July 13, 2022

Suppl. Qs., July 22, 2022, ECF No. 50 ("Def.- Inter.'s Suppl. Qs. Resp."), the case is now decision ready.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and (B)(i). The court will sustain Commerce's antidumping determinations, findings, and conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

A determination by Commerce "is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding." Maverick Tube Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citing Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). The court will not disturb Commerce's determination if it is "supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion." Shandong Huarong Gen. Corp. v. United States, 25 CIT 834, 838, 159 F. Supp. 2d 714, 718 (2001) (citing Heveafil Sdn. Bhd. v. United States, 25 CIT 147, 149 (2001)), aff'd sub nom., 60 F. App'x 797 (Fed. Cir. 2003). Moreover, the court will uphold an agency's action "where the agency's decisional path is reasonably discernable." Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998) (citing Ceramica Regiomontana, S.A. v. United States, 810 F.2d 1137, 1139 (Fed. Cir. 1987)).

## DISCUSSION

In selecting the PSC, Commerce narrowed its choice down to Brazil or Malaysia. Ultimately, Commerce selected Brazil because the agency found the Brazilian data to be superior,

on the whole, to value Yinfeng's factors of production as well as its noninput costs.[17]  IDM at 17–

23.   Before this court, Yinfeng argues that Commerce's reliance upon Brazil as the PSC is

unsupported by substantial evidence and otherwise not in accordance with law because, in

Plaintiff's estimation, the selection is based on two unfounded determinations: (1) "that the

Brazilian financial statements were more comparable than the Malaysian financial statements;"

and (2) "that the Brazilian sawnwood HTS were equally specific to the Malaysian sawnwood

HTS."[18]  Pl.'s Br. at 4.   Moreover, Yinfeng argues that Malaysia is the superior PSC choice because

Malaysia: (3) reports its import values on Commerce's preferred CIF basis; and (4) sources the

best available information to value other inputs of the subject merchandise.[19,20]  Id. at 27–32.   By

contrast, the Government and Coalition argue that substantial evidence supports Commerce's

selection of Brazil and that Yinfeng's contentions "amount to nothing more than a disagreement

---

[17] Recall that in LTFV investigations involving NMEs, Commerce typically selects a single surrogate country to value both the NME producer's factors of production and noninput costs of production.  See 19 C.F.R. § 351.408(c)(2).

[18] Yinfeng asserts that it "challenges each of these determinations separately as well as the overall country selection related to the Department's findings for these two issues." Pl.'s Br. at 4.  For its part, the Coalition argues that where Yinfeng did not raise any challenge to Commerce's selection of individual surrogate values in its administrative case brief, it failed to exhaust any such arguments.  See Def.-Inter.'s Br. at 16 n.6, 18 n.7.  Because the court ultimately sustains each element of Commerce's determination, infra, the Association's exhaustion argument is inconsequential.

[19] Recall that these "other inputs" include labor, truck freight, brokerage & handling, and acrylic polymer.  Pl.'s Br. at 29.

[20] In its briefing before this court, Yinfeng also "note[d] a procedural unfairness" arising from Commerce's refusal to consider certain surrogate value information that Yinfeng submitted after the Commerce-imposed deadline -- but before the regulatory deadline of 19 C.F.R. § 351.301(c)(3) -- in rendering the Preliminary Determination.  See Pl.'s Br. at 4–6.  However, Plaintiff clarified in its oral argument responses that Yinfeng does not raise this issue as a separate argument or seek any particular relief.  See Pl.'s Oral Arg. Subm. at 18.  As such, the court need not address this particular matter further.

with how Commerce weighed the available record evidence." Def.'s Br. at 11; Def.-Inter.'s Br. at

2 (substantively similar).

Before delving into the parties' specific arguments, the court notes that the controlling

question is not whether the surrogate values selected by Commerce were indeed the best available,

but only "whether a reasonable mind could conclude that Commerce chose the best available

information." Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir.

2011) (quoting Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327

(2006)). Cognizant that "there is no requirement that the data [relied upon by the agency] be

perfect," Home Meridian Int'l, Inc. v. United States, 772 F.3d 1289, 1296 (Fed. Cir. 2014), and

for the reasons outlined herein, the court assesses that Commerce's selection of Brazil as the PSC

is supported by substantial evidence and otherwise in accordance with law.

## I.     *Commerce's Selection of Surrogate Financial Statements Was Supported by Substantial Evidence and Otherwise in Accordance with Law.*

As part of its overall decision to select Brazil as the PSC over Malaysia, Commerce

determined that Brazil offered superior financial statements to value Yinfeng's noninput costs.

See IDM at 21–22. In reaching this decision, Commerce assessed each of the twenty Malaysian

financial statements submitted by Yinfeng,[21] see Final SV Mem. at 3–7, but found that only two

of them -- the statements of Minho and Classic Scenic -- were suitable for further examination,

IDM at 21–22. When compared against the two statements deemed usable[22] from Brazilian

---

[21] Recall that prior to Commerce's issuance of its Preliminary Determination, Yinfeng submitted twenty Malaysian financial statements; however, in light of agency-established deadlines, Commerce only considered two of these twenty statements in rendering the Preliminary Determination. PDM at 6.

[22] At the Preliminary Determination stage, Commerce rejected the financial statements of a third Brazilian producer of subject merchandise, Eucatex, because the company's financial statements received a qualified auditor opinion. PDM at 30.

producers -- Adami and Duratex -- Commerce concluded that the Brazilian statements were "limited more to wood products and less inclusive of industries unrelated to the merchandise under investigation," such that they "best represent[] the industry under investigation." Id. at 22.

Yinfeng contests Commerce's selection on two grounds.  First, Yinfeng argues that Commerce acted contrary to its established practice in rejecting four Malaysian financial statements from producers of the subject merchandise -- LMT Superbonus, Fine Quality, Haluan Mutiara, and Chern Hinp -- solely because they did not cover the entire POI.  Pl.'s Br. at 14–16. Second, Yinfeng argues that "[w]hether considering all six [of the] Malaysian statements [that Yinfeng contends are usable] or [only] the two that overlap [with] the entire POI, the Malaysian surrogate financial statements are far more comparable than the two Brazilian [ones]." Pl.'s Br. at 16.  Neither argument is availing.

> ### A.    *Commerce's Rejection of Financial Statements from Malaysian Companies Chern Hinp, Haluan Mutiara, Fine Quality, and LMT Superbonus Accorded with Law.*

In challenging Commerce's rejection of the partially contemporaneous financial statements, Yinfeng contends that "[t]he Department's exclusion . . . was arbitrary in light of [past agency] practice."[23]  Pl.'s Br. at 16.  By contrast, the Government maintains that Commerce reasonably declined to rely on less contemporaneous Malaysian financial statements where fully contemporaneous ones from producers of identical merchandise were available.  See Def.'s Br. at 16.  The Government's position prevails.

It is generally Commerce's practice to select surrogate financial statements that are, among other features, "(1) from an appropriate surrogate country; (2) from a producer of identical or

---

[23] Importantly, Yinfeng does not argue that it "can[] find in the statute [or caselaw] any precise prohibition on the use of Commerce's [chosen] methodology," Lasko Metal, 43 F.3d at 1443, only that Commerce's arbitrarily deviated from past agency practice.

comparable merchandise; (3) contemporaneous with the PO[I]; . . . (4) publicly available," and (5) otherwise comparable to the respondent's experience. Certain Steel Nails from the People's Republic of China: Final Results of the Fourth Antidumping Duty Administrative Review, 79 Fed. Reg. 19,316 (Dep't Commerce Apr. 8, 2014), and accompanying Issues and Dec. Mem. Cmt. 2A at 8 (Mar. 31, 2014) ("Certain Steel Nails from China IDM"); see also Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures, 84 Fed. Reg. 54,106 (Dep't Commerce Oct. 9, 2019), and accompanying Prelim. Dec. Mem. at 9–14 (Oct. 2, 2019). In "evaluat[ing] the suitability of each source," Commerce weighs these criteria "with respect to the particular facts of each case." Hardwood & Decorative Plywood from China IDM Cmt. 7C at 60.

The court notes that the "case-by-case" nature of surrogate value selection, id., complicates any efforts to divine "rules" from past agency practice. For example, regarding the contemporaneity criteria, Commerce has at times declined to "select one set of financial statements over another simply because the overlap with the PO[I] is larger," stating "that as long as the potential surrogate statement covers a portion of the PO[I], it is deemed contemporaneous and appropriate for use if it meets the remaining criteria." Folding Metal Tables and Chairs from the People's Republic of China: Final Results of 2007–2008 Deferred Antidumping Duty Administrative Review and Final Results of 2008–2009 Antidumping Duty Administrative Review, 76 Fed. Reg. 2,883 (Dep't Commerce Jan. 18, 2011), and accompanying Issues and Dec. Mem. Cmt. 2C at 17–18 (Jan. 10, 2011). Whereas at other times, Commerce has declared that where "all other factors are equal, the Department prefers financial statements that cover the most months of the PO[I]." Wooden Bedroom Furniture from the People's Republic of China: Final

Results of Antidumping Duty Administrative Review and New Shipper Review, 73 Fed. Reg.

49,162 (Dep't Commerce Aug. 20, 2008), and accompanying Issues and Dec. Mem. Cmt. 1C at

16 (Aug. 11, 2008) ("Wooden Bedroom Furniture from China IDM").

Exemplifying this latter position, in Wooden Bedroom Furniture from China, Commerce

concluded that the financial statements of four Philippine companies were superior to those of four

Indian companies to derive surrogate financial ratios in an LTFV investigation covering the period

of January 1, 2006 to December 31, 2006.  See Wooden Bedroom Furniture from China IDM at

1, Cmt. 1C at 19.  In so assessing, Commerce whittled down the submitted Indian financial

statements from twenty-two to four useable ones, id. at 13 n.3, 14, first rejecting eleven statements

because they either derived from nonproducers of subject merchandise, did not show a profit,

evidenced subsidies, and/or were incomplete, see id. at 14–16, and then -- critically -- eliminated

seven more Indian statements because they were less contemporaneous than other suitable Indian

statements on the record, see id. at 16.  Commerce explained:

> Although the Indian financial statements from the 2005 - 2006 period are contemporaneous with three months of the PO[I], we determined that these Indian companies (i.e., James Andrew Newton, Jodhpur, Highland House, Askriti Furnishers, Jayabharatham, Nizamuddin, Sujako) statements were not suitable for use in deriving the surrogate financial ratios because the 2006 - 2007 financial statements cover nine months of the PO[I] and, as such, are more contemporaneous than the 2005 - 2006 statements.  Thus, we did not review these statements to determine whether they were from identical or comparable producers, were complete, were profitable, or whether they contained subsidies because there were numerous financial statements on the record that better matched the PO[I].  Further, when all other factors are equal, the Department prefers financial statements that cover the most months of the PO[I] and in this case for the Indian companies it is the financial statements that cover the 2006 - 2007 period.

Id. at 16 (emphasis added).  Accordingly, Commerce "made cuts" among the Indian statements

purely on the basis of contemporaneity.  From there, Commerce compared the four remaining

Indian statements against the four useable Philippine ones and concluded -- once again, solely on

the basis of contemporaneity -- that the Philippine statements comprised "the best available

information":

> Based on our examination of record evidence, we have determined that the record
> contains four financial statements from Indian companies (i.e., Delhi, Dinesh
> Rajen, Nikhil, and Turya) for the 2006 - 2007 period that the Department could
> have used in the final results.  <u>Although the Indian financial statements are
> contemporaneous with many months of the PO[I], the [four] Philippine financial
> statements cover the entire PO[I] almost exactly and are therefore more
> contemporaneous</u>.

Id. at 18–19 (second emphasis added).

Commerce's decision-making in the LTFV investigation here at issue accords with that in

the <u>Wooden Bedroom Furniture from China</u> IDM.  For example, in rejecting the financial

statements of Malaysian companies Chern Hinp, Haluan Mutiara, Fine Quality, and LMT

Superbonus, Commerce explained:

> [R]espondents claim that their . . . SV submission contain[s] financial statements
> for six additional Malaysian producers of identical merchandise which are not only
> contemporaneous with the POI but are also far superior to the financial statements
> of the two Brazilian producers Commerce relied on for the <u>Preliminary
> Determination</u>.  After a careful review of these six [Malaysian] financial statements,
> we find that the financial data for only two of these companies, Minho and Classic
> Scenic, cover the entire POI . . . .  With respect to the other four Malaysian
> companies, [Chern Hinp, Haluan Mutiara, Fine Quality, and LMT Superbonus,] we
> find that although the website information provided for each of them indicates that
> they are also producers of the subject merchandise, none of their financial
> statements covers the entire POI.  <u>In situations such as this one, Commerce has
> preferred to use financial statements of producers of subject merchandise that cover
> the entire POI, as they best reflect the respondent's production experience during
> the POI</u>.

IDM at 21–22 (emphasis added) (footnote omitted).  Just as Commerce in the Wooden Bedroom

Furniture from China IDM "made cuts" within the Indian statements on the basis of

contemporaneity, so too here, the agency declined to rely on partially contemporaneous Malaysian

financial statements where otherwise equal,[24] fully contemporaneous Malaysian statements existed

on the record.

    While the reasoning in the Wooden Bedroom Furniture from China IDM is not

---

[24] A comparison of the criteria enumerated in the Certain Steel Nails from China IDM, supra p. 17–18, against Commerce's rationale and record evidence illuminates that save for contemporaneity, "all other factors [we]re equal," Wooden Bedroom Furniture from China IDM Cmt. 1C at 16, among the financial statements from Malaysian companies Minho, Classic Scenic, Chern Hinp, Haluan Mutiara, Fine Quality, and LMT Superbonus.

    First, the statements were each from "an appropriate surrogate country," namely Malaysia. See Req. for SV Cmts. Attach. I at 2 (Commerce's identification of six countries as a starting point for surrogate country selection, including Malaysia and Brazil).

    Second, the statements were each from a producer of identical merchandise.  See Final SV Mem. at 4 (stating one of Classic Scenic's subsidiaries "is involved in the production of merchandise under consideration"); see also IDM at 22 (stating one of Minho's subsidiaries "appears to be a producer of subject merchandise"); id. (stating the "website information provided for each of [Chern Hinp, Haluan Mutiara, Fine Quality, LMT Superbonus] indicates that they are also producers of the subject merchandise.").  The parties agree that "the terms 'subject merchandise' and 'identical merchandise' are interchangeable." Pl.'s Suppl. Qs. Resp. at 1; see also Def.'s Suppl. Qs. Resp. at 2 (substantively similar); Def.-Inter.'s Suppl. Qs. Resp. at 2 (substantively similar).

    Third, the statements were each "publicly available."  In the Preliminary Determination, Commerce assessed that it had "complete SV data and financial ratios on the record for both Brazil and Malaysia that are publicly available." PDM at 8.  Although Commerce deferred until the Final Determination consideration of the six Malaysian financial statements here at issue, "Commerce made no changes to its finding regarding public availability in the [F]inal [D]etermination." Def.'s Suppl. Qs. Resp. at 1–2 (emphasis added).

    Where Commerce's assessment of the Malaysian statements diverged was upon consideration of the "contemporaneity" factor.  The POI in the underlying LTFV investigation is July 1, 2019 to December 31, 2019.  See 85 Fed. Reg. at 6,503.  The financial statements from Minho and Classic Scenic each "cover[] calendar year 2019," see Final SV Mem. at 3–4, thereby overlapping with all six months of the POI.  By contrast, LMT Superbonus's financial statement overlaps with only four months of the POI, see id. at 4, Fine Quality's statement overlaps with only three months, see id. at 4–5, and Haluan Mutiara's and Chern Hinp's statements each overlap with only two months, see id. at 5.

precedential, its existence undermines Plaintiff's claim that "[t]he Department's exclusion of

contemporaneous relevant statements was arbitrary in light of [past agency] practice." Pl.'s Br. at

16. Here, it is "reasonably discernable," Wheatland Tube, 161 F.3d at 1369–70, that in rejecting

the financial statements of Malaysian companies Chern Hinp, Haluan Mutiara, Fine Quality, and

LMT Superbonus, Commerce was adhering to its "prefer[ence for] financial statements that cover

the most months of the PO[I]" where "all other factors are equal," Wooden Bedroom Furniture

from China IDM Cmt. 1C at 16.  The court, thus, concludes that this element of Commerce's

surrogate value selection accorded with law.

> ### B.   *Substantial Evidence Supports Commerce's Selection of the Financial Statements from Brazilian Companies Adami and Duratex Over Those from Malaysian Minho and Classic Scenic.*

Yinfeng further argues that "[w]hether considering all six Malaysian statements or the two

that overlap the entire POI, the Malaysian surrogate financial statements are far more comparable

than the two Brazilian financial statements." Pl.'s Br. at 16.  This is so, in Yinfeng's estimation,

because: (1) it is unclear that Adami produces subject merchandise; (2) the Malaysian producers

are more limited to comparable products and less inclusive of unrelated industries; and (3) the

Brazilian producers are large, global conglomerates and/or at a different level of integration than

Yinfeng such that they cannot best represent the industry.  See Pl.'s Br. at 16–25.  For their part,

the Government and the Coalition maintain that Commerce's selection of the Brazilian financial

statements "is supported by substantial evidence[] where Commerce found that these . . .

statements are fully contemporaneous with the POI and are more specific to wood product

---

Accordingly, having found that only two of the otherwise "equal" Malaysian financial
statements overlap with the entire POI, Commerce concluded that the statements of Minho and
Classic Scenic "best reflect the respondent's production experience."  IDM at 22.

manufacturing . . . than alternative Malaysian statements."  Def.'s Br. at 7; see also Def.-Inter.'s

Br. at 31 (substantively similar).  Here too, Defendants' position prevails.

The court begins by reiterating that its task is to discern "whether a reasonable mind could

conclude that Commerce chose the best available information" in relying on the Brazilian financial

statements.  Zhejiang, 652 F.3d at 1341 (quoting Goldlink, 30 CIT at 619, 431 F. Supp. 2d at

1327).  This means that "[w]here Commerce is confronted with two alternatives (both of which

have their good and bad qualities), and Commerce has a preferred alternative, the court will not

second-guess Commerce's choice."  Mittal Steel Galati S.A. v. United States, 31 CIT 1121, 1141,

502 F. Supp. 2d 1295, 1313 (2007).  With these principles in mind, the court considers and rejects

each of Yinfeng's objections to Commerce's reliance on the Brazilian financial statements in turn.

> ### 1.     *Substantial Evidence Supports Commerce's Determination that Adami Produces Subject Merchandise.*

Yinfeng's first argument -- that Brazilian company Adami either does not produce "any

identical merchandise" or only produces "very minor" amounts -- is unavailing because the record

contains substantial evidence to the contrary.[25]  Pl.'s Br. at 20.  Commerce's Antidumping Order

specifically covers wood blocks, blanks, and building components, such as "interior paneling,"

and wooden door components, including frames, frame kits, and frame trim.  See Am. Final

Determination at 9,488–89.  Consistent with the Order, Adami's financial statements report

---

[25] Although Yinfeng is correct that where possible, "it is Commerce's practice to use information
from sources that are producers of identical merchandise over sources that are producers of
comparable merchandise," Light Walled Rectangular Pipe and Tube from the People's Republic
of China: Final Results of Antidumping Duty Administrative Review; 2019-2020, 87 Fed. Reg.
13,968 (Dep't Commerce Mar. 11, 2022), and accompanying Issues and Dec. Mem. Cmt. 2 at 8
(Mar. 7, 2022), this preference is not here determinative because Commerce found that Adami,
Duratex, Minho, and Classic Scenic were each producers of "subject merchandise," IDM at 22.
As previously noted, the parties agree that "the terms 'subject merchandise' and 'identical
merchandise' are interchangeable."  Pl.'s Suppl. Qs. Resp. at 1; see also Def.'s Suppl. Qs. Resp.
at 2 (substantively similar); Def.- Inter.'s Suppl. Qs. Resp. at 2 (substantively similar).

revenue from sales of "wood processing products such as frames, pine panels, doors, door and pellet kits." See Pet'r's Prelim. SV Cmts. Ex. 8A at 119. Adami's corporate materials further state that its "main products" include "pallets, panels, frames, doors, [and] door kits," see Resp't's Rebuttal Prelim. SV Subm. Ex. SVR-1 at 2 (June 29, 2020), P.R. 459-465 ("Resp't's Rebuttal Subm."), and that it produces sawn, raw, and processed wood, including "blocks, blancs, panels and frames," see Pet'r's Prelim. SV Cmts. Ex. 8A at 131 (emphasis in original). Thus, evidence on the record supports Commerce's finding that Adami is a producer of the subject merchandise. IDM at 22.

Yinfeng's alternative argument -- that even if Adami produces some subject merchandise, such production is "very minor" -- is impermissibly speculative. See Pl.'s Br. at 20. Yinfeng invokes an excerpt from Adami's website that it "recently expanded and modernized for the production of blocks, blancs, [and] frames, among other products destined for the foreign market," see Pet'r's Prelim. SV Cmts. Ex. 8A at 133 (emphasis in original), to allege that because Adami only recently began production, it could only "produce[] a very small or inconsequential amount of mouldings (if any)," such that its financial statements are unrepresentative of the industry, Pl.'s Br. at 20. Yinfeng cites to no additional record evidence to support this theory, see Jinxiang Yuanxin Imp. & Exp. Co. v. United States, 39 CIT __, __, 71 F. Supp. 3d 1338, 1351 (2015) ("It is well established that speculation does not constitute substantial evidence" (quoting Lucent Techs., Inc. v. Gateway, Inc., 580 F3d 1301, 1327 (Fed. Cir. 2009))), but rather ignores contradictory evidence in lodging it, as Adami's website further states: "In 1994, the company implemented a modern sawmill for the production of sawn, raw and processed wood. In the processing area, it started to produce blocks, blancs, panels and frames selling all its products on the foreign market," see Pet'r's Prelim. SV Cmts. Ex. 8A at 131 (emphasis in original).

Accordingly, Commerce could reasonably read Adami's webpage to suggest that the company began producing blocks, blanks, panels and frames in 1994 and recently expanded and modernized its facilities to improve such production.

Because Commerce's determination that Adami is an adequate producer of the subject merchandise is "supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion," Shandong Huarong, 25 CIT at 838, 159 F. Supp. 2d at 718 (citing Heveafil, 25 CIT at 149), Yinfeng's first argument as to why the two Malaysian financial statements are superior to the two Brazilian ones fails.

> **2.    *Substantial Evidence Supports Commerce's Determination that Adami and Duratex are More Limited to Comparable Products and Less Inclusive of Unrelated Industries.***

Yinfeng's second argument -- that contrary to Commerce's finding, the Malaysian producers are more limited to comparable products and less inclusive of unrelated industries -- is also unavailing. See Pl.'s Br. at 13. In Yinfeng's view, Minho and Classic Scenic are better companies from which to derive surrogate financial statements because they are significant producers of the subject merchandise[26] and their other business lines are comparable to the industry under investigation.[27] However, record evidence supports Commerce's assessment that Minho is

---

[26] Yinfeng submits that Minho "has a capacity of 10 million linear feet of moulding per month," see Pl.'s Br. at 16 (citing Resp't's Final SV Subm. Ex. SV2-3 Company Info. at 5), and Classic Scenic primarily manufactures the subject merchandise of picture frame mouldings, representing over 88.95 percent of its revenue, see id. (citing Resp't's Final SV Subm. Ex. SV2-4 at 62–63).

[27] Yinfeng asserts Minho's comparable businesses include "manufacturing sawn timber, trading timber and timber products, sawmilling and timber equipment, and manufacturing paper bags from wood," see Pl.'s Br. at 16 (citing Resp't's Final SV Subm. Ex. SV2-3 at 103–105), and Classic Scenic's only other division manufactures comparable timber products, see id. (citing Resp't's Final SV Subm. Ex. SV2-4 at 63, Company Info. at 1).

a holding company -- as its financial statement consolidates the data of several subsidiaries[28] -- with "multiple divisions not involved with the subject merchandise and timber trading and extraction operations and activities, neither of which Yinfeng has."   IDM at 22.   Likewise, substantial evidence supports Commerce's finding that Classic Scenic "is also principally an investment holding company," id., with two subsidiaries producing subject merchandise and/or timber products[29] and two additional subsidiaries engaged in dissimilar rental and property holding operations.   See Resp't's Final SV Subm. Ex. SV2-4 at 11.

By contrast, Commerce supportably found that the Brazilian statements -- though not unimpeachable -- are nevertheless superior because they are "limited more to wood products and less inclusive" of unrelated industries.   IDM at 22 (emphasis added).   Although Yinfeng correctly notes that Adami has multiple divisions engaged in disparate activities, including forestry, energy, chemical, and paper/cardboard box production, see Resp't's Rebuttal Subm. Ex. SVR-1 at 2–3, the same corporate materials Yinfeng relies on further state that Adami's "main products" are mostly wood ones, including "sawn and processed wood, pallets, panels, frames, doors, door kits, modulated, packaging paper, sheets and corrugated boxes," id. at 1.   Similarly, although two of Duratex's three divisions are unrelated to the merchandise under investigation,[30] see id. Ex. SVR-

---

[28] Of Minho's fourteen subsidiaries, see Resp't's Final SV Subm. Ex. SV2-3 at 103–105, Commerce found that only one, Victory Enterprise Sdn. Bhd. is a producer of subject merchandise, while another, Lionvest Timber Industries Sdn. Bhd. produces a product related to the industry, see IDM at 22.   Minho's additional subsidiaries are involved in disparate operations, including plantations and timber, property management, chemical services and custom kiln drying, and rough sawntimber trading and logging.   See Resp't's Final SV Subm. Ex. SV2-3 at 3, 10, 103–105, 121.

[29] Namely, Finesse Moulding (M) Sdn. Bhd. produces subject merchandise in the form of picture frame mouldings and Lim Ket Leng Timber Sdn. Bhd. produces timber products.   IDM at 22.

[30] Duratex operates three divisions: deca (ceramics, metal fittings, and electronic showers), ceramic tiles (floor and wall coverings), and wood.   See Resp't's Rebuttal Subm. Ex. SVR-2 at 1.

2 at 1, Commerce found that Duratex's financial data allowed the agency to derive financial ratios

specific to its wood division, eliminating the issue of unrelated industries, IDM at 22 (citing Pet'r's

Prelim. SV Cmts. Ex. 8B).

In sum, Yinfeng's second line of argument does not establish that no "reasonable mind

could conclude that Commerce chose the best available information" in selecting the Brazilian

statements. Zhejiang, 652 F.3d at 1341 (quoting Goldlink, 30 CIT at 619, 431 F. Supp. 2d at

1327).

> **3.    *Substantial Evidence Supports Commerce's Determination that
> the Production Processes of Adami and Duratex are the Most
> Representative.***

Yinfeng's third, and final, argument -- that the Brazilian producers are large, global

conglomerates and/or at different levels of integration than Yinfeng such that they cannot best

represent the industry under investigation -- is likewise unsuccessful. See Pl.'s Br. at 18–22.

Yinfeng contends that Duratex's financial statements cannot be considered representative

of Plaintiff's production experience because Duratex has subsidiaries in other non-economically

comparable countries, including four facilities in Brazil and three in Colombia in its wood division

alone. See Pl.'s Br. at 21 (citing Pet'r's Prelim. SV Cmts. Ex. 8B at 40–41, n.12). To support its

position, Yinfeng invokes Chlorinated Isocyanurates from the People's Republic of China:

Preliminary Results of Antidumping Duty Administrative Review, and Preliminary Determination

of No Shipments; 2018–2019, 85 Fed. Reg. 67,709 (Dep't Commerce Oct. 26, 2020), and

accompanying Prelim. Dec. Mem. at 24–25 (Oct. 19, 2020) ("Chlorinated Isocyanurates from

China PDM"). But that investigation is easily distinguishable, because there, Commerce declined

to utilize financial statements from a "holding company composed of 64 subsidiaries operating in

multiple industries with numerous product lines in multiple countries, including [in] . . .

hyperinflationary economies." Chlorinated Isocyanurates from China PDM at 25. By contrast, here, Commerce explained that it can isolate the financial data of Duratex's wood division, which is based only in Brazil and Colombia. See IDM at 22 (citing Pet'r's Prelim. SV Cmts. Ex. 8B); see also Pl.'s Br. at 21; Def.'s Br. at 23. Moreover, record evidence supports Commerce's finding that Duratex is primarily oriented towards the Brazilian market, as the company is headquartered in São Paulo and sixteen of its nineteen industrial operations are located in the country. See Resp't's Rebuttal Subm. Ex. SVR-2 at 1. Thus, Yinfeng has not succeeded in showing that any reasonable mind would reject Duratex's financial statements simply because the company maintains some operations outside of Brazil.

Yinfeng further argues that the Brazilian companies are not representative of the industry under investigation because Adami and Duratex maintain "extensive forestry divisions[s]"[31] and are, therefore, at dissimilar levels of integration than Yinfeng, which has no forestry operations. See Pl.'s Br. at 19, 22–23. Yinfeng maintains that when selecting surrogate financial statements, it is Commerce's general practice to weigh the level of company integration and reject data from companies with dissimilar production processes when better information is available. Id. at 22–23 (citing Hardwood & Decorative Plywood from China IDM at 62).[32]

---

[31] See Resp't's Rebuttal Subm. Ex. SVR-1 at 1, 18–20, 21–22 (describing Adami's forestry division and explaining that Adami also produces its own energy), and id. Ex. SVR-2 at 1 (describing Duratex's forestry division).

[32] More recently, Commerce explained that a surrogate company's differing level of integration is not per se disqualifying. See Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Administrative Review, Final Determination of No Shipments, and Final Partial Rescission of Antidumping Duty Administrative Review; 2014–2015, 82 Fed. Reg. 25,766 (Dep't Commerce June 5, 2017), and accompanying Issues and Dec. Mem. Cmt. 2 at 8 (May 26, 2017) (explaining that "while [a company's] production process may not be an exact match . . . , this is not a disqualifying factor"); see also Final Determination of Sales at Less Than Fair Value: Coated Free Sheet Paper from the People's Republic of China, 72 Fed. Reg. 60,632 (Dep't Commerce Oct. 25, 2007), and accompanying Issues and Dec. Mem. Cmt. 3B at 21–22

As Yinfeng itself crucially acknowledges, dissimilar production processes are only decisive "when better information is available." Id. (emphasis added). Here, Commerce found that Minho also maintains forestry operations, see Final SV Mem. at 3; see also Resp't's Final SV Subm. Ex. SV2-3 at 104 (listing "operation of an integrated timber complex" as a principal activity of Minho's subsidiary, Lionvest Corporation (Pahang) Sdn. Bhd.). And Commerce further assessed that both Minho and Classic Scenic are involved in "timber trading and extraction operations and activities, neither of which Yinfeng has." See IDM at 22 (emphasis added). Thus, Yinfeng's production process and integration-focused arguments do not clearly compel a finding that the financial statements of Minho and Classic Scenic are more representative.

### 4.    *Conclusion*

In choosing between the financial statements of Brazilian companies Adami and Duratex and those of Malaysian companies Minho and Classic Scenic, "Commerce [wa]s confronted with two alternatives (both of which have their good and bad qualities), and Commerce ha[d] a preferred alternative," namely the Brazilian companies. Mittal Steel, 31 CIT at 1141, 502 F. Supp. 2d at 1313. Because Commerce's "'best available information' analysis is context and fact dependent," SeAH Steel VINA Corp. v. United States, 950 F.3d 833, 842 (Fed. Cir. 2020), and because "there is no requirement that the data [relied upon] be perfect," Home Meridian, 772 F.3d at 1296, the court here declines to "second-guess Commerce's choice," Mittal Steel, 31 CIT at 1141, 502 F. Supp. 2d at 1313.

---

(Oct. 17, 2022) (explaining that Commerce considers level of integration when selecting financial statements, but "it is not [Commerce's] practice to match individual companies to their potential surrogates" (citing Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999))).

## II. *Commerce's Selection of Surrogate Values for Yinfeng's Sawnwood Inputs Was Supported by Substantial Evidence and in Accordance with Law.*

Commerce's selection of Brazil as the PSC was also largely dependent on Commerce's determination that Brazil offered superior data to value Yinfeng's primary inputs: namely, radiata pine and fir sawnwood of a thickness exceeding 6 mm, sawn lengthwise.  See IDM at 19–21; see also Yinfeng, Suppl. Questionnaire Resp. -- Part II (July 7, 2020) at Section D.1, Ex. SQ1-34, Ex. SQ1-35, P.R. 511.  In valuing these inputs, Commerce opted to rely on Brazil's eight-digit HTS subheadings 4407.11.00 and 4407.12.00[33] -- advocated for by the Coalition -- which cover pine and fir wood, respectively, that is "sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness of [exceeding] 6 mm," see Pet'r's Prelim. SV Cmts. at Exs. 1–2 (emphasis added); Pet'r's Rebuttal Br. (Nov. 10, 2020) at 9, P.R. 641, over the ten-digit Malaysian HTS subheadings 4407.11.00.10 and 4407.12.00.10 -- advocated for by Yinfeng -- which cover pine and fir wood, respectively, that is sawn lengthwise only, whether or not planed, sanded or end-jointed, of a thickness exceeding 6 mm, See Pl's Br. at 10 (emphasis in original); Resp't's Final SV Subm. Ex. SV2-21 at 2.

Although the parties do not dispute that Yinfeng uses only pine and fir wood that is sawn lengthwise to produce its subject merchandise or that the Malaysian HTS subheadings cover pine and fir wood sawn lengthwise only, while the Brazilian HTS subheadings comprise a "basket category" that include other wood cuts not consumed by Yinfeng, see Def.'s Br. at 11–13, Commerce, nevertheless, determined that the Brazilian HTS are superior to value Yinfeng's primary sawnwood inputs, see IDM at 19–21.  The agency so assessed because the Brazilian data

---

[33] Although Yinfeng argues that Commerce in fact relied on six-digit HTS 4407.11 and 4407.12 from Brazil, Yinfeng acknowledges there is no distinction between the six-digit and eight-digit level of the Brazilian HTS where, as here, the seventh and eight digits are "00."  See Pl's Br. at 7–8; Def.-Inter.'s Br. at 16–17.  As such, the court need not address this point further.

"are complete, publicly-available, contemporaneous, and specific to each input used by the respondent to produce the subject merchandise during the POI." Id. at 19.  Moreover, Commerce explained that while the Brazilian and Malaysian HTS subheadings "note[] the same inputs at the same specificity," the Brazilian data alone offers a complete set of surrogate values to value all of Yinfeng's factors of production, such that Commerce can adhere to its preference of valuing all inputs from a single surrogate country.  Id. at 20.

Before the court, Yinfeng presents a three-fold objection to Commerce's reliance on the Brazilian HTS to value its primary sawnwood inputs:  First, Yinfeng argues that the Malaysian HTS are more specific, and Commerce must use the most specific surrogate HTS headings to value inputs, see Pl.'s Br. at 11–12; second, Yinfeng contends that Commerce's selection of Brazil was based, in part, on an erroneous determination that the Brazilian HTS were "equally specific" to the Malaysian HTS, see id. at 4; and third, Yinfeng disputes Commerce's determination that the Brazilian data offers a more complete set of surrogate values than the Malaysian data, see id. at 31–32.  Each of these arguments is unavailing.  Because the court can reasonably discern Commerce's rationale that the Brazilian HTS are sufficiently specific to value Yinfeng's sawnwood inputs in light of other relevant advantages afforded by the data, the court sustains this surrogate value selection as supported by substantial evidence and in accordance with law.

### A.    *Commerce Need Not Select the "Most Specific" HTS to Value Inputs as a Matter of Course.*

It is undisputed that the Malaysian HTS -- in covering pine and fir wood that is sawn lengthwise only -- correspond more precisely to the primary wood inputs consumed by Yinfeng, and are, thus, in a sense "more specific" than the Brazilian HTS relied upon by Commerce.  See Pl.'s Reply Br. at 2; Def.'s Br. at 11.  Yinfeng argues that this fact alone should compel Commerce to rely on the Malaysian HTS to value Yinfeng's wood inputs -- and to designate Malaysia as the

PSC -- given Commerce's "well-established preference for specificity" in selecting surrogate value data.  See Pl.'s. Br. 12–13; Pl.'s Reply Br. at 2–3.  In response, the Government and Coalition maintain that Commerce's selection of Brazil is sound because the agency "is not required to 'duplicate the exact production experience'" of Yinfeng.  Def.'s Br. at 12 (quoting Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999)); see also Def.-Inter.'s Br. at 16–18.

        As a general matter, Yinfeng overstates the importance of product specificity in Commerce's determination.  Similar to the financial statement inquiry, when selecting surrogates to value an NME producer's factors of production, Commerce looks for data that is: (i) publicly available; (ii) contemporaneous with the POI; (iii) based on broad-market averages; (iv) tax and duty-exclusive; and (v) specific to the inputs being valued.  See Policy Bulletin No. 04.1: Non-Market Econ. Surrogate Country Selection Process, Dep't Commerce, enforcement[.]trade[.]gov/policy/bull04-1[.]html (last visited Dec. 16, 2022) ("Policy Bulletin 04.1").  This court has repeatedly accepted Commerce's position that there is no hierarchy among these criteria.  See, e.g., United Steel & Fasteners, 469 F. Supp. 3d at 1397–99; Fine Furniture (Shanghai) Ltd. V. United States, 42 CIT __, __, 353 F. Supp. 3d 1323, 1336 (2018); An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States, 40 CIT __, __, 179 F. Supp. 3d 1256, 1269 n.19 (2016); Xiamen Int'l Trade & Indus. Co. v. United States, 37 CIT 1724, 1727–28, 953 F. Supp. 2d 1307, 1312–13 (2013); contra Taian Ziyang Food Co. v. United States, 35 CIT 863, 906–07, 783 F. Supp. 2d 1292, 1330 (2011) ("All of the criteria outlined in Policy Bulletin 04.1 . . . are not equally important.  As a matter of pure logic, first among them must be 'product specificity'")[34].

---

[34] The court notes, of course, that one judge on the United States Court of International Trade is not bound by the decisions of another judge on the court.  See Algoma Steel Corp. v. United States, 865 F.2d 240, 243 (Fed. Cir. 1989).

Thus, the court once again finds that "[t]he relevant question is" "not whether [Commerce's selected HTS] is the most . . . product specific heading available," -- as Yinfeng contends -- but "whether substantial evidence on the record supports that [Commerce's selected HTS] is sufficiently product-specific to the FOP at issue." United Steel & Fasteners, 469 F. Supp. 3d at 1398.

> **B.    *Substantial Evidence on the Record Supports that the Brazilian HTS Are "Sufficiently Specific" and Commerce's Selection Did Not Turn On an Erroneous Assessment.***

The Government and Coalition contend that Commerce found the Brazilian HTS to be "sufficiently specific" to Yinfeng's sawnwood inputs and that such finding is supported by substantial evidence. See Def.'s Br. at 12 (citing IDM at 20 (asserting the Brazilian and Malaysian HTS subheadings "note[] the same inputs at the same specificity")); Def.-Inter.'s Br. at 17.  In contrast, Yinfeng asserts that "the Brazilian HTS is over broad," Pl.'s Reply Br. at 2; moreover, Yinfeng presents a different interpretation of Commerce's comparative specificity finding, arguing that Commerce made the "definitively incorrect" assessment that the Brazilian and Malaysian HTS are "equally specific" -- and not that the Brazilian HTS are "sufficiently 'product specific,'" Pl.'s Br. at 4, 11–12.  While the court easily finds that the Brazilian HTS are "sufficiently specific" to value Yinfeng's sawnwood inputs, whether Commerce itself supplied this rationale such that the court should sustain its determination is a closer question, which the court ultimately answers in the affirmative.

> **1.    *The Brazilian HTS Are "Sufficiently Specific" to Value Yinfeng's Sawnwood Inputs.***

A "surrogate value is sufficiently product specific to the material input when the surrogate data is 'not so removed from the material input such that they are not comparable.'"  Ancientree, 532 F. Supp 3d at 1262 (quoting United Steel & Fasteners., 469 F. Supp. 3d at 1398–99).  In United Steel & Fasteners, Inc. v. United States, this court discerned "a rational relationship between Thai

HTS 7228.20 -- which covers 'Bars And Rods of Silico-Manganese Steel' -- and the material input

of [steel] Bar because the former includes the latter by definition."  469 F. Supp. 3d at 1400.  So

too here, the court discerns a rational relationship between Brazilian HTS 4407.11.00 and

4407.12.00 -- which cover "Pine Wood Sawn/Chipped Lngtw, Thickness Gt 6Mm" and "Fir Wood

Sawn/Chipped, Thickness Exceeding 6Mm," respectively[35] -- and Yinfeng's primary inputs of

pine and fir wood sawn lengthwise because the former, likewise, includes the latter by definition.

Although the Brazilian HTS are indeed basket categories that include wood cuts not consumed by

Yinfeng, the case at bar is clearly unlike the hypothetical example of Commerce impermissibly

using data on fishing rods to value cardboard packing cartons.  Id. (discussing Taian, 783 F. Supp.

2d at 1330).  Because the Brazilian HTS relied upon by Commerce cover Yinfeng's sawnwood

inputs exactly, the court concludes that substantial evidence supports that the Brazilian HTS are

"sufficiently specific."

> **2.      *Commerce's Decisional Path to Finding That the Brazilian HTS
> Are "Sufficiently Specific" Is Reasonably Discernable.***

Yinfeng argues that Commerce's selection of Brazil as the PSC was based, in part, on the

erroneous determination that the Brazilian and Malaysian sawnwood HTS are "equally specific,"

Pl.'s Br. at 4, 12, while Defendants contest that Commerce's selection "hinge[d] on a finding that

Malaysian and Brazilian GTA data capture pricing at precisely the same level of granularity,"

Def.'s Br. at 12.  Resolving this dispute turns on whether in assessing that the Brazilian and

Malaysian HTS "note[] the same inputs at the same specificity," IDM at 20, Commerce meant that

both sets of HTS cover the exact inputs at issue or that they both cover the exact inputs at issue

---

[35] The court notes that "Pine Wood Sawn/Chipped Lngtw, Thickness Gt 6Mm" and "Fir Wood
Sawn/Chipped [Lngtw], Thickness Exceeding 6Mm" are abbreviated definitions for the full
definitions of HTS 4407.11.00 and 4407.12.00, which include pine wood and fir wood sawn
lengthwise, respectively.  See Pet'r's Prelim. SV Cmts. at Ex. 2.

only.  The former description is an accurate characterization, while the latter would amount to a

mistake of fact that would undermine Commerce's selection of Brazil as the PSC.  See Guizhou

Tyre Co. v. United States, 46 CIT __, __, 557 F. Supp. 3d 1302, 1317 (2022) ("[T]he court cannot

sustain an agency determination that relies, in whole or in part, upon an invalid finding of material

fact.").

 The court finds that, while perhaps of less-than-ideal clarity, Commerce's decisional path

to its determination that the Brazilian HTS are "sufficiently specific" is reasonably discernible.  In

the IDM, Commerce accurately cites to the Malaysian and Brazilian sawnwood HTS subheading

descriptions in the record, which lay bare the differences in the scope of product coverage among

the HTS sets, see IDM at 20 n.126 & 128 (citing Pet'r's Prelim. SV Cmts. at Ex. 2 (The Brazilian

sawnwood HTS description) and Resp't's Final SV Subm. Ex. SV2-21 at 2 (The Malaysian

sawnwood HTS description)), while also stating:

> [T]he descriptions for the Brazilian HTS subheading numbers are just as detailed
> as the descriptions for the Malaysian HTS subheading numbers, at the eight or 10-
> digit level, whichever appropriate.  For example, for both pine sawnwood and fir
> sawnwood, the eight-digit Brazilian HTS subheading numbers for these two major
> inputs clearly note the wood species of each input being also sawn lengthwise,
> whether or not planed, sanded, or end jointed of a thickness greater than six
> millimeters.  Similarly, the Malaysian HTS notes the same inputs at the same
> specificity at the 10-digit level.

IDM at 20 (footnotes omitted).  Despite the varying degrees of product inclusivity between the

Brazilian and Malaysian HTS, Commerce's above statements are valid in that both countries' HTS

"note" the same inputs -- pine and fir sawnwood -- at the same specificity -- sawn lengthwise at a

thickness greater than six millimeters -- such that both sets of HTS cover the exact specifications

of Yinfeng's sawnwood inputs.  Commerce's assessment is accurate, even if the agency did not

mention that the Brazilian HTS includes additional wood cuts that the Malaysian HTS does not.

Moreover, Commerce further explained that unlike Brazil, the Malaysian data does not provide a complete set of surrogate values to value all of Yinfeng's factors of production; Commerce states:

> [W]hile both the Malaysia and Brazil GTA data show HTS imports of the primary wood inputs (e.g., pine sawnwood and fir sawnwood), the Brazilian GTA data, unlike the Malaysian GTA data, include imports for the particular type of wood scrap that Yinfeng[] generates from its production process, based on data it placed on the record.

IDM at 20.  This suggests Commerce weighed other factors -- i.e., the data completeness -- alongside the specificity factor to determine that the Brazilian HTS was overall superior for valuing Yinfeng's sawnwood inputs.  This reading is supported by Commerce's conclusion that:

> After careful consideration of all the SV data submitted on the record, we find that the Brazilian GTA data are the best available data for valuing the respondent Yinfeng[]'s FOPs because they are <u>complete</u>, publicly-available, contemporaneous, and <u>specific to each input</u> used by the respondent to produce the subject merchandise during the POI.

IDM at 19 (emphasis added).  Thus, while Commerce's assessment of the comparative specificity of the HTS sets is perhaps of less-than-ideal clarity, the court can reasonably discern that Commerce found the Brazilian HTS to be sufficiently specific in light of other relevant advantages afforded by the Brazilian data, such that it comprises the better choice.

### C.    *Additional Considerations Support Commerce's Decision to Use the Brazilian HTS.*

This court has held that it is within Commerce's discretion to choose a basket header over a more specific one as long as the chosen header is sufficiently product specific and supported by additional considerations, such as Commerce's preference to value all inputs from a single surrogate country.[36]  See United Steel & Fasteners, 469 F. Supp. 3d at 1398, 1401–02 (sustaining

---

[36] Recall that regulation directs Commerce to endeavor to value all factors of production from a single surrogate country.  See 19 C.F.R. § 351.408(c)(2).  "Courts have found that Commerce's

Commerce's decision to choose a sufficiently specific Thai HTS over a more specific Indonesian

HTS where Commerce expressed its preference for using a single surrogate country and the record

did not show it would be unreasonable to do so).  Again, Commerce here explained:

> [W]hile both the Malaysia and Brazil GTA data show HTS imports of the primary
> wood inputs (e.g., pine sawnwood and fir sawnwood), the Brazilian GTA data,
> unlike the Malaysian GTA data, include imports for the particular type of wood
> scrap that Yinfeng[] generates from its production process, based on data it placed
> on the record.  Although the parties differ on the importance of wood scrap in the
> FOP valuation process, it is clear that valuing this input with import data under the
> incorrect HTS subheading would result in inaccurately calculating the offset to
> Yinfeng[]'s normal value calculation.

IDM at 20 (footnotes omitted); see also Final SV Mem. at 3 (Commerce articulating its preference

for valuing all factors of production from a single country).  Although Yinfeng does not appear to

contest the premise that Commerce may prioritize deriving all surrogate values from a single

country, see Pl.'s Br. at 4, Yinfeng challenges the conclusions underpinning Commerce's selection

of Brazil on that basis, see id. at 31–32.  Specifically, Yinfeng argues that Malaysia does in fact

provide data to value wood scrap such that it offers a complete data set; and in the alternative,

Yinfeng argues that the wood scrap by-product is too minor an input to outweigh the other

advantages afforded by the Malaysian data.  Id.  The court rejects both arguments.

First, Yinfeng argues Commerce should have valued its wood scrap by-product under HTS

4401.39, which would provide Malaysian import data for the period of investigation, rather than

under the Commerce-selected HTS 4401.40, which provides no Malaysian import data for the

relevant period.  Id.  This argument is unpersuasive because it is undisputed that Yinfeng's wood

scrap is not agglomerated.  Id.; Def.'s Br. at 13–14.  The HTS selected by Commerce to value

---

single surrogate country preference is strong and must be given significant weight."  Jacobi
Carbons AB v. United States, 38 CIT __, __, 992 F. Supp. 2d 1360, 1376 (2014), aff'd, 619 F.
App'x 992 (Fed. Cir. 2015).

Yinfeng's by-product, HTS 4401.40, covers sawdust and wood waste and scrap, <u>not</u> agglomerated;

whereas HTS 4401.39 -- the HTS advocated for by Yinfeng -- covers sawdust and wood waste and

scrap, whether or not agglomerated in any form other than wood pellets.  <u>See</u> Resp't's Final SV

Subm. Ex. SV2-21.  Therefore, substantial evidence supports Commerce's determination that HTS

4401.40 is the appropriate header to value Yinfeng's admittedly not agglomerated wood scrap by-

product.

In the alternative, Yinfeng argues that even if the court sustains Commerce's selection of

HTS 4401.40 to value the by-product, "the wood scrap is minor in Yinfeng's cost components"

and cannot outweigh the greater specificity that Malaysia's 10-digit HTS affords to value

Yinfeng's primary inputs of pine and fir sawnwood.  Pl.'s Br. at 32; <u>see also</u> Pl.'s Reply Br. at 4

(arguing that wood scrap is much less valuable than its sawnwood inputs because, as the name

connotes, it is "a mere scrap").  By contrast, the Coalition argues that the wood scrap is "clearly a

major input" because Yinfeng's submissions show that the "wood scrap constitutes [[          ]]

[Yinfeng's] starting wood amount and that [[

                    ]]."  Def.-Inter.'s Br. at 14 (citing Pet'r's Rebuttal Br. at 4).  In reaching the

<u>Final Determination</u>, Commerce noted the parties' disagreement concerning the importance of the

wood scrap to the FOP valuation process and concluded that "valuing this input with import data

under the incorrect HTS subheading would result in inaccurately calculating the offset to

Yinfeng[]'s normal value calculation."  IDM at 20.  Because courts hesitate to "substitute [their]

own judgment for the agency's in considering and weighing the relative importance of various

criteria," <u>Bristol Metals L.P. v. United States</u>, 34 CIT 478, 484, 703 F. Supp. 2d 1370, 1376 (2010),

the court defers to Commerce's assessment of the importance of wood scrap to the valuation

process.

### D.    Conclusion

Because the Brazilian HTS subheadings that Commerce selected to value Yinfeng's

sawnwood inputs were sufficiently specific in light of other relevant advantages afforded by the

Brazilian data, the court sustains this surrogate value selection as supported by substantial evidence

and otherwise in accordance with law.

### III.    *Commerce Appropriately Weighed Additional Advantages Afforded by Malaysia in Selecting Brazil as the PSC.*

In rendering the Final Determination, Commerce acknowledged that the Malaysian data

afforded certain advantages, namely that the Malaysian data: (1) are reported on a CIF basis[37] such

that no adjustments are necessary, see IDM at 20–21; and (2) provide superior data to value labor,

truck freight, brokerage & handling, and acrylic polymer, see Final SV Mem. at 2–3.  Despite these

conceded advantages, Commerce explained that Brazil was still the overall superior surrogate

country given the combination of Commerce's reliance on Brazilian GTA data and financial

statements to value Yinfeng's sawnwood inputs and noninput costs, respectively, and the agency's

preference to value all factors of production from a single country.  See IDM at 20–21; see also

---

[37] Recall that when data is reported on a CIF basis that means it already reflects costs for marine insurance and freight, while data reported on an FOB basis -- like that of Brazil -- does not.  Parties do not dispute that as a general practice, Commerce prefers surrogate values reported on a CIF basis rather than on an FOB basis.  See Refillable Stainless Steel Kegs from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, Postponement of Final Determination, and Extension of Provisional Measures, 84 Fed. Reg. 25,745 (Dep't Commerce June 4, 2019), and accompanying Issues and Dec. Mem. at 10 (May 28, 2019) ("Refillable Stainless Steel Kegs from China IDM") ("Commerce prefers to rely on SVs reported on a CIF basis because they include the costs associated with purchasing these inputs from foreign exporters . . . [and] this is the price that is most representative of a domestic price for the input in the surrogate country."); see also Jiangsu, 396 F. Supp. 3d at 1343 n.2 (substantively similar).

Final SV Mem. at 2–3.

Before this court, Yinfeng argues that "[w]hile each of these" -- the CIF delivery terms and the superior data for other inputs -- "on their own may not demand selection of Malaysia over Brazil," when considered in light of the entire record, a "reasonable mind only could conclude that Malaysia . . . should be the primary surrogate country." Pl.'s Reply Br. at 13. In the court's assessment, Commerce committed no inherent error in weighing these additional advantages of the Malaysian data. Moreover, because the court has sustained Commerce's reliance on the Brazilian financial statements and GTA data, the court correspondingly finds that these other advantages afforded by Malaysia are insufficient to undermine Commerce's totality-of-the-circumstances selection of Brazil as the PSC.

### A.    *That Malaysia Reports Import Values on a CIF Basis is Not Decisive to the PSC Selection*

Yinfeng argues that Commerce should have selected Malaysia as the PSC over Brazil, in part, because only the Malaysian GTA data was reported on a CIF basis and Commerce generally prefers CIF data over FOB data. See Pl.'s Br. at 27–29; IDM at 18. While Commerce does not contest Yinfeng's representation of the agency's general preference,[38] the agency explained that here, this factor did not sway the overall PSC selection because: (1) "it is not Commerce's normal practice to select the surrogate country based solely on the difference in delivery terms;"[39] (2) the record contained "the necessary surrogate marine insurance and ocean freight values" to convert the Brazilian data to a CIF basis; and (3) it was not necessary to use the difference in delivery

---

[38] Supra p. 39 n.37.

[39] Again, Yinfeng does not dispute that Commerce need not choose Malaysia as the PSC solely because it reports its data on a CIF basis. See Pl.'s Reply Br. at 13. However, Yinfeng maintains that "this is not the only data deficiency in Brazil." Pl.'s Br. at 28.

terms as a "tiebreaker" where, "after careful consideration" of the financial and GTA import data

on the record, Commerce found Brazil provided the best surrogate value data.  IDM at 21.  The

agency is correct.

> ### 1.      *Because Commerce Could Convert the Brazilian Data to a CIF Basis, This PSC Factor Was Neutral.*

It is well established that, where possible, Commerce will convert data reported on an FOB

basis to a CIF basis by adding certain surrogate value shipping costs.  See Heze Huayi Chem. Co.

v. United States, 45 CIT __, __, 532 F. Supp. 3d 1301, 1329 (2021) (citing Policy Bulletin 10.2:

Inclusion of Int'l Freight Costs When Imp. Prices Constitute Normal Value, Dep't Commerce,

enforcement[.]trade[.]gov/policy/PB-10.2[.]pdf  (last  visited  Dec.  16,  2022)).    Accordingly,

Commerce tends to give more weight to data reported on a CIF basis primarily where the record

is devoid of the surrogate value data necessary to calculate a CIF adjustment for data reported on

an FOB basis.  See, e.g., Certain Steel Racks and Parts Thereof from the People's Republic of

China: Final Affirmative Determination of Sales at Less Than Fair Value, 84 Fed. Reg. 35,595

(Dep't Commerce July 24, 2019) and accompanying Issues and Dec. Mem. at 8–9 (July 17, 2019)

(selecting Romania over Brazil as the PSC, in part, because the Romanian data is reported on a

CIF basis and the record does not contain a surrogate value for marine insurance to adjust the

Brazilian FOB data); see also Refillable Stainless Steel Kegs From China IDM at 10 (substantively

similar).  In contrast, here, Commerce found that it "h[ad] on the record the necessary surrogate

marine insurance and ocean freight values with which to adjust the Brazilian GTA FOB import

values,"[40] rendering neutral this PSC factor.  IDM at 21.

---

[40] In its briefing before this court, Yinfeng appeared to dispute -- for the first time -- the reliability of the surrogate values Commerce used to convert the Brazilian data, specifically noting that the marine insurance data predates the POI by nine years and that the ocean freight price reflects the cost of shipping wood products from China to the United States, rather than the costs of importing

        **2.**      ***Commerce Did Not Need to Rely on its Preference for CIF Data As a Tiebreaker Here.***

Where the record contains the necessary surrogate values to adjust FOB data, Commerce generally treats its preference for CIF data as a tiebreaker among <u>otherwise equal</u> datasets in its overall PSC determination.  <u>See, e.g.</u>, Final Results of Redetermination Pursuant to Ct. Remand at 10–11, <u>Jacobi Carbons AB v. United States,</u> Consol. Ct. No. 16-00185 (June 17, 2019), ECF No. 139 (selecting Malaysia as the PSC over the Philippines because, all else being relatively equal, "[w]hile the underlying record of this administrative review contains international freight SVs to put the Philippine GTA import data on a [CIF] basis, the Malaysian GTA import data available on record are already on a CIF basis").  Here, Commerce assessed that the Malaysian and Brazilian datasets were not otherwise equal, but rather that Brazil was superior, such that Commerce did not need to use its preference for CIF data as a tiebreaker.  IDM at 21 ("[W]e find that Brazil continues to provide the best SV data without needing to consider the difference in delivery terms between the Brazilian and Malaysian GTA import data as a tiebreaker.").  The court finds no issue with Commerce's characterization of its general practice on this matter; moreover, because the court has already affirmed Commerce's reliance on the Brazilian financial statements and HTS, the court correspondingly sustains Commerce's neutral treatment of this PSC factor.

        **B.**      ***Commerce Gave Appropriate Consideration in its Overall PSC Selection to Malaysia's Provision of Superior Data to Value Labor, Truck Freight, Brokerage & Handling, and Acrylic Polymer Inputs.***

The parties do not dispute that Malaysia provides superior data to value Yinfeng's other

---

raw materials for mouldings into Brazil.  <u>See</u> Pl.'s Br. at 27.  However, Yinfeng clarified at oral argument and in its post-oral argument briefing to the court that it does not in fact assert such a challenge.  <u>See</u> Pl.'s Post-Arg. Subm. at 6 ("Defendant-Intervenor emphasizes that Yinfeng cannot argue over the data used to adjust the Brazilian FOB data (an argument Yinfeng has not even made).").  As such, the court need not resolve this matter.

inputs of labor, truck freight, brokerage & handling, and acrylic polymer inputs.[41]  See Final SV

Mem. 2–3.  Importantly, Yinfeng does not appear to contest Commerce's reliance on Brazilian

data to value these inputs individually, but only the weight that Commerce afforded these inputs

in its overall PSC selection.  Pl.'s Br. at 29–32.[42]  The court therefore does not reach the

hypothetical question whether had Yinfeng challenged Commerce's selection of these inputs

individually, such a line of attack would have been meritorious given the agency's statutory

directive to value factors of production according to the "best available information."  See 19

U.S.C. § 1677b(c)(1)(B); see also Baoding Mantong Fine Chemistry Co. v. United States, 41 CIT

__, __, 279 F. Supp. 3d 1321, 1325 (2017) ("[T]he statute contemplates situations in which

Commerce may need to rely upon data from more than one surrogate country in order to fulfill its

statutory obligation.").  Yinfeng closes its discussion on these other inputs by "ask[ing] the Court

---

[41] Concerning the labor input, Commerce acknowledged that the Malaysian data on record is more "specific to the POI and more specific to the wood products-making industry than the Brazilian 2019 labor data."  See Final SV Mem. at 2.  Similarly, for truck freight and brokerage & handling, Commerce found that the Malaysian data on record is more contemporaneous to the POI because it covers 2019 expense data, while the Brazilian data covers 2018 expense date.  Id. at 3.  Finally, for acrylic polymer, Commerce found that the Brazilian and Malaysian HTS subheadings were both specific to acrylic polymers in primary forms, but acknowledged that the Malaysian HTS offered a more detailed breakout for the specific type of primary acrylic polymer used by Yinfeng. Id. at 2.

[42] For instance, Yinfeng's argument that "Malaysia Sources the Best Available Information to Value Other Inputs" is included in the overarching section "The Department's Selection of Brazil as the Primary Surrogate Country is Not Supported by Substantial Evidence."  Pl.'s Br. at 29–32; see also Pl.'s Reply Br. at 13–15.  Moreover, when asked "if this court were to sustain Commerce's overall selection of Brazil as the primary surrogate country," whether "Commerce can and should still use Malaysian data to value certain inputs," Ct.'s Qs. for Oral Arg. at 2, Yinfeng did not enumerate these other inputs, see Pl.'s Oral Arg. Subm. at 1–2.  As such, the court concludes that any challenge that Yinfeng might have lodged against Commerce's individual selection of these other inputs is waived.  See JBF RAK LLC v. United States, 38 CIT __, __, 991 F.Supp.2d 1343, 1356 (2014) (citing United States v. Great Am. Ins. Co., 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived.")).

to remand for the Department to reconsider its primary surrogate country."   Pl.'s Br. at 32.

Accounting for the argument adequately lodged, the court finds that these other inputs -- but a few

of "many data considered"[43] -- are insufficient to undermine Commerce's totality-of-the-

circumstances selection of Brazil as the PSC.

## CONCLUSION

For the foregoing reasons, the court concludes that Commerce's selection of Brazil as the

PSC was supported by substantial evidence and otherwise in accordance with law.   Accordingly,

the court denies Plaintiff's Motion for Judgment on the Agency Record and sustains the agency's

<u>Final Determination</u>.

**SO ORDERED.**

/s/   <em>Gary S. Katzmann</em>
Gary S. Katzmann, Judge

Dated:   <u>December 21, 2022</u>
             New York, New York

---

[43] <u>See</u> Final SV Mem. at 2–3.